No. 23-1335

# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

CORDELL SANDERS,

*Plaintiff-Appellant*,

*v.*

ANDREA MOSS; STEPHAN LANTERMAN; KELLY HAAG; TODD NELSON;
LINDA DUCKWORTH; WEXFORD HEALTH SOURCES, INC.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Central District of Illinois in Case No. 1:16-cv-01366-JEH,
Before the Honorable Jonathan E. Hawley

## BRIEF FOR AMICI CURIAE
## TERRY KUPERS, CRAIG HANEY, AND PABLO STEWART
## IN SUPPORT OF PLAINTIFF-APPELLANT AND REVERSAL

MARISSA A. LALLI
NINA B. GARCIA
EMILY S. SUMMIT
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
marissa.lalli@wilmerhale.com
nina.garcia@wilmerhale.com
emily.summit@wilmerhale.com

May 31, 2024

**Save As**    **Clear Form**

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 23-1335

Short Caption: Cordell Sanders v. Andrea Moss, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Terry Kupers, Craig Haney, and Pablo Stewart

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Wilmer Cutler Pickering Hale and Dorr LLP

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

N/A

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Marissa A. Lalli    Date: May 29, 2024

Attorney's Printed Name: Marissa A. Lalli

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** ✓  **No** ☐

Address: Wilmer Cutler Pickering Hale and Dorr LLP, 60 State Street, Boston, MA 02109

Phone Number: 617-526-6301    Fax Number:

E-Mail Address: marissa.lalli@wilmerhale.com

rev. 12/19 AK

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-1335

Short Caption: Cordell Sanders v. Andrea Moss, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Terry Kupers, Craig Haney, and Pablo Stewart

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Wilmer Cutler Pickering Hale and Dorr LLP

(3)     If the party, amicus or intervenor is a corporation:

i)     Identify all its parent corporations, if any; and

N/A

ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Nina B. Garcia     Date: May 29, 2024

Attorney's Printed Name: Nina B. Garcia

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** [ ]    **No** [✓]

Address: Wilmer Cutler Pickering Hale and Dorr LLP, 60 State Street, Boston, MA 02109

Phone Number: 617-526-6446     Fax Number:

E-Mail Address: nina.garcia@wilmerhale.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-1335

Short Caption: Cordell Sanders v. Andrea Moss, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Terry Kupers, Craig Haney, and Pablo Stewart

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Wilmer Cutler Pickering Hale and Dorr LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: /s/ Emily S. Summit    Date: May 29, 2024

Attorney's Printed Name: Emily S. Summit

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐    **No** ☑

Address: Wilmer Cutler Pickering Hale and Dorr LLP, 60 State Street, Boston, MA 02109

Phone Number: 617-526-6281    Fax Number:

E-Mail Address: emily.summit@wilmerhale.com

rev. 12/19 AK

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................... ii

INTEREST OF THE AMICI CURIAE .................................................... 1

ARGUMENT ............................................................................................ 3

I.    SOLITARY CONFINEMENT DEPRIVES PRISONERS OF BASIC HUMAN NEEDS ................................................................................ 3

II.   SOLITARY CONFINEMENT CAUSES SEVERE, LONG-TERM PSYCHOLOGICAL AND PHYSICAL HARM TO PRISONERS ................. 13

III.  EXACERBATING HARMS ................................................................ 19

     A.    Long Periods In Solitary Confinement Result In Greater Harms ....................................................................................... 19

     B.    Mentally Ill Prisoners Are Especially Vulnerable To Harms Caused By Solitary Confinement ............................................. 21

     C.    Young Prisoners Are Especially Vulnerable To Harms Caused By Solitary Confinement ............................................. 25

CONCLUSION ....................................................................................... 31

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Sanders v. Melvin*, 25 F.4th 475 (7th Cir. 2022) ..............................................3, 4, 22

## DOCKETED CASES

*Ashker v. Brown*, No. 09-CV-05796 (N.D. Cal. 2015)...........................................14

## RULES

Federal Rule of Appellate Procedure 29(a)(4)(E).....................................................2

## OTHER AUTHORITIES

ACLU, *Growing Up Locked Down: Youth in Solitary Confinement in
    Jails and Prisons Across the United States* (Oct. 9, 2012),
    https://www.aclu.org/publications/growing-locked-down-
    youth-solitary-confinement-jails-and-prisons-across-united-
    states......................................................................................................3, 28, 29

Arain, Mariam, et al., *Maturation of the Adolescent Brain*, 2013
    Neuropsychiatric Disease & Treatment 449 (Apr. 3, 2013),
    https://www.dovepress.com/getfile.php?fileID=15666 ......................3, 26, 27

Arrigo, Bruce A. & Jennifer Leslie Bullock, *The Psychological Effects
    of Solitary Confinement on Prisoners in Supermax Units:
    Reviewing What We Know and Recommending What Should
    Change*, 52 Int. J. Offender Ther. Comp. Criminol. 622 (2008)...................19

Bennion, Elizabeth, *Banning the Bing: Why Extreme Solitary
    Confinement is Cruel and Far Too Usual Punishment*, 90 Ind.
    L.J. 741 (2015)................................................................................................9

Blanco-Suarez, Elena, *The Effects of Solitary Confinement on the
    Brain*, Psychology Today (Feb. 27, 2019) ....................................8, 18, 20, 21

Brinkley-Rubinstein, Lauren, et al., *Association of Restrictive
    Housing During Incarceration with Mortality After Release*,
    2 JAMA Network Open e1912516 (Oct. 2019) ...............................17, 18, 20

Cacioppo, Stephanie, et al., *Toward a Neurology of Loneliness*, 140 Psych. Bull. 1464 (2014) .................................................................8

Correctional Ass'n of New York, *Lockdown New York: Disciplinary Confinement in New York State Prisons* (Oct. 2003), https://www.prisonpolicy.org/scans/lockdown-new-york-1.pdf ........................11, 13

DeVeaux, Mika'il, *The Trauma of the Incarceration Experience*, 48 Harv. C.R.-C.L. L. Rev. 257 (2013) ........................................................10, 12

Eiland, Lisa & Russell D. Romeo, *Stress and the Developing Adolescent Brain*, 249 Neuroscience 162 (Sept. 26, 2013), https://www.ibroneuroscience.org/article/S0306-4522(12)01072-X/abstract .................................................................26

Eisenberger, Naomi I., *The Pain of Social Disconnection: Examining the Shared Neural Underpinnings of Physical and Social Pain*, 13 Nature Revs. Neuroscience 421 (2012) ......................................................7

Eisenberger, Naomi I., *Social Pain and the Brain: Controversies, Questions, and Where to Go from Here*, 66 Ann. Rev. Psychol. 601 (2015) ..............................................................................7

Eisenberger, Naomi I. & Matthew D. Lieberman, *Why Rejection Hurts: A Common Neural Alarm System for Physical and Social Pain*, 8 Trends Cognitive Sci. 294 (2004) ............................................7

Eisenberger, Naomi I., et al., *Does Rejection Hurt? An fMRI Study of Social Exclusion*, 302 Science 290 (2003) ........................................7

Elovainio, Marko, et al., *Contribution of Risk Factors to Excess Mortality in Isolated and Lonely Individuals: An Analysis of Data from the UK Biobank Cohort Study*, 2 Lancet Pub. Health e260 (2017) .......................................................................9

Fellner, Jamie, *A Corrections Quandary: Mental Illness and Prison Rules*, 41 Harv. C.R.-C.L. L. Rev. 391 (2006) ................................24

Friedler, Brett, et al., *One Is the Deadliest Number: The Detrimental Effects of Social Isolation on Cerebrovascular Diseases and Cognition*, 129 Acta Neuropathology 493 (2015) ..........................9

Gawande, Atul, *Hellhole*, The New Yorker (Mar. 30, 2009),
http://www.newyorker.com/magazine/2009/03/30/hellhole ................13, 16

Gilmour, Andrew, *The Nelson Mandela Rules: Protecting the Rights
of Persons Deprived of Liberty*, UN Chronicle, United Nations,
https://www.un.org/en/un-chronicle/nelson-mandela-rules-
protecting-rights-persons-deprived-liberty (visited May 31,
2024) ...............................................................................................20

Gonnerman, Jennifer, *Before the Law*, The New Yorker (Sept. 29,
2014) .............................................................................................29, 30

Gonnerman, Jennifer, *Kalief Browder Learned How to Commit
Suicide On Rikers*, The New Yorker (June 2, 2016) ....................................30

Grassian, Stuart & Terry Kupers, *The Colorado Study vs. The Reality
of Supermax Confinement*, Correctional Mental Health Rep.
(May/June 2011) ...............................................................................22

Grassian, Stuart, *Psychiatric Effects of Solitary Confinement*,
22 Wash. U. J.L. & Pol'y 325 (2006) ...................................13, 15, 16, 17, 19

Grassian, Stuart, *Psychopathological Effects of Solitary Confinement*,
140 Am. J. Psychiatry 1450 (1983) .........................................................15, 23

Hafemeister, Thomas & Jeff George, *The Ninth Circle of Hell: An
Eighth Amendment Analysis of Imposing Prolonged Supermax
Solitary Confinement on Inmates with a Mental Illness*,
90 Denv. U. L. Rev. 1 (2012) ...............................................................12, 21

Haney, Craig, *Solitary Confinement, Loneliness, and Psychological
Harm*, in *Solitary Confinement: Effects, Practices, and
Pathways toward Reform* 129 (Jules Lobel & Peter Scharff
Smith eds. 2020) ...............................................................................9

Haney, Craig, *Restricting the Use of Solitary Confinement*, 1 Annual
Rev. Criminology 285 (2018) ...................................................................14

Haney, Craig, *Mental Health Issues in Long-Term Solitary and
"Supermax" Confinement*, 49 Crime & Delinq. 124
(2003) ............................................................... 10, 15, 16, 17, 19, 21, 24

Haney, Craig, *The Science of Solitary: Expanding the Harmfulness Narrative*, 115 N.W. U. L. Rev. 211 (2020)　7, 8, 9, 10, 11, 12, 13, 14, 16, 17

Haney, Craig & Mona Lynch, *Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement*, 23 N.Y.U. Rev. L. & Soc. Change 477 (1997).............................6, 23

Hawkley, Louise & John T. Cacioppo, *Loneliness Matters: A Theoretical and Empirical Review of Consequences and Mechanisms*, 40 Annals Behav. Med. 218 (2010) .........................................9

Human Rights Watch, *Mental Illness, Human Rights, and US Prisons* (Sept. 22, 2009), https://www.hrw.org/news/2009/09/22/ mental-illness-human-rights-and-us-prisons .................................24

James, Kayla & Elena Vanko, *The Impacts of Solitary Confinement*, Vera Institute of Justice (2021) ...............................8, 10, 11, 17, 18

Kaba, Fatos, et al., *Solitary Confinement and Risk of Self-Harm Among Jail Inmates*, 104 Am. J. Pub. Health 442 (2013)............................25

Koffler, Jacob, *What 43 Years of Solitary Confinement Does to the Mind*, Time (June 9, 2015) ...........................................................10

Konrad, Kerstin, et al., *Brain Development During Adolescence: Neuroscientific Insights into This Developmental Period*, 110 Deutsches Arzteblatt International 425 (2013) .....................................26

Kupers, Terry A., *Isolated Confinement: Effective Method for Behavior Change or Punishment for Punishment's Sake?*, in *The Routledge Handbook For International Crime and Justice Studies* 213 (Bruce A. Arrigo & Heather Y. Bersot eds., 2014) .............10, 12

Kupers, Terry A., *The Cell-Front Interview*, 23 Correctional Mental Health Report 77 (Spring 2022), https://www.researchgate.net/ publication/362159963_The_Cell-Front_Interview.....................................25

Kupers, Terry A., *Repetitive Self-Harm in Solitary Confinement*, 24 Correctional Health Report 3 (Summer 2023) .........................................24

Leary, Mark R., et al., *Calibrating the Sociometer: The Relationship Between Interpersonal Appraisals and State Self-Esteem*, 74 J. Personality & Soc. Psychol. 1290 (1998).....................................7

Leary, Mark R., et al., *The Role of Low Self-Esteem in Emotional and Behavioral Problems: Why Is Low Self-Esteem Dysfunctional?*, 14 J. Soc. & Clinical Psychol. 297 (1995) .......................................................7

Lieberman, Matthew D., *Social: Why Our Brains Are Wired to Connect* (2013) .......................................................7

Lobel, Jules & Huda Akil, *Law & Neuroscience: The Case of Solitary Confinement*, 147 Daedalus 61 (2018) .................................................8, 18, 21

Lovell, David, et al., *Who Lives in Super-Maximum Custody? A Washington State Study*, 64 Fed. Prob. 33 (2000)........................................21

Marcus, Andrea Fleisch, et al., *Relationships Between Social Isolation, Neighborhood Poverty, and Cancer Mortality in a Population-Based Study of US Adults*, Plos One (Mar. 8, 2017)...................9

Margulis, Stephen T., *Privacy as a Social Issue and Behavioral Concept*, 59 J. Soc. Issues 243 (2003).............................................12

Mathias, Christopher, *Here's Kalief Browder's Heartbreaking Research Paper On Solitary Confinement*, Huffington Post (June 23, 2015), https://www.huffpost.com/entry/kalief-browder-solitary-confinement-research-paper_n_7646492 .........................30

Maule, Alicia & Yili Liu, *Remembering Kalief Browder a Year After his Suicide and Why Rikers Island Should be Shut Down*, The Innocence Project (July 1, 2016), https://innocenceproject.org/remembering-kalief-browder-year-suicide-rikers-island-shutdown/..............................................................................30

Meyer, Meghan L., et al., *Why Social Pain Can Live On: Different Neural Mechanisms Are Associated with Reliving Social and Physical Pain*, Plos One (June 10, 2015) .......................................................7

O'Grady, Siobhan, *How Did Nelson Mandela Survive 27 Years in Prison? A New Collection of Letters Sheds Light*, Wash. Post (July 18, 2018)..............................................................................20

Orben, Amy, et al., *The Effects of Social Deprivation on Adolescent Development and Mental Health*, 4 Lancet Child Adolescent Health 634 (2020) ..............................................................25, 27

Packheiser, Julian, et al., *A Systematic Review and Multivariate Meta-Analysis of the Physical and Mental Health Benefits of Touch Interventions*, Nature Human Behaviors (Apr. 8. 2024) ..............................11

Pantell, Matthew, et al., *Social Isolation: A Predictor of Mortality Comparable to Traditional Clinical Risk Factors*, 103 Am. J. Pub. Health 2056 (2013)..................................................................................9

Patterson, Raymond F. & Kerry Hughes, *Review of Completed Suicides in the California Department of Corrections and Rehabilitation, 1999 to 2004*, 59 Psychiatric Services 676 (2008)...................................................................................................23, 25

Pullen-Blasnik, Hannah, *The Population Prevalence of Solitary Confinement*, 7 Sci. Adv. 1 (2021) ..........................................................19, 20

Schaeffer, Carol, *"Isolation Devastates the Brain": The Neuroscience of Solitary Confinement*, Solitary Watch (May 11, 2016)............................19

Scott, G.D. & Paul Gendreau, *Psychiatric Implications of Sensory Deprivation in a Maximum Security Prison*, 14 Can. Psychiatric Ass'n J. 337 (1969) .........................................................................11

Simkins, Sandra, et al., *The Harmful Use of Isolation in Juvenile Facilities:  The Need for Post-Disposition Representation*, 38 Wash. U. J. Law & Policy 241 (2012) ...............................................28, 29

Smith, Dana G., *Neuroscientists Make a Case Against Solitary Confinement*, Scientific American (Nov. 9, 2018).......................................19

Smith, Peter Scharff, *The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature*, 34 Crime & Just. 441 (2006) ...................................................3, 14, 15, 16, 19

Tanskanen, Jussi & Timo Anttila, *A Prospective Study of Social Isolation, Loneliness, and Mortality in Finland*, 106 Am. J. Pub. Health 2042 (2016)..................................................................................9

Tottenham, Nim & Adriana Galvan, *Stress and the Adolescent Brain: Amygdala-Prefrontal Cortex Circuitry and Ventral Striatum as Developmental Targets*, 70 Neuroscience and Biobehavioral Reviews 217 (Nov. 2016), https://www.sciencedirect.com/ science/article/abs/pii/S0149763416300811 ...........................................26, 27

Wynn, Jennifer R. & Alisa Szatrowski, *Hidden Prisons: Twenty-Three-House Lockdown Units in New York State Correctional Facilities*, 24 Pace L. Rev. 497 (2004)...........................................................22

## INTEREST OF THE AMICI CURIAE

Amici Curiae are professors and practitioners of psychiatry and psychology with extensive experience studying the psychological and physiological effects of imprisonment and/or treating individuals who are in penal confinement, including solitary confinement. Based on their research and assessment of the professional literature, amici curiae have concluded that any amount of solitary confinement which deprives a prisoner of two basic human needs—social contact and adequate positive environmental stimulation—can cause grave damage to that prisoner's mental and physical health. The damage can be exacerbated when the prisoner is a juvenile or an adolescent. Indeed, this damage has long been recognized by experts and society at large.

Amici curiae are the following:

Terry A. Kupers, M.D., M.S.P., is a Distinguished Life Fellow of The American Psychiatric Association and Professor Emeritus at the Wright Institute. Dr. Kupers has provided expert testimony in several lawsuits about prison conditions and published books and articles on related subjects.

Craig Haney, Ph.D., J.D., is a Distinguished Professor of Psychology and served as UC Presidential Chair at the University of California, Santa Cruz. One of the principal researchers in the "Stanford Prison Experiment," Dr. Haney has toured and inspected numerous solitary confinement units, interviewed hundreds of

prisoners about their experiences there, and has written extensively about the psychological effects of prison isolation.

Pablo Stewart, M.D., is a Clinical Professor of Psychiatry at the John A. Burns School of Medicine at the University of Hawaii.  Dr. Stewart has worked in the criminal justice system for decades and as a court-appointed expert on the effects of solitary confinement for over twenty-five years.

The amici curiae state, pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), that no counsel for a party authored this brief in whole or in part, though this brief expresses views that the amici curiae have expressed previously in other cases.  No counsel for a party authored any part of this brief; no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person other than amici curiae, their members, or their counsel contributed money intended to fund preparing or submitting this brief.

## ARGUMENT

Psychologists and psychiatrists agree that solitary confinement can have disastrous psychological and physical consequences for prisoners who are confined to a small cell without meaningful social interaction or positive environmental stimulation.[1]  The dangerous effects of solitary confinement are particularly grievous for prisoners like Appellant Cordell Sanders, who are juveniles or adolescents[2] when subjected to solitary confinement, and suffer from mental illnesses.

## I.    SOLITARY CONFINEMENT DEPRIVES PRISONERS OF BASIC HUMAN NEEDS

Mr. Sanders was incarcerated in 2004, when he was just sixteen years old. At the time, he had already been diagnosed with intermittent explosive disorder, an impulse control disorder, and a depressive disorder.[3]  In the years since then, he

---

[1] *See, e.g.*, Smith, *The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature*, 34 Crime & Just. 441, 443, 487 (2006).

[2] The term "adolescents" hereinafter refers to individuals ages 10 through 24.  *See* Arain et al., *Maturation of the Adolescent Brain*, 2013 Neuropsychiatric Disease & Treatment 449, 450 (Apr. 3, 2013), https://www.dovepress.com/getfile.php?fileID=15666.  The term "juveniles" hereinafter refers to individuals under the age of 18.  *See* ACLU, *Growing Up Locked Down:  Youth in Solitary Confinement in Jails and Prisons Across the United States*, at 1, 3-4 & n.1 (Oct. 2012), https://www.aclu.org/publications/growing-locked-down-youth-solitary-confinement-jails-and-prisons-across-united-states.

[3] *Sanders v. Melvin*, 25 F.4th 475, 478 (7th Cir. 2022).

has been further diagnosed with posttraumatic stress disorder ("PTSD") and
schizoaffective disorder.[4]

Mr. Sanders spent the first several years of his incarceration, from 2004 to
2009, in Stateville Correctional Facility, where he spent significant periods of time
in solitary confinement.[5]  In 2009, when Mr. Sanders was 22, he was transferred to
Pontiac Correctional Facility, where he spent the next ***eight consecutive years***—
and the remaining years of his adolescence—in solitary confinement.[6]

The conditions of Mr. Sanders' solitary confinement were particularly
harsh.[7]  His cell was approximately 50 square feet, about half the size of an
average single garage.[8]  There was a window across from the cell, but it was
frosted, and difficult to see through.[9]  For much of Mr. Sanders's time in solitary,

---

[4] Pl.'s Opp. Defs.' Mot. Summ. J., Dist. Ct. Dkt. 202, Part E ("Pl.'s Additional
Material Facts") at 62 (¶ 4); *Sanders v. Melvin*, 25 F.4th at 478.

[5] Appellant Br. Appx. (Grassian Expert Rep.) at 29; *see also* Case No. 1:16-cv-
01366-JEH, Dkt No. 184, Ex. 6, Disciplinary Record (showing that Mr. Sanders
was sentenced to several periods of segregation between 2005 and 2009 ranging
from 2 to 6 months).

[6] Order on Wexford Defendants' Mot. Summ. J., Dist. Ct. Dkt. 243 at 3, 5 (noting
that Mr. Sanders was placed in segregation in April 2009 for over eight years and
remained in his cell for twenty-two to twenty-four hours each day); Pl.'s
Additional Material Facts at 63 (¶ 6) (noting that Mr. Sanders was first placed in
solitary confinement at the age of twenty-two).

[7] Pl.'s Additional Material Facts at 64 (¶ 9).

[8] Appellant Br. Appx. (Grassian Expert Rep.) at 30.

[9] *See id.*

his cell had limited ventilation; in the hopes of catching any air that might enter, Mr. Sanders would place his face flat on the ground by the door.[10]  He lacked access to any cleaning materials, causing the cell to become filthy.[11]  The cell was freezing during the winter and excessively hot during the summer.[12]  For at least five of his eight years in solitary confinement, Mr. Sanders was allowed out of his cell for outdoor exercise a maximum of once a month only, and for just one hour.[13]  During the other three years of his solitary confinement, Mr. Sanders was allowed to leave his cell just twice a week, for two and a half hours each.[14]  He was forbidden from phone or video calls with family.[15]  Until 2016, any psychiatric treatment Mr. Sanders received was limited, and "*sui generis*, not reflecting any sense of continuity, of actually reviewing prior records, and considering what came before."[16]  In 2016, due to the settlement of a class action litigation, mental health

---

[10] *See id.*; *see also* Pl.'s Additional Material Facts at 68 (¶ 21).

[11] Appellant Br. Appx. (Grassian Expert Rep.) at 31.

[12] Pl.'s Additional Material Facts at 68-69 (¶ 25); Appellant Br. Appx. (Grassian Expert Rep.) at 31.

[13] Pl.'s Additional Material Facts at 70 (¶ 30); Appellant Br. Appx. (Grassian Expert Rep.) at 31.

[14] Pl.'s Additional Material Facts at 69 (¶ 27); Appellant Br. Appx. (Grassian Expert Rep.) at 31.

[15] Pl.'s Additional Material Facts at 72 (¶¶ 41-42); Appellant Br. Appx. (Grassian Expert Rep.) at 31-32.

[16] *See* Appellant Br. Appx. (Grassian Expert Rep.) at 39.

staff began to make regular rounds, and group counseling meetings were set up for one hour each week.[17]  But on average, his individual sessions with mental health staff were approximately one minute long.[18]  The group counseling sessions were painful and uncomfortable, as Mr. Sanders was shackled by handcuffs and waist chains and secured to a bench against a wall throughout.[19]

These extremely harsh conditions had lasting effects on Mr. Sanders. Although his mental state has improved since his release from solitary confinement, he continues to be depressed and anxious.[20]  He remains paranoid, and cannot sustain ordinary levels of stimulation, including social stimulation.[21] He continues to be retraumatized by memories and invasive thoughts of his time in solitary confinement due to his ongoing PTSD.[22]

Mr. Sanders's experience was consistent with an overwhelming body of scientific research that establishes the ways that solitary confinement conditions deprive prisoners of fundamental human needs and have lasting, detrimental

---

[17] Pl.'s Additional Material Facts at 66 (¶ 16), 101-102 (¶ 130); Appellant Br. Appx. (Grassian Expert Rep.) at 32-33.

[18] *See* Pl.'s Additional Material Facts at 66 (¶ 16).

[19] *See id.*

[20] Appellant Br. Appx. (Grassian Expert Rep.) at 41.

[21] *See id.*

[22] *See id.*

effects.[23]  **First**, the essence of solitary confinement is social isolation and exclusion—the involuntary deprivation of meaningful social contact and intentional exclusion from others.  In combination, social isolation and exclusion damages self-esteem,[24] and they predictably lead to depression, anxiety, emotional numbness, and lethargy.[25]  They deprive individuals of the social grounding that helps anchor them to socially appropriate thoughts and behaviors[26] and can lead to violence and aggression.[27]  They also cause "social pain," a phenomenon that is observable in neural circuity within the brain and is long remembered by those who experience it.[28]

---

[23] *See* Haney & Lynch, *Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement*, 23 N.Y.U. Rev. L. & Soc. Change 477, 504-507 (1997).

[24] *See, e.g.*, Leary et al., *Calibrating the Sociometer: The Relationship Between Interpersonal Appraisals and State Self-Esteem*, 74 J. Personality & Soc. Psychol. 1290, 1297-1298 (1998); Leary et al., *The Role of Low Self-Esteem in Emotional and Behavioral Problems: Why Is Low Self-Esteem Dysfunctional?*, 14 J. Soc. & Clinical Psychol. 297, 307 (1995).

[25] *See* Haney, *The Science of Solitary: Expanding the Harmfulness Narrative*, 115 N.W. U. L. Rev. 211, 233 (2020).

[26] *Id.*

[27] *Id.*

[28] *Id.* at 224 & n.39 (citing Eisenberger, *The Pain of Social Disconnection: Examining the Shared Neural Underpinnings of Physical and Social Pain*, 13 Nature Revs. Neuroscience 421, 421 (2012); Eisenberger, *Social Pain and the Brain: Controversies, Questions, and Where to Go from Here*, 66 Ann. Rev. Psychol. 601, 621 (2015); Eisenberger et al., *Does Rejection Hurt? An fMRI Study of Social Exclusion*, 302 Science 290 (2003); Eisenberger & Lieberman, *Why Rejection Hurts: A Common Neural Alarm System for Physical and Social Pain*, 8

The physical impact of social isolation and exclusion has been well-documented in experimental animal studies, which have shown the impact of such isolation on "brain structure and processes in adult social animals."[29]  Specifically, when mice—which have similar neuroanatomy to humans—are subjected to isolation, their brains undergo dramatic changes:  they lose neurons (nerve cells); their remaining neurons reduce in size; the number of connections between remaining neurons is reduced; and their brains lose blood vessels.[30]  These chemical and physical changes can "precipitate depression-like" and "anxiety-like" behavior in experimental subjects, "suppress the animal immune response to illness," "impair[] their working memory," and "disrupt[] brain activity."[31]  The effects are particularly grievous for juveniles (i.e., individuals who are under 18) and adolescents (i.e., individuals who are ages 10-24) whose brain structures and

---

Trends Cognitive Sci. 294, 294 (2004); Meyer et al., *Why Social Pain Can Live On: Different Neural Mechanisms Are Associated with Reliving Social and Physical Pain*, Plos One (June 10, 2015)); Lieberman, *Social: Why Our Brains Are Wired to Connect* 4-5 (2013) (human "brains evolved to experience threats to our social connections in much the same way they experience physical pain").

[29] Cacioppo et al., *Toward a Neurology of Loneliness*, 140 Psych. Bull. 1464, 1496 (2014).

[30] James & Vanko, *The Impacts of Solitary Confinement*, Vera Institute of Justice 203 (2021) (citing Lobel & Akil, *Law & Neuroscience: The Case of Solitary Confinement*, 147 Daedalus, J. Am. Acad. Arts & Scis. 61 (2018); Blanco-Suarez, *The Effects of Solitary Confinement on the Brain*, Psychology Today (Feb. 27, 2019)).

[31] Haney, 115 N.W. U. L. Rev. at 225.

functions are still developing, and are thus more vulnerable to disruptions, as discussed in greater detail in Section III.C, *supra* at 25.  Apart from brain health, social isolation and exclusion have also been shown to damage the human immune system and is correlated to increased mortality rates.[32]

**Second**, solitary confinement units in the United States prison system typically deprive prisoners of positive mental stimulation.  Cells are normally "no more than between sixty to eighty square feet in dimension—about the size of a king-sized bed or parking space."[33]  They are often constructed of concrete, cinderblock, and metal fencing; they frequently lack access to or view of natural

---

[32] *See* Elovainio et al, *Contribution of Risk Factors to Excess Mortality in Isolated and Lonely Individuals: An Analysis of Data from the UK Biobank Cohort Study*, 2 Lancet Pub. Health e260 (2017); Friedler et al., *One Is the Deadliest Number: The Detrimental Effects of Social Isolation on Cerebrovascular Diseases and Cognition*, 129 Acta Neuropathology 493 (2015); Hawkley & Cacioppo, *Loneliness Matters: A Theoretical and Empirical Review of Consequences and Mechanisms*, 40 Annals Behav. Med. 218, 219 (2010); Pantell et al., *Social Isolation: A Predictor of Mortality Comparable to Traditional Clinical Risk Factors*, 103 Am. J. Pub. Health 2056 (2013); Tanskanen & Anttila, *A Prospective Study of Social Isolation, Loneliness, and Mortality in Finland*, 106 Am. J. Pub. Health 2042 (2016); Marcus et al., *Relationships Between Social Isolation, Neighborhood Poverty, and Cancer Mortality in a Population-Based Study of US Adults*, Plos One (Mar. 8, 2017).

[33] Haney, *Solitary Confinement, Loneliness, and Psychological Harm*, in *Solitary Confinement: Effects, Practices, and Pathways Toward Reform* 129 (Lobel & Smith eds., 2020).

surroundings or natural light.[34]  Prisoners "eat, sleep, and defecate in spaces within a few feet of each other."[35]

Prisoners in solitary confinement are usually forced to endure long periods of idleness because "[f]ew[,] if any[,] rehabilitation or education programs exist" for them.[36]  They are often prohibited from possessing books, watching television, or listening to the radio, limitations that further deprive them of mental stimulation and a way to distract themselves and pass the time.[37]  When prisoners are afforded limited recreational time, it is typically also spent alone "in caged-in or cement-walled areas that are so constraining they are often referred to as 'dog runs.'"[38]  These brief periods in which segregated prisoners are allowed outside their cells do not provide opportunities for meaningful human contact or positive environmental exposure.

---

[34] Haney, 115 N.W. U. L. Rev. at 237.

[35] Bennion, *Banning the Bing: Why Extreme Solitary Confinement is Cruel and Far Too Usual Punishment*, 90 Ind. L.J. 741, 743, 751 (2015).

[36] Kupers, *Isolated Confinement: Effective Method for Behavior Change or Punishment for Punishment's Sake?*, in *The Routledge Handbook For International Crime and Justice Studies* 213, 213 (Arrigo & Bersot eds., 2014).

[37] Koffler, *What 43 Years of Solitary Confinement Does to the Mind*, Time (June 9, 2015); *see also* DeVeaux, *The Trauma of the Incarceration Experience*, 48 Harv. C.R.-C.L. L. Rev. 257, 273 (2013) (describing prisoners' efforts to "counter the idleness, lack of programs, and dearth of anything to read" during the author's time in solitary confinement).

[38] Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, 49 Crime & Delinq. 124, 126 (2003).

Segregated prisoners are also rarely allowed contact visits (in which they are allowed to touch their visitors) and are generally not allowed to participate in group activities.[39]  Carceral facilities with solitary confinement units are often in remote locations, making it difficult for the loved ones of segregated prisoners to visit them.  Many segregated prisoners are not allowed phone calls or are allotted very short periods of time on the phone.[40]  When rare in-person visits do occur, they are generally "non-contact" — only permitted through glass partitions and over phones.[41]  Yet research has established physical touch as an identifiable human need; it provides important social and psychological benefits and its deprivation incurs considerable negative effects.[42]  Depriving prisoners in solitary

---

[39] James & Vanko, *supra* note 30; Haney, 115 N.W. U. L. Rev. at 238, 252.

[40] James & Vanko, *supra* note 30; Haney, 115 N.W. U. L. Rev. at 238, 252.

[41] James & Vanko, *supra* note 30; Corr. Ass'n of N.Y., *Lockdown New York: Disciplinary Confinement in New York State Prisons* 7 (Oct. 2003), https://www.prisonpolicy.org/scans/lockdown-new-york-1.pdf ("Visits are conducted behind Plexiglas or mesh-wire barriers and limited to one visit a week. …  Some inmates remain handcuffed throughout their visits (thus, they cannot embrace or hold hands with their visitors")).

[42] Haney, 115 N.W. U. L. Rev. at 234-235.  Research has also demonstrated the opposite effect: touch therapy interventions have beneficial effects on mental and physical health.  *See also* Packheiser et al., *A Systematic Review and Multivariate Meta-Analysis of the Physical and Mental Health Benefits of Touch Interventions*, Nature Human Behaviors at 7 (Apr. 8. 2024).

confinement of access to positive environmental stimulation as well as close,

caring human touch can undermine cognitive functioning and overall well-being.[43]

 ***Third***, at the same time that solitary confinement deprives prisoners of

positive environmental stimulation, it overexposes them to *negative* stimuli,

including the shouting of officers and other prisoners, banging of heavy doors,

pounding on walls, foul smells, and the constant glare of artificial lights.[44]

Exposure to uncontrollable negative conditions causes many prisoners to suffer

from chronic sleeplessness, which "intensifies psychiatric symptoms … and

magnifies cognitive problems, memory deficits, confusion, anxiety, and

sluggishness."[45]

 Further, prisoners housed in solitary confinement are exposed to near-

constant and uncontrollable forms of surveillance, undermining the human need for

at least limited access to privacy.[46]  Their entire living areas are always visible and

accessible to prison personnel.  Some prisoners are even placed in "stripped cells"

---

[43] *See, e.g.*, Scott & Gendreau, *Psychiatric Implications of Sensory Deprivation in a Maximum Security Prison*, 14 Can. Psychiatric Ass'n J. 337, 339 (1969).

[44] Hafemeister & George, *The Ninth Circle of Hell: An Eighth Amendment Analysis of Imposing Prolonged Supermax Solitary Confinement on Inmates with a Mental Illness*, 90 Denv. U. L. Rev. 1, 39 n.217 (2012); Haney, 115 N.W. U. L. Rev. at 238.

[45] Kupers, *supra* note 36, at 216.

[46] Margulis, *Privacy as a Social Issue and Behavioral Concept*, 59 J. Soc. Issues 243, 246 (2003).

which contain nothing more than a mattress and a blanket.[47]  Even when prisoners

are permitted to exit their cells for short periods of time to exercise or engage in

no-contact visits, they remain under surveillance.[48]  They are often required to

wear handcuffs, a waist chain and sometimes leg irons when removed from their

cells.[49]  Thus, in addition to suffering the severe effects of social isolation and

exclusion, many persons housed in solitary confinement experience the adverse

effects of "hypervigilance"—the elevated state of constantly assessing threats

around you—due to the extreme lack of privacy.[50]

## II.  SOLITARY CONFINEMENT CAUSES SEVERE, LONG-TERM PSYCHOLOGICAL AND PHYSICAL HARM TO PRISONERS

Extreme social isolation and the deprivation of positive environmental

stimulation inflicts severe—and potentially fatal—psychological and physiological

harms on prisoners.  Prisoners begin to feel the impact of these harms almost

immediately, often within days or weeks of confinement.  When deprived of social

interaction and environmental stimulation, people "soon become incapable of

maintaining an adequate state of alertness and attention," and within days their

brain scans may show "abnormal pattern[s] characteristic of stupor and

---

[47] DeVeaux, 48 Harv. C.R.-C.L. L. Rev. at 272.

[48] Haney, 115 N.W. U. L. Rev. at 240.

[49] Corr. Ass'n of N.Y., *supra* note 41, at 7.

[50] Haney, 115 N.W. U. L. Rev. at 240.

delirium."[51]  The harmful effects of solitary confinement are much more severe

than the effects of imprisonment in the general prison population.[52]  For example,

research comparing prisoners in California's Pelican Bay State Prison found that,

although prisoners in the general population were suffering and in distress, inmates

subjected to social isolation and exclusion in solitary confinement were "in

significantly more pain, were more traumatized and stressed, and manifested more

isolation-related pathological reactions."[53]  They also suffered isolation-related

symptoms with more than twice the frequency as compared to prisoners who were

not isolated.[54]  Other studies have shown that PTSD, depression, emotional

numbing, anxiety, and hypervigilance are as much as ten times more common

---

[51] Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J.L. & Pol'y 325, 330-331 (2006).  Terry Anderson, a journalist held hostage in Lebanon for seven years, reported that after just weeks in solitary confinement, his mind went "dead": "There [was] nothing there, just a formless, gray-black misery."  *See* Gawande, *Hellhole*, The New Yorker, Mar. 30, 2009, http://www.newyorker.com/ magazine/2009/03/30/hellhole.

[52] *See* Smith, 34 Crime & Just. at 477 (noting that in studies "those in solitary confinement suffered significantly more both physically and psychologically than the prisoners in the [non-isolated] control group").

[53] Redacted Expert Report of Craig Haney at 81-82, *Ashker v. Brown*, No. 09-CV-05796 (N.D. Cal. 2015); *see also*, Haney, *Restricting the Use of Solitary Confinement*, 1 Annual Rev. Criminology 285-310 (2018).

[54] Haney, 115 N.W. U. L. Rev. at 247-248.

among prisoners in solitary confinement than among prisoners in the general population.[55]

Experts have described the harms of solitary confinement as including cognitive dysfunction, stimuli hypersensitivity, insomnia, memory loss, lethargy, severe depression, anxiety, paranoia, panic, hallucinations, rage, and withdrawal.[56] In a 1983 study of fourteen prisoners held in solitary confinement at Massachusetts Correctional Institution Walpole ("MCI Walpole") (now MCI Cedar Junction), eleven of the subjects reported hypersensitivity to external stimuli such as noise and smells.[57] Half of the subjects suffered from visual or auditory hallucinations, and more than half reported an inability to concentrate, disorientation, and memory failures.[58]

These harmful effects may manifest long after prisoners are released from isolation. Solitary confinement can have a long-term impact on prisoners' thinking, emotions, conduct, and personalities—potentially rendering them permanently ill-suited to life outside solitary confinement, let alone life outside

---

[55] *Id.* at 244 & n.123.

[56] *See* Haney, 49 Crime & Delinq. at 130-131, 134-135 (collecting studies); Grassian, 22 Wash. U. J.L. & Pol'y at 335-337; Smith, 34 Crime & Just. at 492.

[57] Grassian, *Psychopathological Effects of Solitary Confinement*, 140 Am. J. Psychiatry 1450, 1452 (1983).

[58] *Id.* at 1452-1453.

prison.[59]  In solitary confinement, prison staff tightly control nearly every aspect of a prisoner's existence.  As a result, after release from solitary confinement, prisoners may "become uncomfortable with even small amounts of freedom."[60] Many find it challenging to re-establish normalcy in their lives and struggle with returning to ordinary sleeping and eating patterns, or moving beyond the mental "fog" often caused by solitary confinement.[61]  These effects have been documented by studies showing that individuals who were subjected to solitary confinement experience higher rates of adjustment problems following release than those housed in general population.[62]

The limited opportunities for meaningful social interaction while in solitary confinement create a brutal paradox: "[A]s starved as people become for companionship, the experience typically leaves them unfit for social interaction."[63] For example, after release from solitary confinement, prisoners can find it difficult to engage in face-to-face conversation or handle crowded spaces and may feel

---

[59] Grassian, 22 Wash. U. J.L. & Pol'y at 354 (finding that individuals incarcerated in solitary confinement for several years "had become strikingly socially impoverished and experienced intense irritation with social interaction, patterns dramatically different from their functioning prior to solitary confinement.").

[60] Haney, 49 Crime & Delinq. at 139.

[61] Gawande, *supra* note 51; Grassian, 22 Wash. U. J.L. & Pol'y at 331.

[62] Haney, 115 N.W. U. L. Rev. at 252.

[63] Gawande, *supra* note 51.

generally unable to lead non-solitary lives.[64]  The common prohibition of contact

visits and the difficulty of visiting inmates in solitary confinement often prevents

isolated individuals from maintaining strong relationships on the outside that could

help them re-integrate and adapt upon release.[65]  Moreover, as discussed in greater

detail below, prisoners' inability to acclimate to life outside of solitary

confinement becomes more entrenched as the duration of that confinement

increases.[66]  These harmful effects may escape the attention of prison mental health

staff, but can remain latent even if a prisoner does not overtly exhibit

psychological trauma while in solitary confinement.[67]

For example, a study published in 2019 analyzed outcomes for a cohort of

229,274 individuals who were incarcerated in the North Carolina prison system

between January 2000 and December 2016 ("the North Carolina study").[68]  The

study revealed that, as compared to individuals who were never subjected to

---

[64] *Id.*; Smith, 34 Crime & Just. at 484.

[65] Haney, 115 N.W. U. L. Rev. at 252; James & Vanko, *supra* note 30.

[66] Haney, 49 Crime & Delinq. at 138-141.

[67] Grassian, 22 Wash. U. J.L. & Pol'y at 332-333; Haney, 49 Crime & Delinq. at 138 (explaining that prisoners who "are not identified by staff as having any noticeable psychological problems or needs, nonetheless have accommodated so profoundly to the supermax environment that they may be unable to live anywhere else.").

[68] Brinkley-Rubinstein et al., *Association of Restrictive Housing During Incarceration with Mortality After Release*, 2 JAMA Network Open e1912516 (Oct. 2019).

solitary confinement, prisoners who spent ***any*** time in solitary confinement were 24% more likely to die in the first year after release.  Moreover, they were 78% more likely to die from suicide and 54% more likely to die from homicide.[69]  These dramatic findings account for potential covariables such as number of prior incarcerations, drug-related convictions, violence-related convictions, mental health treatment recommended and received, and number of days served in the most recent sentence.[70]

Solitary confinement can also result in long-term, non-obvious physical injury.  Advances in neurobiology and brain imaging technologies have established that the traumatic psychological harms associated with solitary confinement often trigger physical changes in the neural pathways and neurochemistry of the brain.  Researchers have observed that "even one week in solitary can lead to significant changes in electrical activity in the brain," slowing brain activity and negatively impacting prisoners' "performance on intellectual and perceptual-motor tests."[71]  Solitary confinement can also lead to reduction in the size of the hippocampus, a brain structure that impacts learning, memory, and spatial awareness.  Shrinking of

---

[69] *Id.*

[70] *Id.*

[71] James & Vanko, *supra* note 30.

the hippocampus can lead to "loss of emotional and stress control."[72]  Prisoners in

isolation have also been observed to have increased activity in the amygdala—an

area of the brain "responsible for mediating fear and anxiety."[73]  Changes to the

brain caused by solitary confinement can also adversely affect the sufferer's brain

functions by impacting spatial perception and facial recognition.[74]  In addition to

changes in brain chemistry, many isolated inmates experience headaches, heart

palpitations, and extraordinarily high rates of suicide and self-harm.[75]

## III.  EXACERBATING HARMS

### A.    Long Periods In Solitary Confinement Result In Greater Harms

Inmates begin to feel the harmful impacts of solitary confinement almost

immediately, often within days or weeks.  When deprived of social interaction and

environmental stimulation, people "soon become incapable of maintaining an

adequate state of alertness and attention," and within days their brain scans may

show "abnormal pattern[s] characteristic of stupor and delirium."[76]  But extended

---

[72] *Id.* (citing Lobel & Akil, *supra* note 30, at 69-70).

[73] *Id.* (citing Lobel & Akil, *supra* note 30, at 70; and Blanco-Suarez, *supra* note 30).

[74] *See* Schaeffer, *"Isolation Devastates the Brain": The Neuroscience of Solitary Confinement*, Solitary Watch (May 11, 2016); Smith, *Neuroscientists Make a Case Against Solitary Confinement*, Scientific American (Nov. 9, 2018).

[75] Haney, 49 Crime & Delinq. at 133; Smith, 34 Crime & Just. at 488-489, *see also infra* section V.

[76] Grassian, 22 Wash. U. J.L. & Pol'y at 330-331.

periods of solitary confinement—like that endured by Mr. Sanders—have been

shown to produce all the damaging psychological and physical effects discussed

above to an even greater degree.[77]

For example, the North Carolina study found that individuals were more

likely to die in the first year after being released from prison or more likely to

return to prison if they had repeatedly been placed in solitary confinement, and/or

spent more than fourteen consecutive days in solitary confinement.[78]  The United

Nations Standard Minimum Rules for the Treatment of Prisoners (known as the

Nelson Mandela Rules) acknowledges these increased harms by prohibiting

"***prolonged*** solitary confinement," which the Rules consider to be isolation for

more than fifteen consecutive days—far short of Mr. Sanders's more than eight-

year confinement.[79]

In the rodent studies discussed above, a month of social isolation resulted in

the loss of around 20% of the total number of neurons in the brain, but the

remaining neurons branched out more.[80]  When isolation was extended to up to

---

[77] Pullen-Blasnik, *The Population Prevalence of Solitary Confinement*, 7 Sci. Adv. 1 (2021); Arrigo & Bullock, *The Psychological Effects of Solitary Confinement on Prisoners in Supermax Units: Reviewing What We Know and Recommending What Should Change*, 52 Int. J. Offender Ther. Comp. Criminol. 622 (2008).

[78] Brinkley-Rubinstein, *supra* note 68.

[79] Pullen-Blasnik, 7 Sci. Adv. at 1.

[80] Blanco-Suarez, *supra* note 30 (citing Lobel & Akil, *supra* note 30); Gilmour, *The Nelson Mandela Rules: Protecting the Rights of Persons Deprived of Liberty*,

three months, however, that additional branching ceased and "spines (structures that neurons develop to place the machinery that is required to communicate to each other) were greatly diminished."[81]  This indicates that the brain may try to compensate for neural losses when isolation is limited to shorter periods of time, but that when isolation is extended neurons may experience long term losses of their communication abilities.[82]

### B.    Mentally Ill Prisoners Are Especially Vulnerable To Harms Caused By Solitary Confinement

Individuals with mental illnesses, like Mr. Sanders, are at greater risk of both being placed in, and being harmed by, solitary confinement.  A study of prisoners in Washington State's supermax prisons concluded that mental illness was about *twice* as common in segregated prisoners.[83]  And, when placed in solitary confinement, mentally ill prisoners typically deteriorate more rapidly than inmates without mental illness.[84]  This deterioration is often "permanent and disabling," as

---

UN Chronicle, United Nations, https://www.un.org/en/un-chronicle/nelson-mandela-rules-protecting-rights-persons-deprived-liberty (visited May 31, 2024); O'Grady, *How did Nelson Mandela Survive 27 Years in Prison?  A New Collection of Letters Sheds Light*, Wash. Post (July 18, 2018) (Mandela "spent 27 years in prison, most of them isolated on Robben Island").

[81] Blanco-Suarez, *supra* note 30 (citing Lobel & Akil, *supra* note 30).

[82] *Id.*

[83] Lovell et al., *Who Lives in Super-Maximum Custody? A Washington State Study*, 64 Fed. Prob. 33, 36 (2000).

[84] *See* Hafemeister & George, 90 Denv. U. L. Rev. at 38-39.

prisoners with mental illness are "far less likely to be able to withstand the stress, social isolation, sensory deprivation, and idleness" of solitary confinement.[85]

Mr. Sanders is no exception. When he was first placed in solitary confinement, Mr. Sanders had been diagnosed with intermittent explosive disorder, an impulse control disorder, and depressive disorder.[86] By the time he transferred to Pontiac Correctional Facility, his mental health had deteriorated further.[87] He had been further diagnosed with schizoaffective disorder, and in 2017, while at Pontiac, he would be diagnosed with posttraumatic stress disorder.[88]

What is more, Mr. Sanders has attempted suicide and other types of self-harm on more than ten occasions, many of which occurred during the eight consecutive years he spent in solitary confinement at Pontiac.[89] This is consistent with the rate of suicide and non-suicidal self-harm, which are disproportionately high among mentally ill prisoners in solitary confinement. On average, 50% of the

---

[85] *Id.* at 41-42, 46-47; Haney, 49 Crime & Delinq. at 142.

[86] *Sanders v. Melvin*, 25 F.4th at 478; Pl.'s Additional Material Facts at 62 (¶ 3); Grassian Expert Report at 29.

[87] Pl.'s Additional Material Facts at 90 (¶ 113) (2017 PTSD diagnosis); Pl.'s Opp. Mot. Summ. J. at 1 (schizoaffective disorder).

[88] *See id.*

[89] Pl.'s Additional Material Facts at 94 (¶ 121(c)(iv)) (ten suicide attempts as of August 4, 2016); *id.* at 87-88 (¶¶ 101-103, 105) (describing four different incidents while Mr. Sanders was at Pontiac during which he attempted suicide or engaged in other types of self-harm).

completed suicides by inmates occur among the 2-8% of inmates in solitary confinement—the majority of whom are mentally ill.[90]  A study of completed suicides in California prisons found that "among the 154 suicides completed during the covered period, 87 (56%) involved prisoners on the mental health caseload."[91] The authors concluded that "the conditions of deprivation in locked units and higher-security housing were a common stressor shared by many of the prisoners who committed suicide."[92]

Non-suicidal self-harm—such as "cutting" or swallowing sharp objects— among mentally ill inmates in solitary confinement is common.  One analysis of "902 self-mutilation incidents in the North Carolina Department of Corrections occurring between 1958 and 1966 revealed that nearly half occurred in segregation units."[93]  Approximately 20% of the prisoners in the 1983 Massachusetts study at

---

[90] Grassian & Kupers, *The Colorado Study vs. The Reality of Supermax Confinement*, Correctional Mental Health Rep., at 1, 9 (May/June 2011 25); *see also* Wynn & Szatrowski, *Hidden Prisons: Twenty-Three-House Lockdown Units in New York State Correctional Facilities*, 24 Pace L. Rev. 497, 516 (2004).

[91] Patterson & Hughes, *Review of Completed Suicides in the California Department of Corrections and Rehabilitation, 1999 to 2004*, 59 Psychiatric Services 676, 678 (2008).

[92] *Id*.

[93] Haney & Lynch, 23 N.Y.U. Rev. L. & Soc. Change at 525.

MCI Walpole reported engaging in random violence, such as deliberately cutting themselves, during periods of psychiatric decompensation.[94]

Prison staff sometimes incorrectly conclude that prisoners' self-harming behavior is a form of manipulation, designed to get them released from isolation. In most cases, however, the acts are not voluntary at all. Self-harming prisoners are often compelled by mental illness that is compounded by severe anxiety induced by harsh conditions of isolation. At such high levels of anxiety, the isolated prisoner begins to view self-harm as the only manner to escape from his or her anxiety. Paradoxically, and temporarily, the prisoner may feel relief from the self-harm.[95]

A prisoner who feels compelled to self-mutilate is likely experiencing a psychiatric crisis that requires mental health treatment. However, the restrictive manner in which solitary confinement units are typically run greatly limits the access of mental health staff and the quality of treatment they can provide.[96] For

---

[94] Grassian, *Psychopathological Effects*, 140 Am. J. Psychiatry at 1453.

[95] Kupers, *Repetitive Self-Harm in Solitary Confinement*, 24 Correctional Health Report 3, 70-71 (Summer 2023).

[96] Human Rights Watch, *Mental Illness, Human Rights, and US Prisons* at 4 (Sept. 22, 2009), https://www.hrw.org/news/2009/09/22/mental-illness-human-rights-and-us-prisons ("The psychological harm of supermaximum security confinement is exacerbated because mental health professionals are not permitted to provide the full range of mental health treatment services to the prisoners."); *see also* Fellner, *A Corrections Quandary: Mental Illness and Prison Rules*, 41 Harv. C.R.-C.L. L.

example, mental health treatment in isolation units often consists of "cell front therapy" wherein "[inmates] can [only] discuss intimate, personal problems with mental health staff who cannot easily see or hear them through the cell doors (unless they speak so loudly that other prisoners in the housing unit can also listen in)."[97]  The lack of privacy and confidentiality inherent in cell-front therapy not only renders it ineffective, but also violates ethical standards of the mental health profession.[98]  A more effective, ethical medical response is to remove a self-harming prisoner from isolation in order to assess his level of trauma.[99]

### C.    Young Prisoners Are Especially Vulnerable To Harms Caused By Solitary Confinement

Individuals who are subjected to solitary confinement at a young age—like Mr. Sanders, who endured lengthy periods of solitary confinement beginning at sixteen or seventeen years old and concluding at age thirty—are especially vulnerable to its harmful effects.  Numerous studies have documented the debilitating outcomes of juveniles (i.e., those under 18) and adolescents (i.e.,

---

Rev. 391, 404 (2006) ("In many segregation units, mental health services are so poor that even floridly psychotic prisoners receive scant attention.").

[97] Haney, 49 Crime & Delinq. at 143.

[98] Kupers, *The Cell-Front Interview*, 23 Correctional Mental Health Rep. 77,  77-78 (Spring 2022), https://www.researchgate.net/publication/362159963_The_Cell-Front_Interview.

[99] *See* Kaba et al., *Solitary Confinement and Risk of Self-Harm Among Jail Inmates*, 104 Am. J. Pub. Health 442, 445-446 (2013); Patterson & Hughes, 59 Psychiatric Services at 678.

young persons up to the age of 24) placed in solitary confinement due to the impact

it has on brain development, and the social deprivation it causes.

Social isolation has been shown scientifically to have far reaching

consequences on the social and neurological development of adolescents, including

unique effects on brain and behavior.[100]  Researchers have noted that the high

degree of plasticity of the adolescent brain increases the effect that adverse

environmental influences have on cortical circuitry, potentially harming

intellectual and emotional development.[101]  For example, exposure to stress during

adolescence[102] has long-term negative effects on the development of areas of the

brain that are critical to emotional learning and regulation.[103]  Exposing

---

[100] Orben et al., *The Effects of Social Deprivation on Adolescent Development and Mental Health*, 4 Lancet Child Adolescent Health 634 (2020).

[101] *E.g.*, Konrad et al., *Brain Development During Adolescence: Neuroscientific Insights into This Developmental Period*, 110 Deutsches Arzteblatt International 425 (2013).

[102] The term "juvenile" is generally reserved for persons under the age of 18 years old.  Although there is not necessarily a minimum age at which the term "adolescence" applies, it is generally understood to refer to persons up to and including the age of 24 years old.  *See, e.g.*, Arain et al., 2013 Neuropsychiatric Disease & Treatment at 450.

[103] *See* Tottenham & Galvan, *Stress and the Adolescent Brain:  Amygdala-Prefrontal Cortex Circuitry and Ventral Striatum as Developmental Targets*, 70 Neuroscience and Biobehavioral Reviews 217, 218-219 (Nov. 2016), https://www.sciencedirect.com/science/article/abs/pii/S0149763416300811; Eiland & Romeo, *Stress and the Developing Adolescent Brain*, 249 Neuroscience 162, 164-165 (Sept. 26, 2013), https://www.ibroneuroscience.org/article/S0306-4522(12)01072-X/abstract.

adolescents to stress alters their amygdala-prefrontal cortex connections, increasing their fear reactivity and adversely impacting their ability to regulate their behavior.[104]  These changes have been further hypothesized to underlie mental health challenges at later stages of development.[105]  Studies have shown that adolescents exposed to stress exhibit changes to their ventral striatum, a portion of the brain that supports reward-based learning.  These changes to the ventral striatum can negatively impact adolescents' reward sensitivity and motivational behavior, and may make the adolescent more vulnerable to later diagnoses of depression.[106]  And these effects should remain consistent whether experienced earlier or later in adolescence, because research has shown that the brain continues to develop until an individual is approximately 25 years old, with the prefrontal cortex in particular not reaching maturity until the age of 25.[107]

Adolescence is also crucial to the development of emotional and social skills for the additional reason that social interaction typically heightens during adolescence.[108]  Individuals begin to spend far more time with their peers than they

---

[104] *See* Tottenham & Galvan, 70 Neuroscience and Biobehavioral Reviews at 220.

[105] *See id.*

[106] *See id.* at 221-222.

[107] Arain et al., 2013 Neuropsychiatric Disease & Treatment at 451-452.

[108] Orben et al., 4 Lancet Child Adolescent Health at 634-635.

did during childhood.[109]  Often, adolescence is when individuals first build

complex peer relationships, and develop a more robust social self-identity.[110]

Thus, depriving adolescents during this period of social interaction may slow the

development of the emotional and social skills that such peer interaction would

otherwise produce.[111]

Not surprisingly, studies thus show that negative impacts from solitary

confinement are greatly magnified for juveniles and adolescents.  The ACLU and

Human Rights Watch conducted interviews with more than 125 juveniles under the

age of 18 who were held in solitary confinement in jails or prisons in 19 different

states.  Based on these interviews, the study concluded that solitary confinement

had serious detrimental effects on the adolescents' mental and physical health and

development.[112]  As one child and adolescent psychologist interviewed for the

study explained, "young people have fewer psychological resources than adults do

to help them manage the stress, anxiety and discomfort they experience in solitary

confinement."[113]  This is consistent with theories posited by adolescent

psychologists, pointing to the fact that adolescents are less able to see the

---

[109] *Id.*

[110] *Id.*

[111] *Id.*

[112] ACLU, *Growing Up Locked Down*, *supra* note 2, at 3-4.

[113] *Id.* at 24.

"temporariness of isolation, and as a result, cannot pull themselves out of their depression" and are more likely to experience agitation from solitary confinement because they cannot understand that it is "not unfairness directed at [them] personally" but is instead the "consequence for certain behaviors for all residents."[114]

The juveniles whom the ACLU surveyed experienced a variety of mental health issues while in solitary confinement, including "visual and auditory hallucinations; feelings of depression; acute anxiety; shifting sleep patterns; nightmares and traumatic memories; and uncontrollable anger or rage."[115]  Fifteen of the interviewees (more than 10 percent of the group) described attempting suicide one or more times while in solitary confinement, or engaging in other types of self-harm.[116]  This is consistent with research conducted by the Office of Juvenile Justice and Delinquency Prevention (OJJDP), an office of the United States Department of Justice and a component of the Office of Justice Programs. The OJJDP released a study in 1999 revealing that 50 percent of youths who

---

[114] Simkins et al., *The Harmful Use of Isolation in Juvenile Facilities:  The Need for Post-Disposition Representation*, 38 Wash. U. J. Law & Policy 241, 258 (2012).

[115] ACLU, *supra* note 2, at 24.

[116] *See id.*

committed suicide in juvenile facilities were in solitary confinement at the time of their suicide, and 62 percent had previously been held in isolation.[117]

The story of Kalief Browder highlights the extreme mental health risks that solitary confinement carries for juveniles and adolescents.  Mr. Browder was arrested and sent to Rikers Island Jail at the age of seventeen, on accusations of stealing a backpack.[118]  He committed suicide at just twenty-two years old, two years after his release from Rikers Island.[119]  While incarcerated, Mr. Browder spent between seven hundred and eight hundred days in solitary confinement,[120] during which time he attempted suicide on multiple occasions.[121]  After his release, Mr. Browder experienced paranoia and delusions, and was hospitalized three times in a psychiatric ward.  Before his death, he described his hope that solitary

---

[117] Simkins et al., 38 Wash. U. J. Law & Policy at 259.

[118] Gonnerman, *Before the Law*, The New Yorker (Sept. 29, 2014).

[119] Gonnerman, *Kalief Browder Learned How to Commit Suicide On Rikers*, The New Yorker (June 2, 2016), https://www.newyorker.com/news/news-desk/kalief-browder-learned-how-to-commit-suicide-on-rikers.

[120] Gonnerman, *Before the Law*, *supra* note 118.

[121] Maule & Liu, *Remembering Kalief Browder a Year After His Suicide and Why Rikers Island Should Be Shut Down*, The Innocence Project (July 1, 2016), https://innocenceproject.org/remembering-kalief-browder-year-suicide-rikers-island-shutdown/.

confinement would be reconsidered because of the mental health issues it caused

prisoners,[122] and explained the lasting effects it had on him specifically:[123]

> I feel like I'm still in jail, because I'm still feeling the side effects
> from what happened in there. . . .  I'm mentally scarred right now.
> That's how I feel.  Because there are certain things that changed about
> me and they might not go back.

## CONCLUSION

Overwhelming scientific and professional consensus firmly establish that

solitary confinement deprives inmates of basic human needs; produces severe,

negative, and atypical psychological and physical symptoms; and risks imminent,

severe, lasting, and irreversible harm to those who endure it.  This case should be

decided with due regard for the serious harms that solitary confinement has been

shown to cause, particularly to juveniles and adolescents, and people suffering

from mental illness.

Respectfully submitted,

/s/ *Marissa A. Lalli*

MARISSA A. LALLI
NINA B. GARCIA
EMILY S. SUMMIT
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street

---

[122] Gonnerman, *Before the Law*, *supra* note 118.

[123] Mathias, *Here's Kalief Browder's Heartbreaking Research Paper on Solitary Confinement*, Huffington Post (June 23, 2015), https://www.huffpost.com/entry/kalief-browder-solitary-confinement-research-paper_n_7646492.

Boston, MA 02109
(617) 526-6000
marissa.lalli@wilmerhale.com
nina.garcia@wilmerhale.com
emily.summit@wilmerhale.com

May 31, 2024

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(b)(4) because, excluding the parts of the document exempted by the Federal Rule of Appellate Procedure 32(f) this document contains 6,996 words.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft Office 365 in 14 point, Times New Roman font.

/s/ *Marissa A. Lalli*

MARISSA A. LALLI
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
marissa.lalli@wilmerhale.com

May 31, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of March, 2024, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Seventh Circuit using the appellate CM/ECF system.  Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ *Marissa A. Lalli*

MARISSA A. LALLI
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
marissa.lalli@wilmerhale.com