No. 23-1335

## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

CORDELL SANDERS,

*Plaintiff-Appellant,*

v.

ANDREA MOSS, *ET AL.*
*Defendants-Appellees*

Appeal from the U.S. District Court for the
Central District of Illinois, No. 16-CV-1366
Hon. Jonathan E. Hawley, Presiding

## CORRECTED BRIEF OF PLAINTIFF-APPELLANT

Steven J. Horowitz
Kathleen L. Carlson
Leslie Kuhn-Thayer
Tiffany C. Nwosu
Taylor J. Wilson
SIDLEY AUSTIN LLP
One South Dearborn St.
Chicago, IL 60603
(312) 853-7000

-and-

Mitchell Alleluia-Feinberg
SIDLEY AUSTIN LLP
2021 McKinney Avenue, Suite 2000
Dallas, TX 75201
(214) 981-3300

*Attorneys for Plaintiff-Appellant Cordell Sanders*

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-1335

Short Caption: Sanders v. Moss

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐          **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
        Cordell Sanders

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
        Sidley Austin LLP; Roderick and Solange MacArthur Justice Center

(3)     If the party, amicus or intervenor is a corporation:

        i)       Identify all its parent corporations, if any; and
                 N/A

        ii)      list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
                 N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
        N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
        N/A

Attorney's Signature: /s/ Steven J. Horowitz          Date: 06/20/2024

Attorney's Printed Name:  Steven J. Horowitz

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☑   **No** ☐

Address:  Sidley Austin LLP, One South Dearborn Street, Chicago, IL 60603

Phone Number: (312) 853-7000          Fax Number:  (312) 853-7036

E-Mail Address: shorowitz@sidley.com

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-1335

Short Caption: Sanders v. Moss

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Cordell Sanders

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Sidley Austin LLP; Roderick and Solange MacArthur Justice Center

(3)   If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and
           N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
           N/A

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
N/A

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
N/A

Attorney's Signature: /s/ Kathleen Carlson       Date: 06/20/2024

Attorney's Printed Name: Kathleen Carlson

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☐   **No** ☑

Address: Sidley Austin LLP, One South Dearborn Street, Chicago, IL 60603

Phone Number: (312) 853-7000       Fax Number: (312) 853-7036

E-Mail Address: kathleen.carlson@sidley.com

rev. 12/19 AK

| Save As | Clear Form |
|---|---|

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-1335

Short Caption: Sanders v. Moss

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Cordell Sanders

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Sidley Austin LLP; Roderick and Solange MacArthur Justice Center

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

N/A

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Leslie Kuhn-Thayer    Date: 06/20/2024

Attorney's Printed Name: Leslie Kuhn-Thayer

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address: Sidley Austin LLP, One South Dearborn Street, Chicago, IL 60603

Phone Number: (312) 853-7000    Fax Number: (312) 853-7036

E-Mail Address: lkuhntha@sidley.com

rev. 12/19 AK

| Save As | Clear Form |
|---------|-----------|

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: __23-1335__

Short Caption: __Sanders v. Moss__

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Cordell Sanders

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Sidley Austin LLP; Roderick and Solange MacArthur Justice Center

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: __/s/ Mitchell Alleluia-Feinberg__    Date: __06/20/2024__

Attorney's Printed Name: __Mitchell Alleluia-Feinberg__

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐    **No** ☑

Address: __Sidley Austin LLP, 2021 McKinney Avenue, Suite 2000, Dallas, TX 75201__

Phone Number: __(214) 981-3300__    Fax Number: __(214) 981-3400__

E-Mail Address: __malleluiafeinberg@sidley.com__

rev. 12/19 AK

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-1335

Short Caption: Sanders v. Moss

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Cordell Sanders

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Sidley Austin LLP; Roderick and Solange MacArthur Justice Center

(3)  If the party, amicus or intervenor is a corporation:

i)  Identify all its parent corporations, if any; and
N/A

ii)  list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
N/A

(4)  Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
N/A

(5)  Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
N/A

Attorney's Signature: /s/ Tiffany Nwosu    Date: 06/20/2024

Attorney's Printed Name: Tiffany Nwosu

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address: Sidley Austin LLP, One South Dearborn Street, Chicago, IL 60603

Phone Number: (312) 853-7000    Fax Number: (312) 853-7036

E-Mail Address: knwosu@sidley.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-1335

Short Caption: Sanders v. Moss

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Cordell Sanders

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Sidley Austin LLP; Roderick and Solange MacArthur Justice Center

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Taylor J. Wilson    Date: 06/202024

Attorney's Printed Name: Taylor J. Wilson

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes [ ]  No [✓]

Address: Sidley Austin LLP, One South Dearborn Street, Chicago, IL 60603

Phone Number: (312) 853-7000    Fax Number: (312) 853-7036

E-Mail Address: taylor.wilson@sidley.com

## Table of Contents

Statement Regarding Oral Argument ........................................................... 1

Jurisdictional Statement ........................................................................... 1

Statement of the Issues ............................................................................ 2

Introduction ........................................................................................... 2

Statement of the Case ............................................................................. 4

I.      Factual Background ...................................................................... 4

      A.      Sanders Arrived at Pontiac as a Young Adult Designated Seriously
            Mentally Ill. ...................................................................... 4

      B.      Sanders' Extreme and Isolating Conditions of Confinement. ............... 4

      C.      Wexford and its Mental Health Professionals are Responsible for
            Providing Mental Health Care. ............................................... 6

      D.      Sanders' Health Deteriorated in Solitary Confinement and He
            Begged Defendants for Help. ................................................. 9

      E.      The Individual Defendants Elected to Punish, Rather Than Treat,
            Sanders' Symptoms of Mental Illness. .................................... 12

            1.      Andrea Moss. ........................................................ 12

            2.      Todd Nelson. ......................................................... 15

            3.      Stephen Lanterman. ................................................ 17

            4.      Kelly Haag. ........................................................... 19

            5.      Linda Duckworth. .................................................. 20

      F.      Sanders' Release from Solitary Confinement. ........................... 22

II.     Procedural History ..................................................................... 22

      A.      Sanders' First and Second Appeals. ...................................... 22

      B.      The District Court's Erroneous Dismissal and the Present Appeal..... 24

Summary of Argument .......................................................................... 24

Standard of Review ............................................................................... 26

Argument ............................................................................................ 27

I.      The District Court Erred in Granting Summary Judgment to the
      Individual Defendants on Sanders' Eighth Amendment Claims.................... 27

i

A.     The Individual Defendants Denied Sanders Constitutionally Adequate Healthcare By Persisting in a Course of Treatment They Knew Was Ineffective. ................................................. 27

B.     The Individual Defendants Acted With Deliberate Indifference When They Recommended Additional Solitary Confinement And Refused to Recommend Reductions in or Release From Solitary Confinement. ................................................................... 35

II.   The District Court Erred in Finding that Sanders Has Not Established a *Monell* Claim Against Wexford. ....................................................... 42

A.     Sanders Presented Significant Evidence of Wexford's Practice or Custom of Ignoring Prisoners' Mental Health Needs Until A Crisis Occurred. ................................................................. 44

B.     Wexford is Liable For Failing To Create a Policy Where One Was Necessary. ................................................................. 48

CERTIFICATE OF COMPLIANCE ........................................................... 54

CERTIFICATE OF SERVICE ................................................................... 55

CIRCUIT RULE 30(D) COMPLIANCE .................................................... 56

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ................................................................. 26

*Conner v. Reinhard,*
847 F.2d 384 (7th Cir. 1988) ..................................................... 40

*Davenport v. DeRobertis,*
844 F.2d 1310 (7th Cir. 1988) ................................................... 37

*Delaney v. DeTella,*
256 F.3d 679 (7th Cir. 2001) ..................................................... 36

*Farmer v. Brennan,*
511 U.S. 825 (1994) ............................................................ 36, 37

*Finley v. Huss,*
723 Fed. Appx. 294 (6th Cir. 2018) ........................................... 32

*Glisson v. Ind. Dep't of Corr.,*
849 F.3d 372 (7th Cir. 2017) (en banc) ....................... 26, 44, 49, 51

*Gray v. Hardy,*
826 F.3d 1000 (7th Cir. 2016) ................................................... 29

*Greeno v. Daley,*
414 F.3d 645 (7th Cir. 2005) ..................................................... 28

*Grieveson v. Anderson,*
538 F.3d 763 (7th Cir. 2008) ..................................................... 47

*Haley v. Gross,*
86 F.3d 630 (7th Cir. 1996) ....................................................... 28

*Howell v. Wexford Health Sources, Inc.,*
987 F.3d 647 (7th Cir. 2021) ..................................................... 48

*J.K.J. v. Polk Cnty.,*
960 F.3d 367 (7th Cir. 2020) (en banc) ...................................... 51

*Kervin v. Barnes,*
787 F.3d 833 (7th Cir. 2015) ..................................................... 36

iii

*Matz v. Frank,*
    340 Fed. Appx. 323 (7th Cir. 2009) ........................................................ 34

*McClary v. Coughlin,*
    87 F. Supp. 2d 205 (W.D.N.Y. 2000) .................................................... 41

*Monell v. Dep't of Soc. Servs.,*
    36 U.S. 658 (1978) ........................................................................ 24, 43

*Petties v. Carter,*
    836 F.3d 722 (7th Cir. 2016) (en banc) .............................. 24, 27, 28, 29

*Phelan v. Cook Cnty.,*
    463 F.3d 773 (7th Cir. 2006) ................................................................ 47

*Roe v. Elyea,*
    631 F.3d 843 (7th Cir. 2011) ................................................................ 32

*Sanders v. Melvin,*
    25 F.4th 475 (7th Cir. 2022) .......................................... 23, 28, 29, 44

*Sanders v. Melvin,*
    873 F.3d 957 (7th Cir. 2017) ................................................................ 23

*Sanville v. McCaughtry,*
    266 F.3d 724 (7th Cir. 2001) ................................................................ 25

*Stewart v. Wexford Health Sources, Inc.,*
    14 F.4th 757 (7th Cir. 2021) ................................................................ 34

*Thomas v. Cook Cty. Sheriff's Dep't,*
    604 F.3d 293 (7th Cir. 2010) .......................................................... 43, 44

*Wellman v. Faulkner,*
    715 F.2d 269 (7th Cir. 1983) ................................................................ 27

*White v. Woods,*
    48 F.4th 853 (7th Cir. 2022) ................................................................ 26

*Woodward v. Corr. Med. Servs. of Ill., Inc.,*
    368 F.3d 917 (7th Cir. 2004) .............................................. 25, 44, 47, 48

*Zaya v. Sood,*
    836 F.3d 800 (7th Cir. 2016) ................................................................ 26

**Statutes**

28 U.S.C. § 1291 ................................................................................................ 1

28 U.S.C. § 1331 ................................................................................................ 1

28 U.S.C. § 1343 ................................................................................................ 1

29 U.S.C. § 974 ................................................................................................. 1

42 U.S.C. § 1983 ........................................................................................... 1, 43

42 U.S.C. § 12132 .............................................................................................. 1

**Other Authorities**

Fed. R. App. P. 4 .............................................................................................. 1

Fed. R. Civ. P. 56 ............................................................................................ 26

**Statement Regarding Oral Argument**

Pursuant to Federal Rule of Appellate Procedure 34(a) and Circuit Rule 34(f), Plaintiff-Appellant Cordell Sanders respectfully requests oral argument. Although the third appeal in Sanders' case, this is the first time this Court has the opportunity to consider the merits, rather than issues related to Sanders' *in forma pauperis* status. Oral argument will allow Sanders to highlight the numerous factual issues that remain in dispute between the parties in this complex case.

**Jurisdictional Statement**

This appeal arises from a case brought in the United States District Court for the Central District of Illinois under 42 U.S.C. § 1983; Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132; and the Rehabilitation Act, 29 U.S.C. § 974, to remedy violations of his civil rights. The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

On December 18, 2019, under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, the parties consented to the jurisdiction of the magistrate judge. Dkt. 162. On January 24, 2023, the magistrate judge granted summary judgment to Defendants on all claims and entered final judgment. App. 0080. Thus, under Fed. R. App. P. 4(a)(1)(A), Sanders had 30 days from the date of the entry of final judgment to file his notice of appeal. As such, Sanders timely filed a notice of appeal on February 21, 2023. Dkt. 246. This Court has jurisdiction under 28 U.S.C. § 1291.

## Statement of the Issues

I.     Whether the district court erred in granting summary judgment to the Individual Defendants on Sanders' Eighth Amendment claims, where a reasonable jury could conclude based on the ample evidence that the Individual Defendants were deliberately indifferent to Sanders' objectively serious medical condition.

II.     Whether the district court erred in granting summary judgment to Wexford on Sanders' Eighth Amendment claims, where a reasonable jury could conclude based on evidence that Wexford maintained a widespread custom or practice of denying prisoners mental health care unless they threatened self-harm, maintained a widespread custom or practice of refusing to consider the damaging effects of solitary on their mental health, and failed to create a policy requiring its mental health professionals to review the mental health records of an inmate and take them into account when participating in the disciplinary process where such a policy was necessary to prevent obvious harm.

## Introduction

This case is about trained, licensed mental health professionals who knowingly failed to treat Cordell Sanders, a prisoner living with serious mental illnesses, and allowed him to languish in solitary confinement for eight straight years. Despite Sanders' numerous pleas for help, Wexford Health Sources, Inc. ("Wexford") and Andrea Moss, Todd Nelson, Stephen Lanterman, Linda Duckworth, and Kelly Haag (collectively, the "Wexford Defendants") declined to render necessary mental health care to Sanders while his health deteriorated in solitary with little meaningful

human contact. The Wexford Defendants' deliberate indifference caused Sanders to endure immense psychological and physical suffering.

The Illinois Department of Corrections ("IDOC") contracted with Wexford and vested it with the responsibility of caring for prisoners' mental health. The overwhelming evidence shows that the Wexford Defendants understood the disastrous effects of prolonged solitary confinement on prisoners' mental health. Moss, Nelson, Lanterman, Duckworth, and Haag (the "Individual Defendants") personally heard Sanders beg for help dealing with the direct consequences of his isolation. His pleas were met with disregard. Instead, the Wexford Defendants (1) refused to provide Sanders with the mental health therapy he desperately needed; (2) approved prolonged solitary confinement and out-of-cell exercise restrictions as punishments for behavior caused by his mental illness; and (3) implemented policies that failed to protect Sanders from episodes of self-harm.

As a result, Sanders expressed suicidal thoughts, self-harmed, and attempted to take his life multiple times. He overdosed on pain medication in 2010. He attempted to slice his stomach in 2012. He overdosed on 69 pills on October 27, 2015 and overdosed again on pills on July 24, 2016, his fourth suicide attempt in six years. Two days later, in continued distress, he began to bite flesh out of his wrist.

Despite ample evidence from which a reasonable jury could conclude that the Wexford Defendants violated Sanders' constitutional rights, the district court granted summary judgment in their favor. This Court should reverse the district court's judgment.

3

## Statement of the Case

### I.    Factual Background

#### A.    Sanders Arrived at Pontiac as a Young Adult Designated Seriously Mentally Ill.

Cordell Sanders has been imprisoned in the Illinois Department of Corrections ("IDOC") system for 20 years—since he was sixteen years old. App. 1645–46; *see also* App. 1398. He entered IDOC after a disruptive childhood marked by mental illness. App. 1397–98. After being charged with several minor disciplinary infractions, Sanders was transferred to Pontiac Correctional Center ("Pontiac") where he spent eight years in continuous solitary confinement. App. 1398. Mental health professionals at Pontiac consistently agreed he suffered from serious mental illnesses requiring powerful antidepressant, psychotropic, and mood-stabilizing medications to manage his symptoms, and they designated him as Seriously Mentally Ill ("SMI"). App. 1398; App. 1408–09; App. 0421–22 (11/7/08); App. 0450 (3/8/10); App. 0480 (2/28/12); App. 0485 (8/6/12); App. 0507 (10/7/13); App. 0543 (12/2/14); App. 0676 (10/20/16); App. 0763 (11/25/17); App. 0786 (2/4/18).

#### B.    Sanders' Extreme and Isolating Conditions of Confinement.

Sanders was locked in a concrete cell the size of a compact parking spot for nearly every moment of every day for eight straight years—nearly a quarter of his life. App. 1108–15; *see also* App. 1398–401; Dkt. 204-11 at 003377–78, Dkt. 204-11 at 003397–402 (north cell house cells); Dkt. 204-11 at 003434, Dkt. 204-11 at 003441–43 (east cell house solitary confinement unit cells). Sanders spent the majority of that time in Pontiac's north cell house, a place notorious for brutal

conditions described as "disturbing" and "bedlam." App. 1043 at 223:19–22; App. 1401, 1405. The extreme conditions at Pontiac constituted a "particularly harsh version of solitary confinement." App. 1406.

This isolation was all-encompassing. Sanders was held in his cell for 22 to 24 hours a day. On rare occasions he was let out to shower, for visits, to use the solitary confinement law library, or to attend "yard" in slightly larger cells known colloquially as "dog cages," which Wexford's own expert described as "isolated cubicles." App. 1400; App. 0813 at 44:17–23; App. 1327–29, 1341 at 17:16–18:6, 18:21–22:18, 70:4–72:6; App. 1753 at 171:12–172:9; App. 0388 at 84:9–13. He did not have access to out-of-cell religious, educational, or vocational programming. App. 1327–29, 1341 at 17:16–18:6, 18:21–22:18, 70:4–72:6; App. 1754 at 198:7–12. When he did leave his cell, Sanders was shackled, even during medical appointments. App. 1328 at 19:7–14; App. 0387 at 64:21–65:21. His cells had no windows and little air flow, subjecting him to extreme temperatures and stifling conditions. App. 1399–400; App. 1175–76 at 185:19–187:20; Dkt. 204-12 at 003374, 003380–81, 003387, 003425. To even attempt speaking to other prisoners, Sanders was forced to press his face against the filthy floor and yell through small air holes in the direction of nearby cells. App. 1161, at 129:6–19; App. 1346–47, at 93:14–94:24, 95:19–96:3. In 2016, correctional staff installed Plexiglass to cover the holes, further restricting both air flow and human interaction. App. 1333–34 at 40:18–42:19; App. 0815–17 at 126:9–127:10, 137:23–138:8.

What is more, for at least five of the eight years of his solitary confinement, he was on "yard restriction," meaning that he was only allowed to leave his cell for exercise in the dog cages once a month, for a single hour, and often prison officials deprived him of that with no explanation. App. 1400; App. 1108–15; App. 1162–63 at 133:12–134:3. Sanders' correctional expert, Dan Pacholke, called this restriction "exceptionally cruel," and "counterproductive." App. 1502–03.

### C. Wexford and its Mental Health Professionals are Responsible for Providing Mental Health Care.

Amidst these harsh conditions, Wexford employed Defendants Moss, Nelson, Lanterman, Duckworth, and Haag at Pontiac as qualified mental health professionals ("MHPs") to care for the mental health of prisoners like Sanders. App. 0391-92 at 17:22–18:6. All MHPs at Pontiac were part of one multidisciplinary mental health treatment team. App. 0209 at 134:24–135:7, 136:4–15; App. 1127–28 at 213:21–214:5; App. 0401 at 28:14–29:6. The treatment team held daily meetings to discuss patients, particularly those in crisis. App. 1127 at 213:21–214:5. MHPs were tasked with monitoring prisoners' mental health and providing treatment to those suffering from mental illness, including identifying "elevated concerns . . . or any deterioration that needs to be addressed." *Id.*; App. 0391–93, 0395 at 17:22–18:6; 66:12–67:8, 89:5–12; App. 0402 at 30:22–31:17; App. 0394 at 82:2–83:7. The Individual Defendants were each licensed professionals with the education and training necessary to diagnose and treat mental illness. App. 0395 at 87:14–19; *see also* App. 0084 at 10:3–4; App. 0305 at 10:13–19; App. 0178 at 13:8–12; App. 0242–43 at 9:24–10:7; 12:3–6; App. 0136 at 8:24–9:8.

6

Wexford MHPs, including the Individual Defendants, also participated in the
disciplinary process through which prisoners could be punished with solitary
confinement and other restrictions. They made disciplinary recommendations—
including whether solitary confinement, loss of privileges such as access to exercise,
or loss of good time credit should be imposed—after evaluating the mental status
and symptoms of the accused prisoner. App. 0799–803; App. 0109–10 at 113:23–
114:3; App. 1329 at 23:21–24:19; App. 1321 at 78:10–79:4. When a prisoner received
a ticket for an infraction that could result in solitary confinement, an MHP was
required to review the prisoner's mental health records and complete a mental
health disciplinary review form (also called a "Form 0443"), evaluating:

> (1) The reviewing MHP's opinion if, and in what way, the offenders
>     mental illness contributed to the underlying behavior of the offense
>     . . .;
>
> (2) The reviewing MHP's opinion of overall appropriateness of
>     placement in segregation status based on the offender's mental
>     health symptoms and needs; including, potential for deterioration if
>     placed in a segregation setting or any reason why placement in
>     segregation status would be inadvisable, such as the offender
>     appearing acutely psychotic or actively suicidal, a recent serious
>     suicide attempt or the offender's need for immediate placement in a
>     Crisis Treatment Level of Care; and
>
> (3) Based on clinical indications, recommendations, if any, for a specific
>     term of segregation, including no segregation time, or specific
>     treatment during the term of segregation.

App. 0801; *see also* App. 0109–10 at 113:23–114:3; App. 0399 at 112:16–23; App.
1123 at 116:21–117:2. While an Adjustment Committee adjudicates guilt and
administers discipline, it must take into consideration all MHP opinions and must
also adopt the recommendations of an MHP if they determine, "based on clinical

indications . . . that no segregation time be served or that a specific treatment during segregation is necessary." App. 0801–02. MHPs also sat on the Adjustment Committee. *Id.*; *see* App. 0106 at 100:8–10; App. 0328 at 102:9–103:3; App. 1631–32 (Adjustment Committee report signed by Duckworth). These MHPs reviewed the mental health disciplinary review form and opined on the appropriateness of solitary confinement based on their knowledge of a prisoner's mental health needs. App. 0112 at 124:21–125:7; App. 0399 at 112:20–113:6.

Wexford MHPs could also initiate a prisoner's release from solitary confinement. App. 0397 at 97:8–10. It was mandatory for the Adjustment Committee to follow the reviewing MHP's recommendation regarding solitary confinement. App. 0802. The committee could only impose a more severe punishment than recommended by the MHP upon a successful appeal to the Chief Administrative Officer. *Id.* And if a Wexford MHP "identified deterioration, which is the point of . . . segregation rounds[,] [t]hey can take that information back to a supervisor, and they can also recommend [] a segregation reduction." App. 0397–98 at 97:19–98:6. MHPs could recommend increased levels of care and recommend transfer to a residential treatment unit. Dkt. 181-15 at 77:6–78:4. *See* App. 0399 at 112:16–113:6.

Each of the Individual Defendants completed disciplinary reviews for Sanders and/or sat on the Adjustment Committee for Sanders, and in each instance, they had significant power to influence how much solitary confinement Sanders received. *Infra* Statement of the Case Section I.E.

### D.     Sanders' Health Deteriorated in Solitary Confinement and He Begged Defendants for Help.

Sanders' testimony and his medical records document his desperate pleas for help from the Individual Defendants, repeatedly voicing concerns about the consequences of continued solitary confinement on his mental health. App. 1145, 1152–53 at 62:9–63:16, 91:1–12; 94:5–95:5, 95:20–96:2; *see e.g.*, App. 1634 (10/19/17); App. 1629 (3/17/16); App. 1615 (8/22/14).

Despite these pleas, Sanders' course of care remained unchanged as a result of Wexford's practice to provide care only in response to threats of self-harm. App. 1498–99. Moss told Sanders directly on at least two separate occasions that she did not want to see him unless he was suicidal. App. 1145–48, 1151, 1187 at 62:4–15, 68:20–69:16, 73:11–74:24, 86:3–21, 231:20–232:16. Other prison officials repeated this message. App. 1181 at 207:2–11. (Sanders asked another mental health provider whether he truly needed to wait until he felt suicidal to receive counseling and was told: "that's what it seems like."); App. 0564.

Faced with these circumstances, Sanders attempted suicide four times at Pontiac:

- 2010: Sanders tried to kill himself, overdosing on pain medication. App. 1159 at 118:14–121:5; App. 0453–55.

- 2012: During an episode of psychosis, Sanders sliced open his stomach in yet another attempt to get help or end his suffering. App. 1157, 1179, 1184 at 112:8–113:14, 201:13–18, 221:6–10.

- October 27, 2015: After requesting mental health treatment and receiving none, Sanders overdosed on 69 pills. App. 0605–10; App. 1160–61, 1180 at 125:2–126:15; 202:1–17.

9

- July 24, 2016: Sanders overdosed on pills and was placed on suicide watch. App. 1160 at 125:4–13; App. 0645–57. While still on watch, he began biting the flesh out of his wrist. App. 0650.

Following each suicide attempt, he was sent back to solitary confinement with no change in his level of care, despite Duckworth's acknowledgement that "anytime there's a suicide attempt, it's inadvisable" to place a prisoner back in solitary. App. 0250 at 38:18–22.

Medical records evidence the immense harm to Sanders' mental health caused by the Individual Defendants' indifference to his mental health needs and Wexford's policy of refusing to provide adequate mental health treatment. Sanders' records document he was chronically exhausted, restless, obsessive, compulsive, disturbed, depressed, agitated, and engaged in episodes of self-destructive and suicidal behaviors. App. 1157, 1159–61, 1179, 1184 at 112:8–113:14, 118:14–129:1, 201:13–18; 221:6–10; App. 0453–57; App. 0605–11; App. 0645–57. He began to suffer from psychosis, which caused him to black out and take actions that he could not control or remember. App. 1157–58, 1179 at 113:15–20, 114:23–115:3, 117:17–23, 201:13–18; *see also* App. 0506; App. 0564, 0591; App. 0599. He also reported that he increasingly experienced anxiety, hyperactivity, anger, and depression, and stated that auditory and visual hallucinations would come "when I'm alone, when I'm stressed out, when I'm stuck in my cell, and when I'm not exercising." App. 0506.

Despite his serious symptoms, Sanders was repeatedly shuffled between placement on crisis watch and solitary confinement, and he suffered through long gaps without receiving *any* psychotherapy. *See e.g.* App. 0597, 0605, 0612–13, 0617. For over two years before his third suicide attempt in October 2015, Sanders rarely

received therapy or mental health therapy lasting longer than 5-to-10 minutes despite being on Wexford's mental health caseload. He was seen by Moss for a brief session in April 2013, and then waited more than a year for his next session with her in April 2014. App. 1552; App. 0521, 0523. There were no documented counseling sessions for most of May, June, or July 2014. *See* App. 1552–54. He was seen by Moss for one session per month in August, September, and October of 2014, followed by no therapy at all for the next three months. App. 1556; App. 1558; App. 1560, App. 0552. During this period between August to December 2014, Sanders was "increasingly vocal to mental health staff about his thoughts and clearly expressed how his environment and inability to leave his cell was taking its toll on his mental health, yet there was no indication that mental health staff made any efforts to advocate for less isolation." App. 1496.

Little changed in the months that followed. Other than medication management or segregation rounds, Sanders was only seen for brief 5-or-10-minute interactions or "due to crisis" between January 2015 and his October 27, 2015, suicide attempt. App. 0547–91; App. 0592–613. While he received therapy sessions with Moss in the two months following his suicide attempt, and with Nelson in early 2016, Sanders received no therapy or contacts with mental health professionals longer than 5-to-10 minutes until his suicide attempt on July 26, 2016. App. 00636–47.

While Sanders was periodically seen at his cell-front for "segregation rounds," these wellness checks did not constitute mental health therapy. App. 0180, 200, 207 at 20:3–12, 100:16–23,126:15–19, 127:4–19; App. 0393 at 67:9–25.; *see also* App.

11

1201–03. The rounds consisted of door-to-door checks where MHPs would briefly observe each prisoner. App. 0393 at 66:14–22; 67:12–25. MHPs would see up to 150 patients per day when assigned to segregation rounds. App. 0154 at 81:4–13. Thus, segregation rounds were "very, very brief" interactions—about one minute on average—as they were often "just eyeball[ing]" the person. App. 0316 at 56:15–21; App. 0317 at 58:8–16. Even when Sanders was on crisis watch, he would only see MHPs for short visits lasting about five minutes that were non-therapeutic, non-confidential, cell-front interactions where correctional officers were often present. *See* App. 0396 at 91:5–11; App. 1590 App. 1592 App. 1594; App. 1596; App. 1655; *see also* App. 0207. Likewise, although Sanders periodically saw psychiatrists, he was often cuffed behind his back and these interactions were "largely limited to psychiatric assessment and medication management," not counseling or therapy. App. 0401 at 28:14–29:6; App. 0499, 506–08; App. 0543–44.

### E.  The Individual Defendants Elected to Punish, Rather Than Treat, Sanders' Symptoms of Mental Illness.

The lack of treatment and the extreme conditions of confinement were disastrous for Sanders' mental and physical health. Each of the Individual Defendants saw him with regularity and was aware of the harm to Sanders, yet failed to change course.

#### 1.  *Andrea Moss.*

Andrea Moss—a qualified MHP employed by Wexford—knew Sanders' medical history and understood his distress through her many conversations with him. App. 0084 at 13:19–22. Starting in 2013, Moss observed Sanders through mental health

segregation rounds and "triaged" one-to-one mental health therapy with Sanders while assigned to his cellhouse. App. 0087. In her first meeting with Sanders on April 8, 2013, she noted his "inappropriate" affect and indicated he should be revisited in 30-to-60 days and be provided anger management materials—neither of which happened. Sanders was not seen for counseling again for a year and was still asking Moss for anger management material in March 2014. App. 1552; App. 1549–50; *see generally* App. 0407–511 & App. 0512–591 (mental health records showing only segregation rounds and psychiatry medication assessments between April 2013 and April 2014). Moss knew Sanders had been diagnosed with schizoaffective disorder, intermittent explosive disorder, antisocial personality disorder, and narcissistic traits, and she observed that he may be suffering from bipolar disorder and displayed paranoid behavior. App. 1558; App. 0088, 0095, 0105 at 26:21–29:6, 53:23–54:10, 97:10–22.

Critically, both testimony and medical records show Moss knew Sanders was suffering. She knew he was suicidal, as she saw him on a segregation round while he was on crisis watch. App. 1565. She also saw him shortly after he had attempted suicide when she completed a suicide evaluation. App. 1569–70. Moss was equally aware that Sanders had been sentenced to out-of-cell exercise restrictions and prolonged solitary confinement. App. 0540 (Sanders reporting to Defendant Moss that "the only time I leave the cell" is when he was allowed to come out to see her); App. 0105 at 94:12–15 (noting Sanders expressed he had "been in yard restriction

for too long"). Indeed, Sanders told Moss that he was depressed and that "[r]eally when I come out to see you is the only time I leave the cell." App. 1558; App. 1560.

Moss ignored Sanders' requests to talk about his mental health and told him that if he "wasn't suicidal she didn't want to see [him]." App. 1145, 1147–48, 1151 at 62:4–15, 73:11–74:24, 86:3–21. She refused Sanders' request to be admitted to a special mental health unit for additional treatment. App. 1146 at 69:6–19. Moss saw Sanders for counseling a few times in 2014, but then allowed months to pass with Sanders receiving no therapy—including no counseling in the eleven months before his October 2015 suicide attempt, nor in the six months prior to his July 2016 suicide attempt. *Supra* Statement of the Case Sec. I.D. Even after Sanders self-harmed, Moss refused to recommend reduction or release from solitary confinement. *See* App. 0111 at 118:2–11; App. 1145 at 62:9–63:16.

Not only did Moss shut down Sanders' pleas for help, but she approved and recommended additional solitary confinement for Sanders. In mid-2015, Moss acknowledged that Sanders was not stable and that his mental health contributed to his infraction, specifically noting his bipolar diagnosis and his associated "poor judgment/impulse control, unstable, guarded/suspicious thoughts." App. 1636 (mental health disciplinary review form completed by Moss). Despite this awareness, Moss still instructed IDOC that further solitary confinement would not significantly impact Sanders' mental health, and thus recommended six additional months of solitary, out-of-cell exercise restriction, and commissary restriction. App. 1637. The Adjustment Committee followed Moss' recommendation and imposed six

14

months of solitary confinement. App. 1617–19. Just days later, Sanders reported hearing voices when stressed—symptoms of psychosis that are repeated throughout his medical records—and within a month, he was extracted from his cell by a tactical team and put on suicide watch on July 6, 2015. App. 1565; App. 1600–01; App. 1648. Shortly after, on October 27, 2015, he would attempt suicide by overdose. App. 0605–10.

When Sanders was charged with "Disobeying a Direct Order" on the day of his October 2015 suicide attempt, Moss attended an Adjustment Committee hearing only days after that attempt and approved an additional three months of C-grade placement and out-of-cell exercise restrictions, despite her knowledge that Sanders had attempted suicide the day of the infraction and remained at risk of suicide. App. 1626–27 (Adjustment Committee report signed by Moss). She nevertheless stated Sanders was "stable" and his mental illness did not contribute to the incident. App. 1626. Yet the day after the hearing, Moss observed that Sanders' behavior, mood, affect, and memory were "inappropriate," and that he was still at "high risk for suicide." App. 1573.

        2.    *Todd Nelson.*

Todd Nelson, also a qualified MHP for Wexford, was aware of Sanders' deterioration and, like Moss, failed to provide adequate mental health treatment or intervention. App. 0178 at 12:15-19; *supra* Statement of the Case Section I.E.1. From their first meeting in early 2015, Sanders told Nelson he was struggling with his isolation, specifically telling Nelson he was in crisis and that "he has not had yard time for over a year." App 1619; App. 0552; App. 0204 at 115:11–15. Nelson

was also aware that Sanders was diagnosed with major depressive disorder with psychotic features. App. 0198–99 at 91:5–10; 93:21–94:23.

Despite his knowledge of Sanders' condition, Nelson contributed to Sanders receiving additional solitary confinement. For example, only weeks before Sanders' suicide attempt, Nelson completed two mental health disciplinary review forms, recommending that Sanders' mental health should not be considered when imposing discipline, that he was stable, and "that additional segregation status for this offender is appropriate." App. 1639 (mental health disciplinary review form completed by Nelson); App. 1642 (same); App. 0190 at 58:11–18. Nelson recommended that Sanders receive two additional months of solitary confinement and that his out-of-cell exercise time be restricted. App. 1640; App. 1643; App. 0196 at 84:9–14. The Adjustment Committee followed Nelson's recommendation. App. 1621–1624.

In the time leading up to Sanders' 2016 suicide attempt, Nelson was assigned to see Sanders for segregation rounds in the first four months of 2016. App. 1152–53 at 93:9–94:15; App. 1575; App. 1652. When Nelson saw Sanders for 15 minutes on one of these segregation rounds, Sanders again told Nelson he had been denied out-of-cell exercise time for the last one-and-a-half years. App. 1577. After Sanders' July 2016 suicide attempt, Nelson engaged in brief crisis contacts with Sanders, during which Nelson repeatedly acknowledged a continued risk of self-harm. App. 0205–214 at 120:5–157:12; App. 0648–50; App. 0654–55. But despite Sanders' state of crisis, Nelson never attempted to reduce Sanders' solitary confinement or advocate

for his release from those conditions, nor did he ensure Sanders received therapy, instead electing to check "no action required" each time he saw Sanders. App. 0633–34, App. 0637, App. 0665, App. 0667–68; App. 0710, App. 0712, App. 0716.

               3.     *Stephen Lanterman.*

Stephen Lanterman—a qualified MHP for Wexford—likewise failed to provide Sanders the medical help he desperately requested, and Lanterman instead approved additional solitary confinement. App. 0306 at 14:3–4. Lanterman was aware of Sanders' mental health diagnoses and met with him on crisis watch July 7, 2015. App. 0315 at 50:21–51:6; App. 1565. Lanterman noted that Sanders was feeling suicidal and hearing voices, and that his appearance, behavior, mood, affect, and all other categories of evaluation were "inappropriate." App. 1565. A day later, Lanterman took Sanders off of crisis watch and recommended a 7-day follow up. However, he did nothing to ensure Sanders received counseling or therapy in the months that followed—despite documentation that Sanders requested appointments with an MHP; reported hearing voices when stressed and seeing rats that were not there; felt exhausted and stressed; experienced anxiety and hyperactivity; was concerned about being on "yard restriction for years"; felt angry, depressed, and hopeless; and was feeling worried and afraid of guards. *See generally* App. 0591; App. 0599, 0601–04.

Despite this knowledge, less than three months later, Lanterman signed-off on an Adjustment Committee report sentencing Sanders to two additional months of solitary confinement and an additional month of out-of-cell exercise restrictions App. 1621–24. Before making this decision, Lanterman did not observe or speak to

Sanders to determine whether he was mentally stable, nor did Lanterman review his mental health or medical records. App. 0329 at 107:5–108:2. Instead, he relied solely on the opinion of Nelson, which Lanterman "didn't question," App. 0329–30. Indeed, Nelson also formed his opinion without any meaningful inquiry into Sanders' recent mental health, *supra* Statement of the Case at Section I.E.2. As a result of both Nelson's and Lanterman's actions, Sanders was sentenced to further prolonged solitary confinement without any meaningful effort on the part of the MHPs to treat his declining mental health. Shortly after Lanterman's and Nelson's decision, Sanders attempted suicide on October 27, 2015—the third attempt in five years. *Supra* Statement of the Case at I.D.

Despite further interaction with Sanders, after this suicide attempt, Lanterman still never recommended to reduce his solitary confinement. Lanterman saw Sanders on crisis watch following his 2015 suicide attempt, and for segregation rounds from mid-September 2016 through mid-November 2016 following another suicide attempt in July 2016. App. 0315 at 50:21–51:6*; see also, e.g.,* App. 0687; App. 0324 at 88:16-18. During that time, Sanders complained to Lanterman about his lack of out-of-cell exercise time, his long-term solitary confinement, and the negative effects it was having on his mental health. *See, e.g.*, App. 1598; App. 1153 at 94:20–95:2. Regardless, Lanterman never recommended increased care for Sanders or that his out-of-cell exercise restrictions or solitary confinement be reduced, despite having multiple opportunities to do so. App. 1153 at 94:19–95:2.

4.     *Kelly Haag.*

Kelly Haag was a qualified MHP for Wexford between 2015 and 2017, and she was assigned to the north cell house and was the clinician in charge of providing Sanders' group therapy as well as conducting segregation rounds when she was assigned to the floor. App. 0137, 0139 at 12:8–15; 20:6-23. Haag saw Sanders on rounds both before and after his October 2015 suicide attempt, and twice in the month before his July 2016 suicide attempt. Starting in December 2016, she led group therapy sessions that Sanders attended. Sanders spoke with her about his anger, depression, concerns about his lack of access to out-of-cell exercise, and requests to be removed from solitary confinement or minimally have his time reduced. App. 1152 at 90:4–91:6. Sanders asked her for relief from the conditions in solitary confinement and yard restriction, but Haag told him she already had two prisoners in the Mental Health Unit at Pontiac and could not help him. App. 1152 at 91:7–12.

Haag testified that she knew of research showing a correlation between placement in solitary confinement and mental illness, recognizing that solitary confinement can exacerbate the symptoms of the mental illness. App. 0144, 0146 at 39:3–8; 47:20–25. Haag further testified that Sanders had exhibited some of the factors indicated for risk of suicide: depression, lack of impulse control, and serious mental illness. App. 0157 at 91:10–17.

But despite this knowledge, Haag failed to reduce Sanders' solitary time. Haag recommended that Sanders receive a limited solitary confinement term of zero to three months including limited out-of-cell exercise time, noting that solitary

confinement was likely to significantly impact Sanders' mental health. App. 0809–10 (mental health disciplinary review form signed by Haag). Even in this instance, however, Haag testified that she was unaware of any implications of out-of-cell exercise restrictions and admitted she did not consider Sanders' 15-year solitary confinement term in making her recommendation. App. 0152 at 70:17–23. Moreover, when Sanders asked Haag to help remove him from solitary confinement and to transfer him to the Mental Health Unit at Pontiac, she refused to do so. App. 1152 at 91:1–21.

### 5. *Linda Duckworth.*

Linda Duckworth served as a qualified MHP for Wexford and for two months, as Director of the Mental Health Unit at Pontiac, where she supervised Haag, Lanterman, Moss, and Nelson. App. 0244 at 14:14–15:2. Like Wexford's other MHPs, Duckworth was aware of Sanders' mental illness, and in one of her early encounters with him, she observed him indicating that he would cut himself with a paperclip. App. 1562–63. Duckworth's own assessment was that Sanders suffered from schizoaffective disorder, intermittent explosive disorder, and narcissistic traits. App. 0561.

Duckworth recognized that "seriously mentally ill people have a much harder time understanding consequences for behaviors and to continue to punish and punish and punish is not going to actually change their behaviors." App. 0270 at 121: 11–16. And she further testified that anytime there's a suicide attempt, it is inadvisable for solitary confinement time to be recommended. App. 0250 at 38:18–22.

Despite this knowledge, Duckworth still recommended a year of further solitary confinement for Sanders on top of his 15-year term. App. 0260, 0262 at 79:5–10; 87:3–9. Indeed, she testified that she does not consider the length of the solitary confinement term that the prisoner is already serving when making a disciplinary recommendation. App. 0260 at 79:11–80:3. She further testified that she would still recommend a solitary confinement term even when the solitary confinement is likely to significantly affect the prisoner's mental health. App. 0271 at 123:10–15.

For example, on July 24, 2016, Sanders attempted to commit suicide by overdosing on pills. App. 0645–47. He was then placed on a ten-minute suicide watch with a plan to follow up with him on the next day. *Id*. That very same day, he received a citation for "violent outburst" in his cell, despite being actively suicidal. App. 1657–59. Two days later, on July 26, 2016, Sanders again self-harmed. App. 0650–53. He bit out a section of his arm and was placed on another ten-minute suicide watch. App. 0650. In the midst of his mental health crisis, the following day, he was cited again, this time for destruction of property. App. 1631–32. Just eight days after Sanders bit his arm, Duckworth participated as a member of the Adjustment Committee hearings for both citations and approved a sentence of one year of solitary confinement and months of out-of-cell exercise restriction and contact visits restriction, on top of four months of C-grade and other restrictions. Duckworth not only failed to consider Sanders' current term of solitary confinement in reaching her decision, but effectively punished him for being suicidal. App. 0261–62 at 84:10–88:19; App. 157–59. (Adjustment Committee report signed by

21

Duckworth). In fact, following the Adjustment Committee hearing, Duckworth evaluated Sanders' suicide potential and recommended that he remain in solitary confinement. App. 0660–63. In that evaluation, she identified four risk factors for suicide, including Sanders' worries about excessive cell time; difficulty adjusting to another loss of freedom, status and privilege; and previous suicide attempts. Yet, she recommended that Sanders remain in solitary confinement and did not acknowledge the negative impact of solitary confinement. Sanders pleaded with Duckworth to grant a medical order for out-of-cell time or to reduce or eliminate his time in solitary confinement, but she refused. App. 1153, 1187 at 95:20–96:2, 231:20–232:16.

### F.    Sanders' Release from Solitary Confinement.

In September 2017, after filing this lawsuit, Sanders was finally transferred out of solitary confinement and into the general population. App. 1380–84, 1391–97, 1402–04. But the brutal impact of eight straight years in a concrete cell, without meaningful human interaction, are long lasting and have not abated. In 2017, Sanders was diagnosed with Post-Traumatic Stress Disorder ("PTSD"). App. 1603–13; App. 1410. Sanders' medical expert Dr. Stuart Grassian opined that "[g]iven Sanders' serious mental illness, his youth when he was housed in very harsh conditions of solitary confinement, and the length of time he was so confined, it is very unlikely that he will ever fully recover from the ordeal." App. 1410.

## II.    Procedural History

### A.    Sanders' First and Second Appeals.

Sanders filed his complaint *pro se* on September 29, 2016. Dkt. 1. The district

court denied his request to litigate *in forma pauperis*, characterizing his allegations of self-harm as "self-serving," and rejecting his argument that he had plausibly alleged imminent physical harm sufficient to avoid the three-strikes rule under the Prison Litigation Reform Act, 28 U.S.C. § 1915(g). *Sanders v. Melvin*, 873 F.3d 957, 960 (7th Cir. 2017) (*Sanders I*). However, this Court found Sanders' allegations sufficient to meet the imminent harm standard. *Id.* at 961.

Following remand, Sanders filed an Amended Complaint asserting, as relevant here, violations of the Eighth Amendment by the Individual Defendants and Wexford. Dkt. 69. The district court again dismissed this action as a sanction, on the basis that Sanders had "lied" about the inadequacy of the Wexford Defendants' mental health treatment to satisfy the Section 1915(g) imminent danger requirement. Dkt. 223.

This Court again reversed, holding that the district court's finding of fraud was clearly erroneous because the district court improperly disagreed with Sanders' allegations—all of which were supported by admissible evidence—and failed to make appropriate inferences in his favor. *Sanders v. Melvin*, 25 F.4th 475, 485 (7th Cir. 2022) (*Sanders II*). This Court held that Sanders' complaint:

> tells a story of *inadequate* care. He details specific needs he has that are not being met. He relates interactions he has had with the staff that seem to explicitly confirm that a certain degree of crisis is a prerequisite to obtaining necessary care. And the most unfortunate corroboration of all is his record of self-harm and attempted suicide.

*Id.* at 484 (emphasis in original).

23

### B.   The District Court's Erroneous Dismissal and the Present Appeal.

On remand, the district court granted both the Wexford Defendants' and IDOC Defendants' Motions for Summary Judgment, dismissing the case in its entirety on January 24, 2023. App. 001–43; App. 0044–79. As before, the district court gave little consideration to Sanders' evidence and instead drew inferences in favor of the Wexford Defendants.

Following the district court's judgment on January 24, 2023, this appeal ensued. App. 0080. On December 14, 2023, pursuant to a settlement reached between Sanders and the IDOC Defendants, this appeal was voluntarily dismissed as to the IDOC Defendants and now proceeds only as to claims against the Wexford Defendants.

## Summary of Argument

The district court erred by granting Wexford's Motion for Summary Judgment and dismissing Sanders' entire case. Sanders presented ample evidence at summary judgment that a reasonable jury could find sufficient to satisfy the legal standard for deliberate indifference on the part of the Individual Defendants, and liability under *Monell v. Dep't of Soc. Servs.*, 36 U.S. 658 (1978), on the part of Wexford.

First, Sanders established that he suffers from a serious medical condition and that each of the Individual Defendants were deliberately indifferent to that condition, either (1) by failing to provide needed medical care for his mental illness, and/or (2) by approving additional solitary confinement and not advocating to release Sanders from solitary or lift his out-of-cell exercise restriction. *See Petties v.*

24

*Carter*, 836 F.3d 722, 727 (7th Cir. 2016) (en banc). Despite their awareness of Sanders' medical history and serious mental illness, each of the Defendants allowed Sanders' therapy appointments to lapse for months. They approved additional solitary confinement time, out-of-cell exercise restriction, and they did not advocate for any reduction in solitary confinement. Each of these actions, which are substantiated by ample testimony and evidence, placed Sanders at a substantial risk of serious harm or death. *See Sanville v. McCaughtry*, 266 F.3d 724, 733 (7th Cir. 2001).

Second, Wexford's policy of waiting until a prisoner experienced a mental health crisis (such as engaging in self-harm) before providing adequate medical care, and its failure to implement any policy to require its MHPs to consider the mental health history of SMI inmates when recommending solitary confinement to protect them from obvious harm, meet this Court's standard for imposing liability on entities acting pursuant to official government policy (*i.e.*, *Monell* liability). *See Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 929 (7th Cir. 2004). Sanders put forth evidence that he was explicitly told that Wexford's policy was to withhold mental health treatment until an inmate was in crisis, and his treatment history, as shown in the medical records and deposition testimony before the court, confirms that policy. Further, Wexford's failure to create a policy to require its MHPs to review the mental health records of an inmate and take them into account when participating in the disciplinary process was constitutionally deficient where

it was necessary to "remedy a potentially dangerous practice." *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 381 (7th Cir. 2017) (en banc).

This Court should reverse the district court's judgment.

## Standard of Review

An order granting summary judgment is reviewed *de novo*, evaluating the record in the light most favorable to the non-movant and drawing all reasonable inferences in his favor. *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016). Importantly, "no matter how tempting it might be on summary judgment to be distracted by the sparkle of seemingly compelling facts, [the Court's] assigned task is to take the facts in the light most favorable to the non-moving party." *White v. Woods*, 48 F.4th 853, 861 (7th Cir. 2022). "On summary judgment, [courts] do not weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true. Instead, [courts] have 'one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.*

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**Argument**

## I.     The District Court Erred in Granting Summary Judgment to the Individual Defendants on Sanders' Eighth Amendment Claims.

The District Court erred in granting summary judgment to the Individual Defendants on Sanders' Eighth Amendment claims. Throughout its opinion, the district court rubberstamped the Individual Defendants' version of events. Viewing all the evidence presented by Sanders in the light most favorable to him, a reasonable jury could find that the Individual Defendants violated his Eighth Amendment rights by: (1) persisting in a course of inadequate mental health treatment that they knew was ineffective; and (2) prolonging Sanders' solitary confinement and disregarding the serious risk of harm. The district court's contrary decision should be reversed.

### A.     The Individual Defendants Denied Sanders Constitutionally Adequate Healthcare By Persisting in a Course of Treatment They Knew Was Ineffective.

Under the Eighth Amendment, prisoners suffering from serious mental illnesses are entitled to adequate medical and mental health care. *Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983). To establish a constitutional violation, a plaintiff must prove both: (1) an objectively serious medical condition; and (2) defendants' deliberate indifference to that condition. *Petties*, 836 F.3d at 727–28. It is undisputed that Sanders suffered from an objectively serious medical condition. App. 0031 ("It is well-settled that mental illness treated with prescription medications constitutes an objectively serious medical condition.") (citation omitted). The only issue remaining is whether the Individual Defendants were

deliberately indifferent—and, more specifically at this stage, whether a reasonable jury, drawing all inferences in Sanders' favor, could so find.

Medical providers act with deliberate indifference when they "know of and disregard an excessive risk to inmate health." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). Sanders "is not required to show that he was literally ignored by prison staff to demonstrate deliberate indifference." *Petties*, 836 F.3d at 729. Nor does he need to show that the defendants "intended, hoped for, or desired the harm that transpired." *Haley v. Gross*, 86 F.3d 630, 641 (7th Cir. 1996). "If a risk from a particular course of medical treatment (or lack thereof) is obvious enough, a factfinder can infer that a prison official knew about it and disregarded it." *Petties*, 836 F.3d at 729. The court must "look at the totality of an inmate's medical care" to determine whether the defendant medical provider's actions constituted "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Id*.

This case is "a story of *inadequate* care." *Sanders II*, 25 F.4th at 484 (emphasis in original). Each of the Individual Defendants had personal knowledge of Sanders' history and risk of suicide and were informed by Sanders himself that he was suffering. Yet they persisted in offering only brief, non-confidential and non-therapeutic segregation rounds and crisis contacts—little more than wellness checks—with few to no therapeutic interactions in between. The result was a near-complete lapse in treatment until Sanders experienced a major, life-threatening

crisis event (his suicide attempts). And once his crisis subsided, the Individual Defendants failed to change course. This cycle of inadequate care resulted in multiple suicide attempts and plainly constitutes conscious disregard. *Petties*, 836 F.3d at 728. This Court explained in *Petties* that "if knowing a patient faces a serious risk of appendicitis, the prison official gives the patient an aspirin and sends him back to his cell, a jury could find deliberate indifference even though the prisoner received some treatment." *Id.* at 730. The same is true here. The evidence bears out what this Court has already observed in Sanders' case; "[v]iewed in the proper light, the documentary evidence . . . show[s] that he received *some* care, but many of the visits were only five or ten minutes long, and he indisputably received flurries of additional attention and care following self-harm." *Sanders II*, 25 F.4th at 485. The Individual Defendants persisted in providing wellness checks and medication management that were plainly ineffective "treatment" in the face of Sanders' suffering and suicide attempts. *See also Gray v. Hardy*, 826 F.3d 1000, 1009 (7th Cir. 2016) ("Knowingly persisting in an approach that does not make a dent in the problem is evidence from which a jury could infer deliberate indifference.").

Sanders' medical records and the Defendants' deposition testimony are replete with observations about his unstable and deteriorating mental state. Individual Defendants acknowledged that Sanders was a suicide risk when they repeatedly placed him on crisis watch for extended periods of time. Lanterman met Sanders when he was on crisis watch. App. 0345 at 171:21–172:24; App. 1565. Haag testified

29

that she was aware that Sanders was designated seriously mentally ill and noted that Sanders had "an inability to refrain from behaviors that result in disciplinary infractions." App. 0142, 0148 at 33:2–7; 56:7–13. Duckworth spoke to Sanders multiple times between 2015 and 2016, noting that Sanders had a lack of positive future orientation or sense of hope. App. 0661. Moss was aware of Sanders' diagnoses and observed his suicidal behaviors firsthand in 2015 when she placed him on crisis watch, noting that he displayed five risk factors for suicide. App. 0088 at 26:21–29:6; App. 1569–71. Nelson conducted segregation rounds and performed suicide screenings on multiple occasions, noting that Sanders expressed hopelessness and showed signs of depression. App. 1152–53 at 93:9-94:1; App. 0188 at 51:24–52:10.

Sanders told each Individual Defendant directly that his psychiatric medication was not effective and that his continued isolation and lack of access to outside exercise was harming him. Sanders begged Moss to meet with him on more than one occasion, and his pleas were met with the response that she did not want to see him unless he was suicidal. App. 1145–46, 1148–49 at 62:4–15, 68:20–69:16; 76:23–78:17; App. 0105 at 94:12–15. Sanders complained to Nelson repeatedly about the impacts solitary confinement and yard restrictions were having on his mental health. App. 0204 at 115:11–15; App. 1153 at 93:9–94:15. Sanders told Lanterman about the negative effects that his lack of yard time and long-term solitary confinement were having on his mental health. App. 1598; App. 1153 at 94:20–24. Sanders told Haag that his solitary confinement was exacerbating his mental

health issues. App. 1152 at 90:4–93:1. Sanders also complained to Duckworth about his lack of out-of-cell time and solitary confinement. App. 1153 at 95:20–96:2. He also asked Duckworth to provide a medical order for out-of-cell time or to reduce or cut his solitary confinement term. *Id.*; App. 1186 at 231:20–232:16.

Despite their awareness of Sanders' deterioration, the Individual Defendants failed to provide adequate mental health care. In fact, Moss told him directly that she would not help him, telling him twice that she did not want to see him unless he was suicidal. App. 1145–46, 1148–49 at 62:4–15, 68:20–69:16; 76:23–78:17; App. 0105 at 94:12–15). The record also shows serious gaps in mental health treatment from the Individual Defendants. At one time, Sanders had to wait a year between counseling sessions with Moss. App. 1552; App. 0521, 0523. He also experienced at least three other periods where he suffered three-month or longer gaps in treatment. The Individual Defendants failed to provide Sanders with meaningful treatment throughout 2014 and 2015, subjecting him to multiple months-long gaps in care. *See* App. 1552; App. 1554; App. 1556; App. 1558; App. 1560, App. 0552. This lack of treatment culminated in his October 2015 suicide attempt. App. 1567; App. 1573; App. 0605, 612–13; App. 0605–10. After a flurry of care around his suicide attempt, and despite their knowledge of Sanders' ongoing mental illness, Sanders was *again* subjected to lengthy gaps in care, receiving only *three* therapy sessions between his October 2015 suicide attempt and his next suicide attempt in July 2016. App. 0636–47. Moreover, he was returned to solitary confinement after

attempting to take his life, despite the fact that "anytime there's a suicide attempt, it's inadvisable" to place the person back in solitary. App. 0250 at 38:1822.

The contacts that Sanders did have with the Individual Defendants were mostly "very, very brief" non-therapeutic segregation rounds. App. 0316 at 56:15–21; App. 0393 at 66:14–22; 67:12-25; App. 0636–44. These wellness checks were insufficient to address Sanders' serious mental health needs. Constitutional liability cannot be avoided by "fetching a band-aid [when] an inmate is hemorrhaging." *Finley v. Huss*, 723 Fed. Appx. 294, 298 (6th Cir. 2018). Moreover, "a defendant's showing that a plaintiff received '*some*' treatment does not resolve the issue conclusively if the treatment was 'blatantly inappropriate.'" *Roe v. Elyea*, 631 F.3d 843, 858 (7th Cir. 2011) (quoting *Greeno*, 414 F.3d at 653–54 (emphasis in original)).

The district court was only able to find for the Individual Defendants because it took a reductive view of what constitutes adequate mental health care and drew inferences in the Individual Defendants' favor. Rather than considering the length, quality, and frequency of the Individual Defendants' contacts with Sanders, it simply tallied the number of encounters. App. 0036 (concluding that the evidence shows "multiple encounters with Defendants for mental health treatment" and that "Plaintiff met with Defendants more than sixty times"). But the fact that there were "multiple encounters" is not enough to absolve the Individual Defendants because those encounters did not provide meaningful treatment, or, at the very least, a reasonable jury could so find.

In the decision below, the district court once again did what this court said in *Sanders II* it should not do: it conflated the number of interactions with the adequacy of those interactions.

Out of the 63 interactions between Sanders and the defendants that the district court considered, more than half were non-therapeutic segregation rounds and crisis contacts: these were non-confidential, cell-front checks where correctional officers were often present and MHPs were often "just eyeball[ing]" Sanders. *See* App. 0317 at 58: 8–16; App. 0396 at 91:5–11. Of the remaining contacts with Defendants, many were group sessions where Sanders participated with his arms and legs shackled to a bench. App. 1188 at 234:6–10.

There were just nine instances ever in which the Individual Defendants attempted to provide any one-on-one therapeutic contact with Sanders. App. 0005, 0006–10, 0018. Between these therapeutic interactions were long stretches without any therapy from other clinicians, with Sanders rarely receiving therapy or contacts with MHPs longer than 5 to 10 minutes.

The district court reached its decision by ignoring Sanders' evidence and improperly making credibility determinations in the Individual Defendants' favor. For example, the district court downplayed the seriousness of Sanders' suicide attempts, finding that Sanders "reportedly overdosed," and reasoning that at the times Sanders self-harmed and was placed on crisis watch, each of his suicide attempts were largely related to "property issues" and "confrontations with correctional and medical staff." App. 0025; App. 0035. But there is no "reportedly"—

the fact is that Sanders overdosed. *See e.g.*, App. 0605–10; App. 1160–61; App. 1180 at 125:2–126:15; 202:1–17. Sanders' correctional expert also explained that Sanders' comments about his property and lack of access to out-of-cell exercise time only underscore the relationship between the dire conditions of his confinement and his mental health. App. 1489–90, 1492, 1496. The district court also ignored the fact that the Individual Defendants themselves placed Sanders on crisis watch. App. 0251–52 at 45:25–46:3; *See*, *e.g.*, App. 1160–61, 1164 at 124:9–10, 126:5–127:20, 140:16–141:18; App. 1650; App. 0315 at 51:1–52:10; App. 0205–14 at 120:5–157:12; App. 0648–49; App. 1654–55; App. 1569–71. The district court's framing is wholly inconsistent with the summary judgment standard.

In *Matz v. Frank*, 340 Fed. Appx. 323, 329 (7th Cir. 2009), this Court criticized a lower court that similarly overlooked and discounted evidence of plaintiff's suicide attempts at summary judgment, noting the district court's "references to 'attempts to harm himself' is a gross understatement of what Matz's evidence shows when viewed in a light favorable to him." *Id*. Here as in *Matz*, Sanders *did* harm himself, and the district court erroneously "followed the defendants' lead and minimized the undisputed seriousness" of his injuries. *Id*. at 327.

As the Seventh Circuit has reminded judges, "no matter how tempting it might be on summary judgment to be distracted by the sparkle of seemingly compelling facts, our assigned task is to take the facts *in the light most favorable to the non-moving party*." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021) (emphasis added). A reasonable jury considering the evidence in a light most

favorable to Sanders could conclude the Individual Defendants were deliberately indifferent, and therefore, summary judgement was improper.

**B.    The Individual Defendants Acted With Deliberate Indifference When They Recommended Additional Solitary Confinement And Refused to Recommend Reductions in or Release From Solitary Confinement.**

Not only did the Individual Defendants know that Sanders' placement in solitary confinement was exacerbating his mental illness and causing his mental health to deteriorate to the point of him attempting suicide more than once, but they acted with deliberate indifference by affirmatively recommending or approving *additional* time in solitary confinement. Specifically, because Sanders was designated SMI, they were required to review and provide an informed medical recommendation for discipline—including weighing in on solitary confinement time, loss of privileges such as access to out-of-cell exercise, and loss of good time credit on mental health disciplinary review forms. App. 1748 at 62:25–63:12; App. 1321 at 78:1–79:4; App. 1329 at 23:21–24:18, 47:9–21; App. 0189 at 57:18–24; App. 0799; App. 0804–08; App. 1639–40; App. 1642–43; App. 1636–37; Dkt. 204–75, Wexford Bates #001573-74. Wexford's MHPs were supposed to use their clinical judgment to determine whether confinement in solitary was likely to significantly impact Sanders' mental health and provide their opinion of overall appropriateness of placement in solitary confinement based on his mental health symptoms and needs. App. 1639–40; App. 1642–43; App. 1636–37; Dkt. 204–75, Wexford Bates #001573-74; App. 0799–803; App. 0804–08. This clinical judgment should have involved considering the potential for deterioration or other reasons solitary confinement was inadvisable,

35

including if Sanders had recently demonstrated suicidal behavior. *Id.*

Sanders presented evidence at the summary judgment stage permitting a reasonable jury to find in his favor both on the objective prong (that the risk to the himself was sufficiently serious) and the subjective prong (that the Individual Defendants were deliberately indifferent to the risk) of the Eighth Amendment analysis. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Delaney v. DeTella*, 256 F.3d 679, 683 (7th Cir. 2001).

As to the objective prong, Sanders was subjected to solitary confinement for eight consecutive years, exposing him to a substantial risk of serious harm. Sanders' expert testimony demonstrates the risk of harm posed by long-term solitary confinement. App. 1370–1478; App. 1479–1547. Solitary confinement and serious mental illness are a dangerous—even deadly—combination. App. 1377. "It has been long known that severe restriction of environmental and social stimulation has a profoundly deleterious effect on both mental and physical functioning." *Id.;* App. 1386 (describing research in medical literature, law journals, court opinions, and position papers of medical and international organizations all reaching similar conclusions condemning prolonged solitary confinement as "psychologically toxic, cruel, ineffective and counterproductive"); App. 1405 (opining that it is "fairly universally accepted that solitary confinement is at least a risk factor for psychiatric decompensation"). Indeed, this Court has recognized "[t]he serious psychological consequences of such quasi-solitary imprisonment have been documented." *Kervin v. Barnes*, 787 F.3d 833, 837 (7th Cir. 2015); *see also*

*Davenport v. DeRobertis*, 844 F.2d 1310, 1313 (7th Cir. 1988) (noting that it "seems pretty obvious, that isolating a human being from other human beings year after year or even month after month can cause substantial psychological damage").

The harms of solitary confinement are so well-established in law and medical literature as to be so obvious, and, a reasonable jury could find that the Individual Defendants, each of whom have training as mental health professionals, were therefore aware of that risk. App. 0395 at 87:14–19; App. 1404–08. The district court failed to account for this evidence. App. 0034.

Sanders also presented evidence at the summary judgment stage permitting a reasonable jury to find in his favor on the subjective prong, showing that the Individual Defendants consciously disregarded the risk of harm and prolonged Sanders' solitary confinement. *Farmer*, 511 U.S. at 834. Indeed, the Individual Defendants themselves explicitly acknowledged the risk of harm, evidencing their awareness. Duckworth testified that solitary confinement was not recommended for people with serious mental illness, because they "have a much harder time understanding consequences for behaviors, and to continue to punish and punish and punish is not going to change their behaviors." App. 0270 at 121:6–16, 164:2–5. Haag testified that she knew of research showing a positive correlation between placement in solitary confinement and mental illness, recognizing that solitary confinement can exacerbate the symptoms of the mental illness. App. 0144, 0146 at 39:3–8; 47:20–25. In fact, IDOC itself acknowledged the risk when it enacted an administrative directive specifically requiring special procedures for the placement

of SMI inmates in solitary confinement. App. 0799 ("The Department . . . shall ensure the involvement of a mental health professional during the processes of hearings and administration of discipline for offenders identified as seriously mentally ill *to prevent further deterioration*.") (emphasis added). All of this evidence, taken with the fact that each Defendant actually observed Sanders' deterioration and refused Sanders' requests for help, *supra* Statement of the Case Section I.E, establishes that a reasonable jury could find that the Individual Defendants knew of the risk.

Despite this knowledge, the Individual Defendants did not recommend a reduction in Sanders' solitary sentence or out-of-cell exercise restrictions. Instead, they affirmatively prolonged both Sanders' solitary and his out-of-cell exercise restrictions, even for offenses that occurred simultaneously with his suicide attempts and demonstrated that he was not stable. Each of the Individual Defendants was required to participate in the disciplinary process in two ways. First, they were called on to complete a mental health disciplinary review form for SMI inmates that were accused of an infraction, the purpose of which was to provide a recommendation as to whether the inmate's mental illness contributed to their behavior and whether they would be harmed by further solitary confinement or other punishments. App. 1123 at 116:21–117:2; App. 0799–803; App. 0804-08; *see also* App. 0109–10 at 113:23–114:3; App. 0399 at 112:16–23. Second, they sat on the Adjustment Committee, which reviewed mental health disciplinary review forms and meted out punishment accordingly. App. 0112 at 124:21–125:7; App. 0399 at

112:20–113:6. At both stages of the disciplinary process, the Individual Defendants had the ability to recommend no punishment *and* reductions in existing sentences. App. 0397–99 at 97:19–98:6; 112:20–113:6.

On numerous occasions, the Individual Defendants recommended or approved additional solitary confinement. For example, Moss recommended an additional six months in solitary confinement and an additional three months in C-grade. App. 1636–37. When Sanders was charged with "disobeying a direct order" on the day of his 2015 suicide attempt, Moss, as a member of the Adjustment Committee considering that charge, approved an additional three months of solitary. App. 1626–27. Nelson recommended additional solitary confinement for Sanders despite the fact that Sanders had told him he was suffering. App. 1639–40; App. 1642–43; App. 0190 at 58:11–18. Similarly, Lanterman approved two additional months of solitary confinement and an additional month of out-of-cell exercise restrictions. App. 1621–24. Haag, too, approved further out-of-cell exercise restrictions. App. 0809–10. And Duckworth recommended an additional year of solitary confinement for Sanders days after his fourth suicide attempt. App. 0260, 0262 at 79:5–10; 87:3–9.

The Individual Defendants' disciplinary review was cursory, both in completing the mental health disciplinary review forms and sitting on the Adjustment Committee. Nelson testified that when completing the mental health disciplinary review form, he did not observe, meet with, or speak to Sanders, nor did he review his medical records. App. 0189–90, 0196 at 57:18–59:24; 82:3–5. Lanterman also

39

testified that he did not observe or speak to Sanders to determine if he was mentally stable, nor did he review mental health or medical records. App. 0329 at 107:5–108:2. Haag testified that she did not consider Sanders' 15-year solitary confinement term in making her recommendation. App. 0152 at 70:17–23. Duckworth likewise testified that she does not consider the length of the solitary term that the prisoner is already serving when making a disciplinary recommendation. App. 0260 at 79:11–80:3 Sanders' correctional expert opined that the Individual Defendants' recommendations for prolonged solitary confinement were neither appropriate nor proportional to Sanders' conduct. App. 1487. That testimony must be credited at this stage.

The Individual Defendants played a pivotal role in Sanders' disciplinary decisions, and IDOC was required to take their recommendations into account. Contrary to the evidence, the district court absolved the defendants of responsibility by finding they were only involved "to a limited extent" in the disciplinary proceedings. App. 0037. But the extent of their involvement is a classic fact question for the jury, and the Individual Defendants' decisions in recommending additional solitary confinement and serving as members of the Adjustment Committee are sufficient to constitute personal involvement giving rise to Eighth Amendment liability. This applies even if they were not the sole or ultimate decision-maker in sentencing him to solitary confinement. The requirement of "personal involvement" can be established by showing that a defendant had direct participation in, and connection to, the constitutional deprivation. *See Conner v. Reinhard*, 847 F.2d 384,

397 (7th Cir. 1988) ("The requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or should reasonably have known would cause others to deprive the plaintiff of her constitutional rights."); *see also McClary v. Coughlin*, 87 F. Supp. 2d 205, 215 (W.D.N.Y. 2000) (opining on a similar adjustment committee as here "[p]ersonal involvement does not hinge on who has the ultimate authority for constitutionally offensive decisions. Rather, the proper focus is the defendant's direct participation in, and connection to, the constitutional deprivation."). Here, each of the Individual Defendants had direct involvement, and each took actions that resulted in Sanders experiencing constitutional harm.

The district court also erroneously concluded that Sanders was not harmed when the Individual Defendants' recommended additional solitary confinement because he did not actually serve this additional time. App. 0039–40. The district court reasoned that Sanders was already facing stacked solitary confinement sentences that the Individual Defendants only added onto, and it found Sanders was ultimately released early from solitary confinement in September 2017. App. 0040. But the district court disregarded evidence that the Individual Defendants could have advocated for Sanders to be released from solitary confinement, given a reduced solitary confinement sentence, be moved to a residential treatment center, or otherwise receive more mental health treatment. *See supra*, Statement of the Case Sec. I.C; App. 0397–99 at 97:8–98:6, 100:25–101:23; App. 0140 at 24:9–23; App. 0406 at 155:10–156:9.

Additionally, the Individual Defendants' failure to undertake a meaningful review of Sanders' medical history before recommending solitary confinement and their failure to exercise their clinical judgment to recommend reductions in Sanders' solitary confinement directly harmed Sanders. He remained in solitary and could have been released earlier, were it not for the Individual Defendants' deliberate indifference.

The Individual Defendants could have provided Sanders with mental health treatment, but instead, they subjected Sanders to substantial gaps in care and provided help only after his suicide attempts. The Individual Defendants also could have advocated for Sanders, based on their knowledge of his mental health deterioration and history of suicidal behavior, in their role in assigning solitary confinement. Again, instead of helping, they made things worse for Sanders by recommending additional punishments, even when the behaviors he was being punished for occurred concurrently with crisis events. Sanders presented sufficient evidence that a reasonable jury could find that the Individual Defendants were aware of the risk of harm their actions posed to him, and that they remained deliberately indifferent to those risks. Accordingly, the district court's decision to grant summary judgment should be reversed.

## II.     The District Court Erred in Finding that Sanders Has Not Established a *Monell* Claim Against Wexford.

The District Court erred in finding that no reasonable jury could find Wexford liable for its actions pursuant to official government policy under *Monell*. Sanders presented substantial evidence from which a jury could reasonably conclude that

Wexford ignored Sanders' pleas for help numerous times over the course of several years, resulting in repeated suicide attempts and self-harm. Viewed in the light most favorable to Sanders, this evidence establishes an unconstitutional widespread practice or custom. Sanders' evidence also establishes that Wexford failed to implement any policy to require its MHPs to review the mental health records of an inmate and take them into account when participating in the disciplinary process. This evidence is sufficient to establish liability under *Monell*—and all the more so if the evidence is viewed (as it must at this stage) in the light most favorable to Sanders.

Under *Monell*, municipalities can be held liable under Section 1983 when their official policy is "responsible for a deprivation of rights protected by the Constitution." *Monell*, 436 U.S. 658, 690 (1978). Municipalities can face liability under *Monell* even where there is not a formal policy. For example, they can be liable when constitutional violations arise from "an official policy," a "widespread and well settled" unofficial "government practice or custom," or an act by "an official with final policy-making authority." *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (citing *Monell*, 436 U.S. at 690).

Private entities like Wexford can be held liable under Section 1983 when they perform municipal functions, acting under color of state law. *Thomas*, 604 F.3d at 303. A private entity is liable if, in maintaining its widespread practice or custom or failing to implement a policy, it was "deliberately indifferent as to [the] known or obvious consequences" created by the practice or custom, or failure to implement a

43

policy. *Id.* at 303. This Court has long recognized that a plaintiff can establish the existence of a widespread practice or custom by pointing to repeated violations of his or her own rights. *Woodward*, 368 F.3d at 929 (finding *Monell* liability based on "based on repeated failures to ensure [the inmate's] safety."). Wexford can also be held liable for a failure to enact a policy "in situations where rules or regulations are required to remedy a potentially dangerous practice." *Thomas*, 604 F.3d at 303 (citing *Sims v. Mulcahy*, 902 F.2d 524, 543 (7th Cir. 1990)); *see also Glisson*, 849 F.3d at 381.

### A. Sanders Presented Significant Evidence of Wexford's Practice or Custom of Ignoring Prisoners' Mental Health Needs Until A Crisis Occurred.

Sanders put forth more than sufficient evidence to give rise to a genuine issue of material fact as to whether Wexford had a widespread practice or custom giving rise to *Monell* liability. Wexford made it abundantly clear, through the consistent actions of several of its MHPs, that Wexford had a policy that a prisoner must be in a life-or-death situation to receive any meaningful mental health treatment. As this Court observed, Sanders' testimony "relates interactions he has had with staff that seem to explicitly confirm that a certain degree of crisis is a prerequisite to obtaining necessary care" and he "indisputably received flurries of additional attention and care following self-harm." *Sanders II*, 25 F.4th at 484–85. And following his release from suicide watch, Sanders returned to solitary confinement and Wexford resumed its inadequate treatment of his mental illness, as if nothing serious had occurred. Thus, the cycle continued. Not surprisingly, Sanders attempted suicide multiple times. Wexford's care—or lack thereof—was not merely

44

sporadic or random. Rather, it was a widespread practice or custom, which carried obvious risks, and Wexford was deliberately indifferent.

The evidence in this case establishes that, for nearly a decade, Sanders' desperate pleas for mental health treatment were ignored, to the point that he tried to take his own life on multiple occasions. Instead of providing help, Wexford employed its widespread practice of having its employees to limit their services to brief contact with prisoners, until any situations escalated into a crisis. *See supra* Statement of the Case, Sec. I.E. Defendant Moss *explicitly* told Sanders that this was their practice; on at least two separate occasions, she told him that she did not want to see him unless he was suicidal. App. 1147–48, 1151 at 73:11–74:24, 76:10–78:10, 86:3–21. Another mental health provider confirmed to Sanders that "it seem[ed] like" it was true that he would not receive mental health care until he self-harmed. App. 1181 at 207:2–9.

The widespread practice that Moss described is confirmed by Sanders' experience: Sanders endured months without mental health therapy, receiving treatment only after he had attempted suicide. For over two years leading up to his 2015 suicide attempt, Sanders received almost no treatment, despite his history of suicidal behavior and his pleas for help. He received one therapy session in 2013, and then had to wait more than a year to receive another therapy session in April 2014. App. 0521, 0523. He then waited four more months before his next session. *See* App. 1552; App. 1554; App. 1556. In 2015, Sanders received one session with Duckworth in February 2015. App. 0552, 0556–57. Every other therapy session he

45

received in 2015 *only occurred because he was in crisis*: he saw Nelson in January 2015 "due to crisis," App. 0552, 0556–57, he received treatment in May 2015 after asking to see crisis staff, App. 0561, 0586–90, he received therapy in July 2015 when he reported he was suicidal, App. 1565, and was not seen again until he overdosed on 69 pills on October 27, 2015. App. 1567; App. 1573; App. 0605, 0612–13; App. 1279 ¶ 103. The same practice continued for the next year; in 2016, Sanders received one therapy session between January 2016 and his suicide attempt on July 26, 2016. App. 0636–44; *see* App. 0648–69. This evidence is more than sufficient to create a genuine dispute as to whether Wexford had a policy of waiting to provide mental health treatment to patients until they were actively suicidal.

Sanders also presented sufficient evidence to create a genuine dispute of material fact as to whether Wexford was deliberately indifferent to the obvious risks of its widespread practice or custom of refusing mental health treatment until an inmate harms themselves or commits suicide. Refusing to provide mental health treatment to a person until they attempt suicide carries the obvious risk that the person will never be *prevented* from attempting suicide; they will only receive treatment if they are lucky enough to survive their attempt. Wexford's mental health professionals are all educated and trained to know this. *See* App. 0395 at 87:14–19. Sanders complained to mental health staff on numerous occasions that solitary confinement was worsening his mental illness and begged for medical treatment to help him deal with his near constant isolation. For example, Moss

46

ignored Sanders' pleas for mental health treatments and measures, transfer to the mental health unit or release from solitary confinement. App. 1145 at 62:9–63:16. Haag also ignored his requests to be considered for treatment in the mental health unit, to be released from solitary confinement, and to receive increased out-of-cell exercise time. App. 1152 at 91:1–12. Nelson and Lanterman refused his requests to reduce solitary confinement time or increase out-of-cell exercise time, even when Sanders expressed concern that solitary confinement and lack of out-of-cell exercise were harming his health. App. 1153 at 94:5–95:5; 95:20–96:2. Not only was the risk obvious by virtue of their training and education, Sanders himself put them on notice. Further, the risks were obvious even if Wexford's practice of refusing mental health treatment until an inmate was in crisis had not yet resulted in the death of an inmate. Prison medical staff "does not get a 'one free suicide' pass." *Woodward*, 368 F.3d at 929.

These facts are sufficient, at a minimum, to give rise to a genuine issue of material fact as to whether Wexford has a widespread practice or custom of refusing mental health treatment until an inmate harms himself or commits suicide. This Court has stated numerous times that evidence like Sanders'—showing a widespread practice through repeated actions directed at one individual—can "truly evince the existence of a policy" to establish *Monell* liability. *Phelan v. Cook Cnty.*, 463 F.3d 773, 790 (7th Cir. 2006); *see also Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008) ("[W]e note that it is not impossible for a plaintiff to demonstrate the existence of an official policy or custom by presenting evidence limited to his

experience."); *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 655 (7th Cir. 2021) ("There are many other, less severe examples where incarcerated plaintiffs have adequately pleaded *Monell* liability alleging only their individual experiences.") (collecting cases). The instant case presents precisely the situation contemplated by this Court's prior decisions. Sanders begged the Individual Defendants to help him obtain mental health care and recommend reduced solitary confinement, and even though they were capable of doing this, they refused. He cut his stomach open, he bit the flesh off his wrist, he overdosed on pills, and still, they refused. *Supra* Statement of the Case, Section I.D. Despite his obvious distress and mental deterioration, he received little more than wellness checks, medication management, and crisis interventions for years. *Supra* Statement of the Case, Section I.E. The circumstances Sanders endured are exceptional and readily distinguishable from cases in which this Court found the plaintiff unable to demonstrate evidence of a widespread practice.

Accordingly, Sanders has raised sufficient evidence of Wexford's repeated unconstitutional conduct such that a reasonable jury could find that Wexford had a widespread practice or custom of denying mental health care unless a person was in crisis, and was deliberately indifferent to the risk that practice created. *See Woodward*, 368 F.3d at 929 (noting medical staff's "culture that permitted and condoned violations of policies that were designed to protect inmates.").

### B. Wexford is Liable For Failing To Create a Policy Where One Was Necessary.

*Monell* imposes liability on an entity for acting pursuant to an unconstitutional

policy, and thus most *Monell* cases involve some affirmative, concrete policy. But this Court has held that *Monell* liability can also attach where there is a failure to implement a policy where one was necessary to prevent constitutional harm. *Glisson*, 849 F.3d at 381. Sanders presented more than enough evidence to establish a *Monell* claim for Wexford's unconstitutional widespread practice or custom, but he has also presented ample evidence to show a genuine dispute of fact as to whether Wexford failed to implement a policy where one was necessary.

This Circuit has held that a defendant can be liable for a "a conscious decision not to take action," where "rules or regulations are required to remedy a potentially dangerous practice." *Glisson*, 849 F.3d at 381. In addition to its *Monell* violations for acting pursuant to an unconstitutional policy, Wexford is also liable under *Monell* for its unconstitutional failure to promulgate and follow a policy requiring MHPs to evaluate a prisoners' medical history and overall solitary confinement sentence, and to make appropriate recommendations regarding solitary confinement for SMI prisoners to prevent prolonged isolation.

The Individual Defendants' testimony shows that Wexford employees were not required to evaluate inmates either in completing a solitary confinement recommendation through a mental health disciplinary review form, or in approving solitary confinement as members of the Adjustment Committee.

Nelson testified that he would not review mental health records of prisoners prior to making a recommendation. App. 0189–91 at 57:25–58:7, 63:14–19. Lanterman testified that when serving on the Adjustment Committee, he "didn't

49

question" the mental health disciplinary review form recommendations, and that he did not review inmates' mental health history, observe inmates, or speak to inmates prior to approving solitary confinement. App. 0329–30 at 107:5–108:2, 113:6–14; App. 1639–40; App. 1642–43. Lanterman further admitted that in completing mental health disciplinary review form, he would make his recommendations about the appropriateness of solitary confinement without meeting with the prisoner, observing them, or making any attempt to directly assess their mental health symptoms. App. 329–30 at 109:25–110:15. Haag testified that during her entire tenure at Wexford, she did not recall a prisoner ever being listed as "contraindicated" for solitary confinement, no matter how severe his or her mental illness. App. 0141 at 26:9–11. Further, Sanders' expert opined that mental health disciplinary review forms "[were] handed out randomly, and the person filling them out might have had no contact with the inmate, no expectation that she would speak with him before filling out the form, and would have no basis for making an assessment about what was going on in the inmate's head when engaging in the behavior in question." App. 1407.

The district court acknowledged that Wexford did not institute a policy to recommend reductions in solitary confinement for SMI prisoners like Sanders. App. 0042. The court reasoned, however, that the presence of an IDOC policy alone was sufficient to mitigate constitutional harm, and thus "the fact that Wexford did not have a separate policy does not create liability under *Monell*." *Id*. This is incorrect.

50

Most importantly, Wexford offered no evidence that it had actually adopted IDOC's policy as its own or implemented it among its employees.

The fact that IDOC had a policy requiring the Adjustment Committee "to take into consideration the disciplinary recommendation of the mental health professional" was sufficient to put Wexford on notice of obvious risk associated with failing to implement their own policy to prevent harm to prisoners from extended solitary confinement. App. 1212–13, 1215 s*ee Glisson*, 849 F.3d at 380 (noting medical providers failed to adopt policies recommended by the Indiana Department of Corrections). In rejecting Sanders' *Monell* claim, the district court also ignored evidence that it "has long been known" that prolonged solitary confinement can cause "devastating" effects on a prisoner's mental health, which strongly suggests that a policy is necessary to prevent constitutional harm. App. 1377. The evidence shows that Wexford was well-aware of the obvious risk that additional solitary confinement posed to SMI prisoners' mental health and well-being, yet chose not to institute a policy to address this risk. *See J.K.J. v. Polk Cnty.*, 960 F.3d 367, 384 (7th Cir. 2020) (en banc) (finding *Monell* liability where county prison failed to implement a policies to fill obvious gaps in prisoner sexual abuse prevention, such as a policy for how to report abuse, even though there was a separate policy prohibiting sexual abuse of inmates generally). Despite this awareness, Wexford also failed to offer any evidence suggesting that the absence of a policy for recommending reductions in solitary confinement was a reasonable choice.

Wexford could have—and should have—created a policy requiring MHPs to evaluate a prisoners' medical history and overall solitary confinement sentence, and to recommend reductions in solitary confinement where appropriate. Such a policy implemented by Wexford could have prevented SMI prisoners from experiencing the harms caused by MHPs like the Individual Defendants. As a direct result of Wexford's failure, Sanders' medical condition further worsened when Wexford's MHPs continued to approve stacked solitary confinement sentences, which were an exacerbating factor in his suicide attempts, self-mutilation and deteriorating mental health. *Supra* Statement of the Case Section I.D, I.E. A reasonable jury could find that Wexford is liable for failing to create this policy. Instead, the district court improperly resolved factual disputes at summary judgment. Accordingly, this court should reverse.

## Conclusion

For the foregoing reasons, Sanders respectfully requests that this Court reverse the judgment below.

Date: June 20, 2024        Respectfully Submitted,

CORDELL SANDERS

By: */s/ Mitchell Alleluia-Feinberg*
    One of His Attorneys

Steven J. Horowitz               -and-
Kathleen L. Carlson
Leslie Kuhn-Thayer           Mitchell Alleluia-Feinberg
Tiffany C. Nwosu             **SIDLEY AUSTIN** LLP
Taylor J. Wilson              2021 McKinney Avenue, Suite 2000
**SIDLEY AUSTIN** LLP        Dallas, TX 75201
One South Dearborn St.      (214) 981-3300

Chicago, IL 60603
(312) 853-7000

*Attorneys for Plaintiff-Appellant Cordell Sanders*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g)(1), I hereby certify the attached Appellant brief complies with the type-volume and type-face requirements of Fed. R. App. P. 32(a)(6) and Circuit Rule 32(b) because this brief has been prepared in 12-point Century Schoolbook font. In addition, the attached brief complies with Circuit Rule 32(c) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 13,421 words.

*/s/ Mitchell Alleluia-Feinberg*
Mitchell Alleluia-Feinberg

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing with the Clerk of the United States Court of Appeals for the Seventh Circuit using the CM/ECF system this 20th day of June, 2024, and that a copy was served on all counsel of record by the CM/ECF system.

*/s/ Mitchell Alleluia-Feinberg*
Mitchell Alleluia-Feinberg

## CIRCUIT RULE 30(D) COMPLIANCE

The undersigned, an attorney, hereby certifies, pursuant to Circuit Rule 30(d), that all materials required by Circuit Rule 30(a) and (b) are included in the appendix.

*/s/ Mitchell Alleluia-Feinberg*
Mitchell Alleluia-Feinberg

## <u>TABLE OF CONTENTS REQUIRED OR AUTHORIZED<br>BY CIRCUIT RULE 30(a)</u>

Order on Wexford Defendants' Motion for Summary Judgment,
    01/24/2023, Dkt. 243 ............................................................................ App. 0001

Order on IDOC Defendants' Motion for Summary Judgment,
    01/24/2023, Dkt. 244 ......................................................................... App. 0044

Judgment,
    01/24/2023, Dkt. 245 ........................................................................... App. 0080

E-FILED
Tuesday, 24 January, 2023  02:27:57 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

CORDELL SANDERS,          )
          )
       **Plaintiff,**      )
    **v.**          )     **Case No. 16-cv-1366-JEH**
          )
ANDREA MOSS, *et al.*,      )
          )
       **Defendants.**    )

## ORDER ON WEXFORD DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is now before the Court on a Motion for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7.1(D) by Defendants Andrea Moss, Kelly Haag, Todd Nelson, Linda Duckworth, Stephan Lanterman, and Wexford Health Sources, Inc. (the "Wexford Defendants") (Doc. 181); Plaintiff's Response (Doc. 202); and Defendants' Reply (Doc. 217). For the reasons stated below, the Wexford Defendants' Motion is GRANTED.

## BACKGROUND

Plaintiff Cordell Sanders, an inmate in the custody of the Illinois Department of Corrections ("IDOC"), is proceeding on an Amended Complaint under 42 U.S.C. § 1983. (Doc. 69). Plaintiff, who was diagnosed with mental illnesses and designated as seriously mentally ill ("SMI"), was held in segregation[1] at Pontiac Correctional Center ("Pontiac") for approximately eight years for various disciplinary violations. *Id.*

---

[1] Defendants use the term "disciplinary segregation" to describe the restricted housing area at Pontiac. Plaintiff uses the term "solitary confinement." There is no housing area called "solitary confinement" at Pontiac. For purposes of this Order, the distinction is immaterial.

App. 0001

In Count III, Plaintiff alleges that, despite their knowledge of his serious mental health needs, Defendants failed to provide adequate mental health services and advocate for his removal from segregation, which Plaintiff claims caused or exacerbated his illness. *Id.* at 19, ¶ 101. Plaintiff alleges that Wexford is vicariously liable for the unconstitutional acts of its employees. *Id.* at 20, ¶ 107. Although the Seventh Circuit does not recognize *respondeat superior* claims for alleged constitutional violations of employees under § 1983, Plaintiff included this claim to preserve the argument. *Id.* at n. 3.

In Count IV, Plaintiff alleges that Wexford contracted with the State of Illinois to provide medical care to inmates at Pontiac and was responsible for creating, implementing, and overseeing policies, practices, and procedures for treatment. He claims that Wexford knew employees were allegedly denying mental healthcare for inmates like Plaintiff with serious mental illnesses and ignoring requests for treatment. *Id.* at 20, ¶¶ 111-112.

Plaintiff also alleges that IDOC employees Rob Jeffreys, Michael Melvin, Teri Kennedy, and Dr. Daidra Marano (the "IDOC Defendants") violated his rights under the Eighth and Fourteenth Amendments, the Americans with Disabilities Act ("ADA"), and the Rehabilitation Act ("RA"). The IDOC Defendants filed a Motion for Summary Judgment (Doc. 183), which this Court addressed in a separate Order.

## MATERIAL FACTS

Defendants object to thirty-one of Plaintiff's 166 additional material facts as a violation of the Court's Local Rules and argue that facts 8, 9, 12, 18, 25, 30, 48-49, 51-52, 63, 72-73, 76-78, 81, 85, 92, 97-98, 103, 105, 118, 121(c), 121(d)(iv), 121(e)(i), 122, 126, 129,

App. 0002

135-136, and 150 should be stricken. (Doc. 217 at 83) (citing CDIL-LR 7.1(D)(2)(b)(5)). Defendants maintain that Plaintiff's additional material facts "(1) combine multiple facts, making it impossible for Defendants to categorize them; (2) contain argumentative and conclusory statements, not facts; and (3) are vague due to use of non-specific words like 'rarely,' 'oftentimes,' 'defendants,' and 'mental health providers,' without reference to individuals or dates." (Doc. 217 at 83). The Court agrees many of the additional facts violate the Local Rules and are not statements of undisputed fact. Consequently, those statements are not included in the overview of the facts below. However, in the argument section of Plaintiff's Response, he cites to specific stated facts. (Doc. 202 at 110-125). In each instance, the Court has reviewed the cited materials.

### *Parties*

Plaintiff is currently incarcerated at Menard Correctional Center. (Doc. 181 at UMF[2] 1-2). The allegations in this case relate to his treatment during the eight years he was incarcerated at Pontiac from April 2009 until November 2017. *Id.* at UMF 3, 5.  During this time, the IDOC contracted with Wexford to provide mental health treatment for inmates. (Doc. 69 at 3, ¶ 8). Defendants Moss, Haag, Nelson, Duckworth, and Lanterman were employed by Wexford and worked as qualified mental health professionals ("MHPs") at Pontiac. *Id.* at ¶ 7.

---

[2] An "Undisputed Material Fact" from Defendants' Motion (Doc. 181) is abbreviated as "UMF."

*Plaintiff's History of Mental Illness*

Plaintiff was diagnosed with intermittent explosive disorder, impulse control disorder, and a depressive disorder when he was fifteen years old. (Doc. 202 at AUMF[3] 2). On May 17, 2004, at the age of sixteen, Plaintiff was sentenced to twenty years in prison. *Id.* at AUMF 3. While incarcerated, MHPs have diagnosed him with many serious mental illnesses, including bipolar mood disorder, schizoaffective disorder, and posttraumatic stress disorder ("PTSD"). *Id.* at AUMF 4, 113. Although Plaintiff's mental health diagnoses have varied, MHPs at Pontiac have consistently agreed that he suffers from serious mental illness requiring prescription medications. *Id.* at AUMF 5. It is undisputed that Plaintiff was, at times, designated as SMI. *Id.* at AUMF 121.

*Conditions of Plaintiff's Confinement at Pontiac*

In April 2009, after being charged with several disciplinary infractions, Plaintiff was placed in segregation at Pontiac, where he remained for over eight years. *Id.* at AUMF 6. His rule violations included assaulting staff and other inmates, fighting, intimidation and threats, dangerous contraband, and gang activity. (Doc. 184-6). Plaintiff's privileges were restricted because of his disciplinary history. (Doc. 202 at AUMF 14). For a description of Plaintiff's lengthy disciplinary history and the reasons for the IDOC's sentencing decisions, the Court references and incorporates herein its Order on the IDOC Defendants' Motion for Summary Judgment.

---

[3] An "Additional Undisputed Material Fact" from Plaintiff's Response (Doc. 202) is abbreviated as "AUMF."

App. 0004

The conditions in segregation differed from those of the general population. *Id.* at AUMF 10. Inmates in segregation remain in their cells for at least twenty-two and up to twenty-four hours a day. *Id.* at AUMF 11. During most of Plaintiff's time in segregation, inmates were allowed out of their cells only for showers, yard (a maximum of two times per week), visits, and to use the segregation law library. *Id.* at AUMF 13. Plaintiff did not have access to out-of-cell religious and educational programming or vocational opportunities. *Id.* Plaintiff participated in group mental health therapy when it was offered after 2016. *Id.* at AUMF 16.

### *Mental Health Treatment Provided by the Wexford Defendants*

It is undisputed that mental health staff assess and diagnose inmates. Every therapeutic contact between an inmate and a MHP is documented. *Id.* at AUMF 119. Defendants' encounters with Plaintiff are described below.

### *Defendant Andrea Moss*

On April 8, 2013, Plaintiff met with Defendant Moss for the first time. (Doc. 181 at UMF 25). According to the Mental Health Progress Note from this encounter, Defendant observed that Plaintiff's appearance, behavior, mood, concentration, memory, speech, and thoughts were appropriate and that he seemed alert, coherent, organized, and calm. (Doc. 206-18). Only his affect was documented as inappropriate and blunted. *Id.* Although Defendant noted that Plaintiff had been diagnosed with schizoaffective disorder, she determined that he could continue to be treated on an outpatient level of care. *Id.*

5

Defendant next encountered Plaintiff on February 5, 2014, for a routine mental health segregation round. (Doc. 181 at UMF 33). Segregation reviews or rounds allow MHPs to briefly assess an offender at the cell front, ask about psychotropic medication compliance, check the offender's cell, and inquire about any concerns. (Doc. 181-7, Moss Dep. at 21:7-13). If the MHP determined that the offender required mental health treatment or medical care, he or she could write a referral to address the identified need. *Id.* at 76-77. During this encounter, Plaintiff reported no mental health problems or complaints and indicated that he was seeing mental health staff or the psychologist regularly. (Doc. 181-18 at 5-6). Defendant determined that Plaintiff's appearance, behavior, mood, affect, concentration, memory, speech, and thoughts were appropriate, and she found his mental status to be within normal limits. *Id.* She concluded that there were no contraindications for his placement, and he did not require special accommodations. *Id.*

Plaintiff's next encounter with Defendant Moss was on March 10, 2014, for a mental health segregation round. (Doc. 181 at UMF 37). Plaintiff reported no mental health problems or complaints and advised that he was seeing mental health staff or the psychologist regularly. (Doc. 206-16 at 2). Defendant found Plaintiff's mental status to be within normal limits and noted that his appearance, behavior, mood, affect, concentration, memory, speech, and thoughts were appropriate. *Id.* She again concluded that there were no contraindications for his placement and that he did not require any special accommodations. *Id.* at 3.

6

When Plaintiff encountered Defendant again on April 2, 2014, he provided a summary of his criminal and mental health history. (Doc. 181 at UMF 42-43). He denied ever attempting suicide. (Doc. 206-17 at 2). Defendant noted his diagnoses of schizoaffective disorder, intermittent explosive disorder, and antisocial and narcissistic traits. *Id.* She observed that Plaintiff was alert, calm, cooperative, and coherent and determined that he could continue being treated on an outpatient level. *Id.*

Plaintiff saw Defendant again on April 29, 2014, for a mental health segregation round. (Doc. 181 at UMF 48). He did not report any mental health problems or complaints and told Defendant he had been seeing mental health staff or the psychologist regularly. (Doc. 181-18 at 13-14). Defendant noted that Plaintiff's mental health status was within normal limits and observed his appearance, behavior, mood, affect, concentration, memory, speech, and thoughts were appropriate. *Id.* She concluded that there were no contraindications for his placement and that he did not require any special accommodations. *Id.*

Plaintiff next saw Defendant on May 7, 2014. (Doc. 181 at UMF 53). He reported issues with his current disciplinary and criminal proceedings. (Doc. 206-19 at 2). They performed an exercise where Plaintiff listed what triggered his anger and aggression. *Id.* Defendant noted that Plaintiff's appearance, behavior, mood, concentration, memory, speech, and thoughts were appropriate, but indicated that his affect was "restricted." *Id.* Plaintiff denied any suicidal or homicidal ideations. *Id.* Defendant determined that Plaintiff could continue an outpatient level of care. (Doc. 181 at UMF 58).

On May 29, 2014, Plaintiff saw Defendant for a mental health segregation review. *Id.* at UMF 59. He did not report any mental health problems or complaints and told Defendant that he was stable and seeing mental health staff or a psychologist regularly. (Doc. 181-18 at 16-17). Defendant observed that his appearance, mood, affect, concentration, memory, speech, and thoughts were appropriate. *Id.* at 16. She determined his mental status was within normal limits, but she indicated his behavior was inappropriate because he began masturbating at the end of the interview. *Id.* Defendant determined that there were no contraindications for his placement and that he did not require any special accommodations. *Id.*

Plaintiff next saw Defendant on June 13, 2014 and July 14, 2014 during mental health segregation rounds. (Doc. 181 at UMF 65). Defendant did not believe any further action was required based on these encounters. (Doc. 181-18 at 18, 20).

When Plaintiff met with Defendant on August 5, 2014, he reported that he was ready move to another cellhouse because he had not received a disciplinary ticket in four months. (Doc. 181 at UMF 67-68). Defendant noted that his appearance, behavior, mood, memory, speech, and thoughts were appropriate. (Doc. 206-20 at 2). She indicated that his affect and concentration were poor because he was "smiling at inappropriate times," "easily distracted," and "drifting off into [his] own 'world.'" *Id.* There were no observable signs of distress or agitation, and Plaintiff denied any suicidal and homicidal thoughts. *Id.* Defendant determined that an outpatient level of care was still appropriate. (Doc. 181 at UMF 74).

During the next encounter on September 3, 2014, Plaintiff indicated that he might be depressed; however, he stated that he was feeling better after the doctor recently increased his Prozac dosage. *Id.* at UMF 75, 77, 79. Plaintiff reported issues with correctional staff and that his request for a yard restriction reduction had been denied. (Doc. 206-21 at 2). Defendant documented his appearance, behavior, mood, affect, concentration, memory, speech, and thoughts as appropriate. *Id.* She found him to be coherent, alert, cooperative, and euthymic and documented that he had good impulse control. *Id.* Plaintiff denied that he was experiencing suicidal or homicidal thoughts. *Id.*

Plaintiff next encountered Defendant on October 8, 2014. (Doc. 181 at UMF 83). They discussed Plaintiff's complaints about his ongoing criminal case and issues he was having with security. (Doc. 206-22 at 2). Plaintiff reported that it had been six months since he last received a disciplinary ticket. *Id.* Defendant noted that Plaintiff seemed easily distracted and was "detached emotionally." *Id.* Defendant did not observe any signs of distress or agitation and noted that his appearance, behavior, mood, affect, memory, speech, and thoughts were appropriate. *Id.* Plaintiff did not report any homicidal or suicidal ideations. *Id.* Defendant concluded that he could continue an outpatient level of care. (Doc. 181 at UMF 89).

Plaintiff did not encounter Defendant again until September 9, 2015, for a mental health segregation round. (*Id.* at UMF 90-91; Doc. 181-19 at 4). Plaintiff reported that he was not taking his psychotropic medications because "they don't help." *Id.* at 6. Defendant noted that his appearance, behavior, mood, affect, concentration, memory, speech, and thoughts were appropriate. *Id.* He was alert, calm, cooperative, and exhibited

9

good eye contact. *Id.* She did not notice any signs of distress or agitation, and Plaintiff denied having any suicidal or homicidal thoughts. *Id.* Defendant referred Plaintiff for mental health services, instructed him to consult with a psychiatrist regarding his medications, and completed a formal request for a psychiatric consult. *Id.* at 5-6. Defendant determined that Plaintiff could remain on an outpatient level of care. (Doc. 181 at UMF 101).

Defendant next encountered Plaintiff when she was called to respond to a purported crisis in his cell on November 4, 2015. *Id.* at UMF 102. When Defendant arrived, correctional staff informed her that Plaintiff was covering his cell front and "threatening to do something dangerous." *Id.* at UMF 103. She evaluated his suicide potential and noted his recent overdose attempt. *Id.* at UMF 103-104. Plaintiff reported that he was worried about losing his shoes after he was extracted from his cell. (Doc. 206-26 at 2). Plaintiff indicated he was not suicidal, but due to his recent overdose attempt, observable anger and agitation, and his threats of dangerous activity, Defendant placed him on suicide watch in the crisis care area and scheduled an appointment with a MHP. (Doc. 206-27 at 2-4). While on suicide watch, inmates see a mental health staff member each day for a crisis check. (Doc. 181-8, Nelson Dep. at 149:22-151:19).

Plaintiff next saw Defendant on November 12, 2015. (Doc. 181 at UMF 109). He did not exhibit any signs of agitation or distress during their forty-minute session. (Doc. 206-29 at 2). When asked to discuss his recent crisis placement, he informed Defendant that he never said he was dangerous and that he was extracted from his cell because he was angry about his property. *Id.* Defendant observed that his affect, behavior, appearance,

concentration, memory, and speech were appropriate. *Id.* Plaintiff denied any suicidal or homicidal thoughts and auditory or visual hallucinations. *Id.* Although Defendant noted some paranoid ideations and mood issues, she determined that he could continue with an outpatient level of care. (Doc. 181 at UMF 114).

During their next encounter on December 3, 2015, Plaintiff told Defendant that he did not want to change anything about himself because he is perfect, fearless, not scared of anyone or anything, and had not cried in years. *Id.* at UMF 115-118. He further reported that he is unable to empathize, struggles to read social cues, and mimics behaviors. *Id.* at UMF 119-121. Defendant did not observe signs of distress or agitation and opined that he was competent, alert, and organized. *Id.* Defendant also opined that Plaintiff had a strong sense of entitlement, was egocentric, had poor social skills, and struggled to apply skills in his environment. (Doc. 181 at UMF 125). Plaintiff denied any current concerns, suicidal or homicidal ideations, and auditory or visual hallucinations. (Doc. 181-19 at 34-35). Based on their forty-minute encounter, Defendant determined that he could continue with an outpatient level of care. (Doc. 181-18 at 35).

Plaintiff met with Defendant Moss for the last time on November 3, 2016, when he requested a disciplinary segregation review. (Doc. 181 at UMF 127). He reported that he had not received any tickets for some time. (Doc. 206-30 at 2). During their thirty-minute session, Defendant observed that Plaintiff seemed coherent, organized, and competent. *Id.* Plaintiff reported that he was satisfied with his current medications and denied experiencing any side effects. *Id.* Defendant opined that Plaintiff misinterprets other people's motivations and behaviors, which causes him to distrust others. *Id.* She also

11

noted that he experiences severe anxiety, which causes him to respond inappropriately to social cues and hold peculiar beliefs. (Doc. 181 at UMF 131). She noted a diagnosis of schizotypal personality disorder and "MDD – w/paranoid ideation, along with a designation of SMI." (Doc. 206-30 at 2). Defendant determined that he could continue with an outpatient level of care. (Doc. 181 at UMF 132).

### *Defendant Kelly Haag*

Defendant Haag began her employment with Wexford in October 2014. *Id.* at UMF 133. She encountered Plaintiff for the first time on August 26, 2015, during a mental health segregation round and was not aware of his prior mental health issues or needs. *Id.* at UMF 135-137. Plaintiff told her that he was fine and was compliant with his medication; his cell appearance was good; and Defendant determined no further action was needed. (Doc. 181-19 at 3).

Defendant saw Plaintiff again on November 6, 2015, June 21, 2016, and July 6, 2016, during mental health segregation rounds. (Doc. 181 at UMF 144, 154). During each encounter, Plaintiff reported that he was compliant with his medication; he did not express any immediate concerns; his cell appearance was good; and Defendant determined no further action was needed. (Doc. 181-19 at 28, 48, 52).

Defendant did not have any further mental health contacts with Plaintiff until December 13, 2016, when she began facilitating anger management group therapy sessions. (Doc. 181 at UMF 158-159). During a session that lasted 1.5 hours, Plaintiff reported that he was doing fine and denied experiencing homicidal or suicidal ideations. (Doc. 181-20 at 23). He further reported that prior to his group session, he had an incident

App. 0012

with a nurse about medication, but he used coping strategies and did not act aggressively. (Doc. 181 at UMF 161-162). Defendant performed a mental status evaluation and determined that he was cooperative, oriented, appropriately groomed, and presented a clear and coherent thought process. (Doc. 181-20 at 23). Defendant did not observe any signs of psychosis, distress, or agitation and opined that he was showing signs of improved impulse control and insight. (*Id.* at 24.; Doc. 181 at UMF 165). Defendant noted that she would continue providing support to Plaintiff through group therapy. (Doc. 181-20 at 24).

Defendant next saw Plaintiff on December 27, 2016, for a conflict resolution group therapy session. (Doc. 181 at UMF 166). During this one-hour session, Plaintiff reported that he was "the same as always" and expressed frustration that he should not have to choose between groups and yard. (*Id.* at UMF 167; Doc. 181-20 at 27). Plaintiff denied experiencing homicidal and suicidal ideations. *Id.* Defendant performed a mental status evaluation and determined that he was cooperative, oriented, appropriately groomed, and presenting a clear and coherent thought process. *Id.* She did not observe any signs of psychosis, distress, or agitation. (Doc. 181 at UMF 171).

Plaintiff next saw Defendant on January 3, 2017, for the second session of his conflict resolution group. *Id.* at UMF 172. He acted appropriately and was engaged in the group process. *Id.* at UMF 173. His speech was fluent and coherent, and he volunteered to read for the other group members. (Doc. 181-20 at 31). Defendant noted that he was cooperative and his thought process was clear. (Doc. 181 at UMF 175). Defendant did not observe signs of psychosis, agitation, or distress, and Plaintiff denied any homicidal or

13

suicidal ideations. (Doc. 181-20 at 31). Defendant opined that Plaintiff had poor impulse control, as evidenced by his inability to refrain from behaviors that result in disciplinary infractions, but she opined that he was showing improved insight regarding behavioral triggers and the consequences of his behaviors. (Doc. 181 at UMF 177-178).

Defendant encountered Plaintiff on January 10 and 17, 2017, for group therapy sessions. *Id.* at UMF 179, 186. During these one-hour meetings, Plaintiff acted appropriately and was engaged in the group process. *Id.* at UMF 180, 187. He denied any suicidal or homicidal ideations; he appeared cooperative, oriented, and appropriately groomed; and he presented a clear and coherent thought process. (Doc. 181-20 at 39-40). Defendant did not observe any signs of psychosis, agitation, or distress. *Id.* She opined that Plaintiff was showing improved impulse control and insight, as evidenced by his ability to refrain from behaviors that result in disciplinary infractions. (Doc. 181 at UMF 184-185; Doc. 181-20 at 40).

Defendant evaluated Plaintiff again on February 8, 2017. *Id.* at UMF 192. He reported that he was doing "pretty good" and denied experiencing homicidal or suicidal ideations. (Doc. 181-20 at 46). Plaintiff was engaged in the group process, volunteered to read, and offered insightful responses to questions. (Doc. 181 at UMF 195). When Defendant evaluated his mental status, she noted that he was cooperative, oriented, appropriately groomed, and presented a clear and coherent thought process. (Doc. 181-20 at 46). Defendant did not observe signs of psychosis, agitation, or distress. *Id.*

Defendant next encountered Plaintiff on February 28, 2017. (Doc. 181 at UMF 198). When they discussed difficulties adhering to the correctional environment, Plaintiff

14

reported, "I'm survivin'. I'm used to this." (*Id.* at UMF 199-200). Defendant did not observe any signs of psychosis, agitation, or distress. (Doc. 181-20 at 62). She opined that Plaintiff showed improved insight and impulse control, as evidenced by his ability to refrain from behaviors that result in disciplinary infractions. (Doc. 181 at UMF 203). Plaintiff denied homicidal and suicidal ideations. (Doc. 181-20 at 62). Defendant noted that she would continue providing support to Plaintiff through the group process. *Id.*

Defendant met with Plaintiff on March 1 and 22, 2017, during mental health segregation rounds. (Doc. 181 at UMF 205, 209). During both encounters, he did not express any concerns; his cell appearance was good; and Defendant determined no further action was needed. (Doc. 181-20 at 63, 68).

Plaintiff next encountered Defendant on March 28, 2017, for group therapy. (Doc. 181 at UMF 213). Plaintiff reported that he was doing "ok" and expected to be released from segregation in July 2017. (Doc. 181-20 at 69). Plaintiff denied experiencing homicidal or suicidal thoughts. *Id.* Defendant assessed Plaintiff's mental status and determined that he was cooperative, oriented, appropriately groomed, and presented a clear and coherent thought process. *Id.* Defendant did not observe any signs of psychosis, agitation, or distress. *Id.*

Defendant next encountered Plaintiff for a mental health segregation round on April 5, 2017. (Doc. 181 at UMF 218). Plaintiff informed Defendant that he had been reading the material she gave him; he did not express any immediate concerns; his cell appearance was good; and Defendant determined no further action was required. (Doc. 181-20 at 70).

15

Plaintiff next encountered Defendant for mental health segregation rounds on April 19, 2017 and May 3, 2017. (Doc. 181 at UMF 223, 228). Plaintiff reported that he heard he was going to the West Cellhouse and that he was "a little depressed and stuff over court yesterday," but he did not report any other immediate concerns. (Doc. 181-20 at 77; Doc. 181-21 at 1). Defendant noted his cell appearance was good and determined no further action was required. *Id.*

Plaintiff's last encounter with Defendant Haag was on September 6, 2017. (Doc. 181 at UMF 234). He expressed that it was good to see her back and that he could use more reading materials. (Doc. 181-21 at 41). Plaintiff did not express any other immediate concerns; his cell appearance was good; and Defendant determined no further action was needed. *Id.*

### Defendant Todd Nelson

Defendant Nelson began working at Pontiac in December 2014. (Doc. 181 at UMF 242). According to Plaintiff's medical records, Defendant first encountered Plaintiff on January 26, 2015, when Plaintiff called for a crisis contact with mental health because he was having issues with his yard and audio-visual restrictions. (Doc. 181-18 at 41). During their thirty-minute session, Defendant performed a mental status evaluation and noted that Plaintiff's appearance, behavior, mood, affect, concentration, memory, speech, and thoughts were appropriate. *Id.* When Defendant evaluated his suicide potential, Plaintiff did not report any previous suicide attempts, denied having suicidal thoughts, and reported that he was opposed to suicide. *Id.* at 38-40. Plaintiff denied being worried about any major problems, but informed Defendant that he had not been to the yard in over a

16

year and had been without his TV for three years. *Id.* at 38. Defendant informed Plaintiff that his concerns regarding yard time and TV privileges should be directed to security staff. *Id.* at 41. Plaintiff reported being anxious, experiencing headaches, and feeling hopeless, helpless, and depressed; however, Defendant determined that he was not a danger to himself or others. *Id.* at 38, 40-41. Defendant recommended that Plaintiff continue to see a MHP and psychiatrist as regularly scheduled. *Id.* Defendant informed Plaintiff that a MHP would follow up with him during segregation rounds. *Id.* at 41.

Defendant did not encounter Plaintiff again until January 25, 2016, for a wellness check after he was transferred to a different cellhouse. (Doc. 181 at UMF 263-264). During this encounter, Plaintiff stated that he was fine and did not have any current mental health concerns. *Id.* at UMF 265. Defendant noted that Plaintiff's appearance, behavior, mood, affect, concentration, memory, speech, and thoughts were appropriate. (Doc. 181-19 at 39). He also noted that Plaintiff appeared oriented and stable and did not observe any signs of psychosis. *Id.* Defendant determined that Plaintiff could continue with an outpatient level of care and planned to follow up with him in thirty days or as clinically indicated. *Id.*

Defendant next encountered Plaintiff during a mental health segregation round on February 11, 2016. (Doc. 181 at UMF 270). They discussed Plaintiff's mental health, and Plaintiff reported that his medications had expired. (Doc. 181-19 at 42). Defendant helped Plaintiff schedule an appointment with a psychiatrist who could renew his medications. (Doc. 181-8, Nelson Dep. at 22:22-23; Doc. 181-19 at 42).

17

Plaintiff next encountered Defendant on March 9, 2016. *Id.* at 43. Plaintiff reported no concerns; his cell appearance was fair; and Defendant determined no further action was required. *Id.*

Plaintiff encountered Defendant again on March 29, 2016. (Doc. 181 at UMF 280). Plaintiff reported that he was doing well and that he received a TV over the weekend. (Doc. 181-19 at 45). Plaintiff further reported that he had been on yard restriction for three years and had not been allowed his monthly yard time for 1.5 years. *Id.* Plaintiff denied any homicidal or suicidal ideations and stated that he could guarantee his own safety. *Id.* Defendant noted that his appearance, behavior, mood, affect, concentration, memory, speech, and thoughts were appropriate. *Id.* Defendant did not observe signs of psychosis, determined that Plaintiff could be managed on an outpatient level of care, and recommended a follow up appointment in thirty days or as clinically indicated. *Id.*

Plaintiff next encountered Defendant for a mental health segregation round on April 13, 2016. (Doc. 181 at UMF 287). Plaintiff reported no concerns; his cell appearance was good; and no further action was needed. (Doc. 181-19 at 46).

On July 25, 2016, Defendant met with Plaintiff while he was on suicide watch. (Doc. 181 at UMF 290). Plaintiff told Defendant that he dislocated his thumb during a staff assault and did not receive medical attention. *Id.* at UMF 291. Plaintiff stated he "became suicidal and took an overdose of Motrin." (Doc. 181-19 at 57). Plaintiff reported that he understood his actions showed poor judgment, stated that he was doing better and could guarantee his own safety, and denied any homicidal or suicidal ideations. *Id.* Defendant observed that Plaintiff was cooperative, appropriate, stable, and showed no

18

signs of psychosis. *Id.* Defendant consulted with the mental health treatment team who determined that Plaintiff should remain on ten-minute suicide watch. *Id.* A follow up appointment with a MHP was scheduled for the following day. (Doc. 181 at UMF 298). Defendant also conveyed Plaintiff's medical concerns about his thumb to the cellhouse lieutenant and major. (Doc. 181-8, Nelson Dep. at 145:2-6).

Plaintiff next encountered Defendant on July 26, 2016, while on suicide watch. (Doc. 181 at UMF 300). Plaintiff stated that he was doing better and was ready to be removed from suicide watch. (Doc. 181-19 at 58). Plaintiff denied any homicidal or suicidal thoughts and stated he could guarantee his own safety. *Id.* Defendant noted that he appeared cooperative and stable and did not exhibit any signs of psychosis. *Id.* Defendant consulted with the mental health treatment team who determined that Plaintiff could move from a ten-minute watch to a fifteen-minute watch with continued property restrictions. (Doc. 181 at UMF 306). A follow up appointment with a MHP was scheduled for the next day. (Doc. 181-19 at 58).

Defendant next encountered Plaintiff on July 27, 2016, while he was on suicide watch. *Id.* at 59. Plaintiff reported that he bit his arm the night before in an attempt to get medical attention for his injured thumb. (Doc. 181 at UMF 309-310). As a result, he was placed on a ten-minute watch. *Id.* at 309. Plaintiff denied homicidal and suicidal ideations and indicated that he could guarantee his own safety. (Doc. 181-19 at 59). Although Plaintiff "minimized his actions" and pointed out that the wound did not bleed, Defendant was concerned by his actions and informed the cellhouse lieutenant and major of his requests for medical care for his thumb. (*Id.*; Doc. 181-8, Nelson Dep. at 147:14-20).

19

Defendant also consulted with the mental health treatment team who determined that Plaintiff should remain on ten-minute suicide watch. (Doc. 181 at UMF 313).

Plaintiff next encountered Defendant on July 28, 2016. *Id.* at UMF 315. Plaintiff reported that he was doing better, admitted that biting his arm to get medical attention was poor judgment, and advised that he knew there was an appropriate procedure for requesting medical treatment. (Doc. 181-19 at 63). Plaintiff denied having any homicidal or suicidal thoughts, appeared stable, and did not exhibit any signs of psychosis. *Id.* Defendant consulted with the mental health treatment team who determined that Plaintiff could be moved from a ten-minute watch to a fifteen-minute watch. *Id.* A follow up appointment with a MHP was scheduled for the next day. *Id.*

Plaintiff encountered Defendant again on July 29, 2016, while on crisis watch. (Doc. 181 at UMF 323). Plaintiff stated that his thoughts of harming himself "just went away;" he could guarantee his own safety; and he was ready to be removed from suicide watch. (Doc. 181-19 at 64). Plaintiff denied having any homicidal or suicidal thoughts. *Id.* Defendant noted that he seemed cooperative, appropriate, and stable and did not exhibit any signs of psychosis. *Id.* After Defendant consulted with the treatment team, Plaintiff was moved from a fifteen-minute watch to a thirty-minute watch. (Doc. 181 at UMF 329). Plaintiff met with a MHP for a crisis checkup the next day. (Doc. 181-19 at 65).

Plaintiff encountered Defendant again on August 2, 2016, while on crisis watch. (Doc. 181 at UMF 332). Plaintiff reported that he was doing fine and was ready to come off suicide watch. (Doc. 181-19 at 68). He also reported that he knew how to utilize positive coping skills during times of frustration, denied suicidal thoughts, and stated

App. 0020

that he could guarantee his own safety. *Id.* Defendant observed Plaintiff to be cooperative, appropriate, and stable and did not note any signs of psychosis. *Id.* Defendant and the treatment team collectively determined that Plaintiff could be removed from suicide watch. (Doc. 181 at UMF 338). Plaintiff was scheduled for a follow up appointment with a MHP in seven days. *Id.* at UMF 339.

Plaintiff encountered Defendant Nelson during routine mental health segregation rounds on August 10, 24, and 31, 2016, January 18 and 25, 2017, and February 8, 2017. *Id.* at UMF 340, 343, 346, 349, 352, 355. During these encounters, Plaintiff did not report any concerns; his cell appearance was fair; and Defendant determined that no further action was needed. (Doc. 181-19 at 74, 76-77; Doc. 181-20 at 41, 43, 47).

### Defendant Linda Duckworth

Plaintiff first encountered Defendant Duckworth on February 23, 2015, after he requested a crisis contact. (Doc. 181 at UMF 358-359). Plaintiff refused to speak with her in front of correctional staff and was returned to his cell. (*Id.* at UMF 360-361; Doc. 181-18 at 45). Based on their brief encounter, Defendant observed that Plaintiff's appearance, concentration, memory, speech, and thoughts were appropriate and that his behavior, mood, and affect were inappropriate. *Id.* She advised Plaintiff to follow up with a MHP and the psychiatrist. (Doc. 181 at UMF 365). Correctional staff later informed Defendant that Plaintiff received a disciplinary ticket earlier that day for masturbating in front of a female officer and became so upset after receiving the ticket that he broke the head off a sprinkler. (Doc. 181-18 at 45).

App. 0021

Shortly after their initial encounter, Defendant returned to Plaintiff's cell to speak with him after he reportedly took out a paper clip and gestured that he was going to cut himself. (Doc. 181 at UMF 368). Plaintiff stated that he was upset because he was falsely accused of a ticket and his property would be taken away for three days. *Id.* at UMF 369-370. Defendant observed that Plaintiff's appearance, behavior, mood, affect, concentration, memory, speech, and thoughts were appropriate. (Doc. 181-18 at 46). She advised him to try deep breathing exercises and meditation to help get through the three days without his property and to follow up with his MHP and psychiatrist as scheduled. (Doc. 181 at UMF 374-375). Defendant determined that Plaintiff was at a minimal risk of suicide and could continue with an outpatient level of care. (Doc. 181-18 at 46).

Plaintiff encountered Defendant again on May 3, 2015. (Doc. 181 at UMF 377). Plaintiff indicated that when he requested a crisis contact, a correctional officer responded by saying: "What are you going to do? Kill yourself by hanging yourself?" *Id.* at UMF 377. Although he told the officer yes, Plaintiff informed Defendant that he was not suicidal. *Id.* at UMF 378-379. Plaintiff reported that he was upset because he got a ticket for masturbating, his property was taken away, and he wanted hygiene articles and clean underwear. *Id.* at UMF 380-381. Plaintiff's appearance, behavior, mood, affect, concentration, memory, speech, and thoughts were appropriate. (Doc. 181-18 at 50). Defendant determined that Plaintiff was stressed but at a minimal risk of suicide and could be managed on an outpatient level of care. *Id.* She instructed him to follow up with his MHP and psychiatrist as scheduled. (Doc. 181 at UMF 386).

App. 0022

Plaintiff next encountered Defendant on July 26, 2015. *Id.* at UMF 387. Plaintiff reported that on June 18, 2018, a female officer allegedly asked him to masturbate. *Id.* at UMF 388. Defendant advised Plaintiff to meet with internal affairs. *Id.* at UMF 397. Plaintiff stated that he was not suicidal, had no thoughts of harming himself, and did not need mental health services. (Doc. 181-18 at 79). Plaintiff's appearance, behavior, mood, affect, concentration, memory, speech, and were appropriate; Defendant did not observe any signs of agitation or distress; and Plaintiff denied any auditory or visual hallucinations. *Id.* Defendant determined that Plaintiff was at a minimal risk of suicide and could continue with an outpatient level of care. *Id.*

Plaintiff next encountered Defendant during a mental health segregation round on May 11, 2016. (Doc. 181 at UMF 398). Plaintiff reported that he had no concerns; Defendant determined that he was stable; his cell appearance was good; and no further action was required. (Doc. 206-11 at 2).

Plaintiff next saw Defendant on August 4, 2016, to evaluate his suicide potential due to his recent report under the Prison Rape Elimination Act. (Doc. 181-19 at 69-73; Doc. 181 at UMF 403-404). Plaintiff reported that a correctional officer had hit his butt, kicked his arm, and tried to break his wrist. *Id.* at UMF 405. Defendant noted that Plaintiff attempted suicide on July 24, 2016. (Doc. 181-19 at 69-72). Plaintiff reported that he was worried about having too much segregation time and losing his underwear in May 2015. (Doc. 181 at UMF 408). Plaintiff denied feeling embarrassed, ashamed, hopeless, or helpless. (Doc. 181-19 at 69-72). Defendant did not observe any signs of depression, anxiety, anger, or fear. *Id.* Plaintiff denied having suicidal thoughts or experiencing any

23

visual or auditory hallucinations. *Id.* Based on her overall assessment, Defendant Duckworth determined that Plaintiff was at a minimal risk of suicide and did not need a suicide watch placement. *Id.*

### Defendant Stephan Lanterman

Plaintiff first encountered Defendant Lanterman on April 21, 2015, for a mental health segregation round. (Doc. 181 at UMF 414). Plaintiff told Defendant that he was "ok;" his cell appearance was fair; and Defendant determined that no further action was needed. (Doc. 181-18 at 51).

Plaintiff next encountered Defendant for a crisis watch follow up on July 7, 2015. (Doc. 181 at UMF 418-419). Plaintiff reported that he felt suicidal the night before and was put on suicide watch. (Doc. 181-18 at 73). Plaintiff was upset because a correctional officer made false accusations about him and spit on him; a tactical team extracted him from his cell; and his wrist hurt. (Doc. 181 at UMF 421-422). Plaintiff also reported, "I hear voices – can't make them out" and stated, "I am still suicidal, been angry." *Id.* at UMF 423. Plaintiff denied a history of suicide and reported that he was compliant with his medications. *Id.* at UMF 424. Defendant determined that Plaintiff should remain on a crisis level of care with ten-minute watches and scheduled a follow up appointment with mental health staff. *Id.* at UMF 425-427.

Plaintiff next encountered Defendant on July 8, 2015. *Id.* at UMF 428. Plaintiff reported that he felt good and had time to cool off after a correctional officer spit on him. *Id.* at UMF 429-430. He also reported that he was not suicidal and was compliant with his medications. *Id.* at UMF 430-431. Plaintiff's mood was stable, and his mental status was

24

clear. (Doc. 181-18 at 75). Defendant determined that Plaintiff was at a low risk of suicide and could be taken off crisis watch. (Doc. 181 at UMF 433). Defendant instructed Plaintiff to follow up with a doctor and a MHP in seven days. *Id.* at UMF 434.

On October 9, 2015, Plaintiff saw Defendant at an Adjustment Committee hearing. (Doc. 181-10, Lanterman Dep. at 99:25-100:1-2). They did not interact during the hearing. Defendant's role was to observe the hearing, answer questions posed to him, and address any mental health considerations that arose during the Committee's deliberations. (Doc. 181 at UMF 436; Doc. 181-10, Lanterman Dep. at 100, 102-103). Defendant participated "minimally" in the discussion and "functioned as a witness." *Id.* at 102-103. The recommended disciplinary action was one month of yard restriction. *Id.* at 104:9-13. According to a consultation with mental health staff, Plaintiff was deemed stable on October 9, 2015. *Id.* at 100:19-24, 107:11-17.

Plaintiff next encountered Defendant on October 27, 2015, when he reportedly overdosed. (Doc. 181 at UMF 444-445). The tactical team extracted Plaintiff from his cell and took him to urgent care. *Id.* at UMF 445. As a result, Defendant was unable to perform a further assessment at that time. *Id.* at UMF 446. Instead, Defendant placed him on a crisis level of care, ordered a ten-minute suicide watch, and directed him to follow up with a MHP the next day. *Id.* at UMF 447-448.

Plaintiff next encountered Defendant on October 28, 2015, while on crisis watch. *Id.* at UMF 449. Defendant evaluated Plaintiff's suicide potential. *Id.* at UMF 450. Plaintiff reported that he was worried because he "caught a new case" and his yard time was taken away. (Doc 181-19 at 18-21; Doc. 181 at UMF 452). Defendant observed that Plaintiff

**App. 0025**

was acting calm and his appearance, behavior, mood, affect, concentration, memory, speech, and thoughts were appropriate. (Doc. 181-19 at 21). Plaintiff denied experiencing suicidal or homicidal ideations and auditory or visual hallucinations. *Id.* Defendant determined that Plaintiff should remain on a crisis level care with a fifteen-minute watch. (Doc. 181 at UMF 457).

Plaintiff's last encounter with Defendant Lanterman on October 30, 2015, while he was on crisis watch. *Id.* at UMF 458. Plaintiff reported, "I feel good on Prozac, ate and slept good." *Id.* at UMF 459. He also reported that he was not suicidal and could guarantee his own safety. (Doc. 181-19 at 22). Defendant determined that Plaintiff's appearance, behavior, mood, affect, concentration, memory, speech, and thoughts were appropriate. *Id.* Plaintiff denied experiencing suicidal or homicidal ideations and auditory or visual hallucinations. *Id.* Defendant determined that Plaintiff could be removed from crisis watch and return to his previous level of care. (Doc. 181 at UMF 464). A follow up appointment with a MHP was scheduled in seven days. *Id.* at UMF 465. Defendant's employment with Wexford ended on November 22, 2016. (Doc. 181-10, Lanterman Dep. at 28:15-16).

Although Plaintiff does not dispute the accuracy of the statements in Defendants' notes from their encounters with him, Plaintiff asserts that the self-reporting of individuals with mental illness, especially inmates, can often be unreliable. (Doc. 202 at 46; Doc. 206-1 at 18-19, n. 20). Plaintiff also asserts that his interactions with MHPs during mental health segregation rounds were brief and not therapeutic and that the appearance of his cell and his mental status or suicidality on a particular date are immaterial as to

26

whether Defendants improperly denied him medical treatment and failed to advocate for his removal from segregation. (Doc. 202 at 11, 59, 61).

### *Mental Health Staff's Involvement in the Disciplinary Process*

Since September 2014, the IDOC's Administrative Directives require MHPs to be involved to a limited extent in the Adjustment Committee process when inmates who are designated as SMI are disciplined. (Doc. 181-23; Doc. 181 at UMF 467). SMI inmates are entitled to additional protections during disciplinary proceedings. *Id.* at UMF 471. After a prison official writes a ticket, the directive requires the MHP to review the inmate's mental health records and provide a completed Mental Health Disciplinary Review, also known as a "DOC 0443." (Doc. 202 at AUMF 65-66; Doc. 181 at UMF 470; Doc. 181-23 at 3). DOC 0443 provides the following:

(1) The reviewing MHP's opinion if, and in what way, the offender's mental illness contributed to the underlying behavior of the offense for which the DOC 0317 [Offender Disciplinary Report] was issued;

(2) The reviewing MHP's opinion of overall appropriateness of placement in segregation status based on the offender's mental health symptoms and needs; including, potential for deterioration if placed in a segregation setting or any reason why placement in segregation status would be inadvisable, such as the offender appearing acutely psychotic or actively suicidal, a recent suicide attempt or the offender's need for immediate placement in a Crisis Treatment Level of Care; and

(3) Based on clinical indications, recommendations, if any, for a specific term of segregation, including no segregation time, or specific treatment during the term of segregation.

(Doc. 181-23 at 3; Doc. 181 at UMF 477-478; Doc. 202 at AUMF 68-71). When formulating their recommendations, MHPs make a determination regarding a specific offense and disciplinary decision and do not consider the inmate's placement or past disciplinary

27

findings. (Doc. 181 at UMF 480). Plaintiff asserts that, in practice, the review was often cursory. (Doc. 202 at 21).

The Adjustment Committee is required to consider all opinions provided on DOC 0443 and can ask the reviewing MHP to appear before the Committee to provide additional testimony. (Doc. 181-23 at 3; Doc. 181-10, Lanterman Dep. at 100:13-18). MHPs do not participate in the finding of guilt or in deciding the actual discipline imposed. (*Id.* at 4; Doc. 181-15, Dr. Gillespie Dep. at 101:9-11). Final decisions on these issues are reached by the IDOC. *Id.* at 101:22-23. The Adjustment Committee must adopt the MHP's proposed discipline if the MHP determines that segregation should not be imposed due to clinical concerns. (Doc. 181-23 at 3-4).

### *Plaintiff's Complaints About Segregation Time*

Plaintiff claims that he voiced concerns about segregation in grievances he filed, but he offers no evidence that Defendants ever viewed the grievances or were aware of them. (Docs. 140-1–140-5). Plaintiff also states that he complained to Defendants about segregation and claims they should have advocated for his release. (Doc. 197-6, Sanders Dep. at 62:9-63:16, 91:1-12; 94:5-95:5, 95:20-96:2). Specifically, Plaintiff states that Defendant Haag did not advocate for his release from segregation or attempt to move him to the Mental Health Unit. (Doc. 202 at AUMF 94). Regarding Defendant Moss, Plaintiff testified that she ignored him and declined to recommend admitting him to the Mental Health Unit. *Id.* at 62:4-15, 68:20-69:16, 231:20-232:16. On one occasion when he was "extremely stressed out," he begged Defendant Moss to talk with him as she passed his cell, but she did not respond. *Id.* at 73:11-74:24, 86:3-21. Plaintiff testified that he was

28

App. 0028

seen by a different MHP that day. *Id.* at 75:1-4. Plaintiff states that he asked Defendant Duckworth for a medical order for out-of-cell time and requested that his time in segregation be eliminated or reduced, but she refused. *Id.* at 95:20-96:2, 231:20-232:16. Plaintiff testified that he told Defendant Lanterman that his conditions of confinement contributed to his depression, anger, and other mental health afflictions, but Defendant Lanterman refused to recommend that Plaintiff's segregation time be reduced. (Doc. 202 at 38, ¶ 90; Doc. 197-6, Sanders Dep. at 94:19-95:2, 231:20-232:16). Plaintiff states that he "repeatedly requested help with Defendant Nelson, who like did nothing to help." (Doc. 202 at 40, ¶ 92 (citing Doc. 197-6, Sanders Dep. at 93:9-14, 94:5-11, 231:20-232:16)).

Defendants assert that Plaintiff did not establish when these conversations took place and failed to provide additional information about his full mental state during these encounters that would have enabled Defendant to gather a clear clinical picture of his full mental state.

Plaintiff's requests for reduced segregation time were denied until January 26, 2017, when his segregation end date and C Grade status was cut by nearly ten years from an end date of June 16, 2027 to July 1, 2017. (Doc. 202 at AUMF 87-88). He also received cuts to his commissary and yard restrictions. *Id.* at AUMF 88.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, "[t]he court has one task and one task only: to decide,

29

based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004). To successfully oppose a motion for summary judgment, a plaintiff must do more than raise a "'metaphysical doubt' as to the material facts, and instead must present definite, competent evidence to rebut the motion." *Michael v. St. Joseph Cnty.*, 259 F.3d 842, 845 (7th Cir. 2001) (internal citation omitted).

## ANALYSIS

Defendants argue they are entitled to summary judgment on Plaintiff's claim alleging that they were deliberately indifferent to his serious mental health conditions. To establish an Eighth Amendment violation by a prison official for failure to provide adequate medical care, a prisoner "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 105-106 (1976). Plaintiff must show that he suffered from an objectively serious medical condition; Defendants knew of the condition and were deliberately indifferent to it; and this deliberate indifference injured Plaintiff. *Stocken v. Milwaukee Cnty.*, 44 F.4th 605, 614 (7th Cir. 2022) (citing *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010)).

30

### A. Plaintiff suffered from an objectively serious medical condition.

"A 'serious' medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 765-66 (7th Cir. 2002) (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1371 (7th Cir. 1997)). It is well-settled that mental illness treated with prescription medications constitutes an objectively serious medical condition. *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019) (Plaintiff's "schizoaffective disorder diagnosis, his symptoms, and his multiple prescriptions for psychotropic medications firmly establish that he suffered from an objectively serious medical condition."); *Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983) ("Treatment of the mental disorders of mentally disturbed inmates is a 'serious medical need.'").

It is undisputed that Plaintiff was designated as SMI at times and diagnosed with multiple serious mental illnesses, including bipolar mood disorder, schizoaffective disorder, and PTSD. Although his mental health diagnoses varied over the years, MHPs at Pontiac consistently agreed that he suffered from serious mental illness and required medication. The Court finds that Plaintiff suffered from an objectively serious medical condition.

### B. Defendants were not deliberately indifferent to Plaintiff's serious mental health needs.

Plaintiff's claim hinges on whether Defendants possessed the "sufficiently culpable state of mind" necessary to establish the subjective element of a deliberate

31

indifference claim. *See Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). To determine whether Defendants were deliberately indifferent to Plaintiff's serious mental health needs, "we look into his or her subjective state of mind." *Petties v. Carter*, 836 F3d 722, 728 (7th Cir. 2016) (citing *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996)). In other words, "a plaintiff must provide evidence that an official *actually* knew of and disregarded a substantial risk of harm." *Petties*, 836 F.3d at 728 (emphasis in original) (citing *Farmer v. Brennan*, 511 U.S. 825, 844 (1994)). "This is a high bar 'because it requires a showing [of] something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022) (quoting *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012)). "Evidence that the defendant responded reasonably to the risk, even if he was ultimately unsuccessful in preventing the harm, negates an assertion of deliberate indifference." *Rasho*, 22 F.4th at 710. "Similarly, 'the mere failure of the prison official to choose the best course of action does not amount to a constitutional violation.'" *Id.* (citing *Peate v. McCann,* 294 F.3d 879, 882 (7th Cir. 2002)).

"[M]ere negligence" or even civil "objective recklessness" simply "is not enough." *Petties*, 836 F.3d at 728; *see also Farmer*, 511 U.S. at 836–38. "This subjective standard requires more than negligence and it approaches intentional wrongdoing. The Supreme Court has compared the deliberate indifference standard to that of criminal recklessness." *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012) (citing *Farmer*, 511 U.S. at 837) (internal citations removed)).

The Seventh Circuit has held "[a] medical professional is entitled to deference in treatment decisions 'unless no minimally competent professional would have so

responded under those circumstances.'" *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008) (quoting *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 988 (7th Cir. 1998)). Therefore, for a medical professional to be liable for deliberate indifference to an inmate's medical needs, he or she must make a decision that represents "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Sain*, 512 F.3d at 895 (internal citations omitted).

Finally, the Eighth Amendment is not a vehicle for bringing claims of medical malpractice. *Snipes v. DeTella*, 95 F.3d 586, 590 (7th Cir. 1996). Inadequate medical treatment due to negligence or even gross negligence does not support an Eighth Amendment violation. *Shockley v. Jones*, 823 F.2d 1068, 1072 (7th Cir. 1987). Consequently, mere dissatisfaction or disagreement with a course of treatment is generally insufficient. *Snipes*, 95 F.3d at 591-92.

### 1. Plaintiff fails to establish Defendants provided inadequate mental health treatment.

Defendants argue that there is no evidence that they were actually aware of a substantial risk of serious harm posed by Plaintiff's segregation placement or his disciplinary restrictions. They also assert that even if the Court were to find that Plaintiff's placement in segregation presented a substantial risk of harm, the undisputed material facts establish that Defendants were not deliberately indifferent to his mental health needs because they provided appropriate and consistent mental health treatment while he was in segregation.

33

In response, Plaintiff asserts that Defendants were aware that his placement in segregation had a detrimental impact on his mental health, but they ignored his needs and provided inadequate treatment, causing further deterioration, crisis interventions, and self-harm. In support, Plaintiff cites the opinion of his expert, Dr. Stuart Grassian, who opined that Plaintiff's time in segregation caused or exacerbated his severe mental and neuropsychiatric illnesses. (Doc. 206-1 at 3).

Plaintiff alleges that he was held in segregation between April 2009 and September 2017; however, Defendants were not employed by Wexford and involved in his mental health care until 2013, at the earliest. It is undisputed that Defendant Moss first encountered Plaintiff on April 8, 2013; Defendant Haag encountered Plaintiff on August 26, 2015; Defendant Nelson encountered Plaintiff on January 26, 2015; Defendant Duckworth encountered Plaintiff on February 23, 2015; and Defendant Lanterman first encountered Plaintiff sometime between April 21, 2015, and when he left Wexford's employment November 26, 2016. The Court will not consider liability for the Defendants at times they were not involved in Plaintiff's care. *See Zimmerman v. Tribble,* 226 F.3d 568, 574 (7th Cir. 2000) (to be responsible for a § 1983 violation, an individual must have caused or personally participated in the alleged constitutional deprivation).

Defendants claim that evidence of Plaintiff's diagnoses or SMI designation is insufficient to establish that they were aware that he faced a substantial risk of harm from his housing placement because, during their numerous encounters with him, it was not evident that he faced a substantial risk of harm. At times when Plaintiff self-harmed and was placed on crisis watch, he reported that his crisis episodes were largely related to

34

property issues and confrontations with correctional and medical staff. For example, during an encounter with Defendant Moss on November 4, 2015, Plaintiff reported that he was worried about losing his shoes after he was extracted from his cell. On July 7, 2015, Plaintiff reported to Defendant Lanterman that he was angry because an officer spit on him and made false accusations about him. While Plaintiff was on suicide watch on July 25, 2016, he reported to Defendant Nelson that he dislocated his thumb during a staff assault and was upset because he did not receive medical attention.

On one occasion, Plaintiff exhibited signs of mental instability and reported issues with his disciplinary restrictions. On October 27, 2015, Plaintiff was extracted from his cell and taken to the infirmary after an overdose. Defendant Lanterman placed Plaintiff on a crisis level of care, ordered a ten-minute suicide watch, and scheduled a follow up appointment with a MHP the next day. On October 28, 2015, Defendant Lanterman met with Plaintiff while he was on crisis watch and evaluated his suicide potential. Plaintiff reported that he was depressed and angry because his yard time was taken away. As a result of this encounter, Defendant Lanterman decided to keep Plaintiff on crisis watch to closely monitor his mental health.

Based on the totality of the information available to Defendants during their encounters with Plaintiff, the Court finds that they were not actually aware of the alleged impact segregation and his disciplinary restrictions had on his mental health. During the few times when Plaintiff complained to Defendants about segregation or his limited yard time, Defendants concluded that he was mentally stable based on the information available to them during these encounters. It was their professional opinion that he could

App. 0035

continue to be managed at an outpatient level and that his placement was not contraindicated. *See Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 989 (7th Cir. 1998) ("A plaintiff can show that the professional disregarded the need only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, no minimally competent professional would have so responded under those circumstances.").

Even if Defendants were aware of a substantial risk to Plaintiff's mental health posed by his segregation placement, the Court finds that the undisputed material facts do not establish the callous disregard required to make out an Eighth Amendment claim. *See Rasho*, 22 F.4th at 710 (citing *Rosario*, 670 F.3d at 822 (affirming a grant of summary judgment to officers where their acts were "not perfect" but demonstrated an "overall picture" of "protection and compassion")). In fact, after Defendants became involved in Plaintiff's mental health care, the undisputed material facts and Plaintiff's mental health records demonstrate multiple encounters with Defendants for mental health treatment. *See Petties*, 836 F.3d at 728 (courts must "look at the totality of an inmate's care when considering whether that care evidences deliberate indifference to serious medical needs"). It is undisputed that between April 8, 2013, and September 6, 2017, Plaintiff met with Defendants more than sixty times for segregation rounds, therapy sessions, group therapy, suicide evaluations, and crisis watches. Plaintiff claims that segregation rounds were often very brief; however, the mental health records reveal that some other encounters with Defendants lasted more than an hour. His mental health records also

36

reveal that he was treated by MHPs and a psychiatrist in between his visits with Defendants. (Doc. 181-18 – 181-21).

While in segregation, Plaintiff remained on the mental health caseload, and his access to mental health services was not diminished. When Plaintiff engaged in self-injurious behavior, Defendants completed suicide evaluations, consulted with his mental health treatment team, and determined whether he should be placed on crisis watch, and if so, how often he should be monitored. Based on the treatment Defendants provided, the Court finds that no reasonable jury could conclude that Defendants were deliberately indifferent to Plaintiff's serious mental health needs.

### 2.  Defendants' involvement in Plaintiff's disciplinary proceeding after September 2014 does not rise to the level of deliberate indifference.

After the IDOC passed an Administrative Directive pertaining to the discipline of SMI inmates in 2014, Defendants were involved, to a limited extent, in Plaintiff's disciplinary proceedings. They were required to complete a Mental Health Disciplinary Review ("DOC 0443") to provide an opinion regarding whether Plaintiff's mental health played a role in the infraction, make a recommendation regarding the proposed discipline, and submit their proposals to the Adjustment Committee for consideration. At times, Defendants were asked to join the Adjustment Committee as a resource for the correctional staff to answer questions and to act as a witness during the hearings. Defendants did not determine Plaintiff's actual guilt or make the final decision regarding the discipline imposed. The only time the Adjustment Committee was required to adopt

App. 0037

their recommendations was if they determined that Plaintiff should not be placed in segregation because of clinical concerns.

Plaintiff claims that Defendants "put blinders on" when they made their disciplinary recommendations because they did not meet with him, consider his mental health symptoms and needs, question his cumulative segregation time or privilege restrictions, and consider his recent suicide attempts or crisis placement. (Doc. 202 at 119). Plaintiff alleges that Defendants' failure to recommend ending or reducing his segregation amounted to deliberate indifference. Specifically, Plaintiff identifies disciplinary proceedings where Defendants made recommendations to the Adjustment Committee. (Doc. 202 at AMF 77, 123; Docs. 204-65 (Moss recommended 0-3 months segregation); Doc. 204-76 (Moss recommended 6 months segregation and recreation/commissary restriction); Doc. 181-25 (Haag recommended 0-3 months segregation, recreation restriction, and 1-3 months C grade); Doc. 204-77 (Nelson recommended 2 months segregation); Doc. 204-64 at 2-5 (Lanterman recommended 2 months segregation and 1 month yard restriction on separate charges); Doc. 204-67 at 2-3 (Duckworth recommended no segregation); and Doc. 181-19 (Duckworth was on committee that gave Plaintiff 1 year segregation for staff assault).

Defendants assert that there is nothing in Plaintiff's Mental Health Disciplinary Reviews which suggest that they were actually aware that he faced a substantial risk of harm by continuing his placement in segregation at the time. DOC 0443 allows the MHP to mark "yes" if "confinement in segregation is likely to significantly impact the offender's mental health." (Doc. 217 at 88). Defendants Duckworth, Moss, and Nelson

38

marked "no" to indicate that in their professional opinion, Plaintiff would not be significantly impacted.

Even in instances when Defendants indicated that Plaintiff's confinement in segregation was likely to significantly impact his mental health, they still found that reduced segregation time was clinically appropriate if security found him guilty of the alleged rule violations. (Doc. 181-25). Defendant Haag is the only Defendant who indicated "yes" that confinement in segregation was likely to significantly impact Plaintiff's mental health. *Id.* However, Haag also marked "consider reduced segregation time" and recommended "segregation status placement for this offender should be limited due to offender's mental health symptoms and needs." *Id.* She recommended 0-3 months of segregation for three counts of disobeying direct orders. *Id.* The Court finds that her recommendations demonstrated a balance of Plaintiff's mental health needs and security considerations rather that an intentional and reckless disregard for Plaintiff's serious medical needs.

Regarding whether Defendants were deliberately indifferent by not advocating that Plaintiff be moved to a higher level of care, such as a residential treatment unit, Plaintiff admits that this decision is made by the entire mental health treatment team and ultimately left to the IDOC. (Doc. 202 at 67, ¶ 127; Doc. 181-16, McCormick Dep. at 90:4-24).

Finally, by the time Defendants began working at Pontiac, the earliest being Defendant Moss in April 2013, Plaintiff was already sentenced to segregation through January 2019. By Plaintiff's own admission, he was released from segregation in

39

September 2017. (Doc. 181 at UMF 25; Doc. 202 at AUMF 73). Therefore, even if Defendants recommended additional segregation during disciplinary proceedings between April 2013 and September 2017, Plaintiff was not harmed by their recommendation because he did not actually serve this time in segregation.

Therefore, the Court finds that Defendants were not deliberately indifferent to Plaintiff's serious mental health needs during the disciplinary process.

**C. Plaintiff has not established a *Monell* claim against Wexford.**

Plaintiff's Eighth Amendment claim against Defendants Moss, Haag, Nelson, Duckworth, and Lanterman fails as a matter of law, which defeats his *Monell* claim against Wexford *ab initio*. *See Ray v. Wexford Health Sources, Inc.*, 706 F.3d 864, 866 (7th Cir. 2013) (unnecessary to determine what Wexford's policy was where plaintiff failed to establish a constitutional problem with his treatment and did not suffer actionable injury from the policy he attributed to Wexford).

Wexford cannot be liable simply because it employs Defendants. *See Iskander v. Vill. of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982) (*respondeat superior* unavailable under § 1983); *Jackson*, 300 F.3d at 766 n. 6 (private corporations acting under color of state law are treated as municipalities for purposes of § 1983). Plaintiff admits Wexford's liability based on the theory of vicarious liability is an open question in the Seventh Circuit and that he included this claim to preserve the argument. (Doc. 202 at 120) (citing *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 378-79 (7th Cir. 2017) (en banc)).

Nevertheless, Plaintiff asserts that Wexford is liable pursuant to *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). *See Jackson*, 300 F.3d at 766 n. 6

(extending *Monell* liability test to private actors). Liability attaches to Wexford only if an unconstitutional policy caused the constitutional deprivation. *Monell*, 436 U.S. at 691-92; *Woodward v. Corr. Med. Servs. of Illinois, Inc.*, 368 F.3d 917, 927 (7th Cir. 2004). Liability may be based on (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express policy, is so permanent and well-settled as to constitute a custom or usage with the force of law; or (3) a constitutional injury caused by an official with final policymaking authority. *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (citing *Monell*, 436 U.S. at 690)).

Here, Plaintiff has no evidence of an unconstitutional policy. Instead, his *Monell* claim is based on the alleged lack of a policy. When a § 1983 claim against a corporation alleges a failure to have a policy in place, Plaintiff has the burden of providing evidence which indicates the company made a decision not to act. *Glisson*, 849 F.3d at 381 ("The key is whether there is a conscious decision not to take action"); *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 967 (7th Cir. 2019).

Plaintiff argues that there are genuine issues of material fact regarding (1) whether Wexford lacked a sufficient policy regarding consistent mental health treatment provided to prisoners, or provided guidance to its employees on how to consider the impact of segregation on mental health, and (2) whether Wexford employees have a widespread practice and custom to not consider the long-term impact of a prisoner's placement in segregation and to never recommend reducing a prisoner's time in segregation. (Doc. 202 at 120).

App. 0041

Plaintiff also asserts that Defendants' testimony raises a genuine issue of material fact regarding whether there was a widespread practice among Wexford's employees to never recommend reduced segregation time for SMI inmates. For example, Defendant Haag testified that she did not recall a prisoner ever being listed as "contraindicated" for segregation, and Defendant Lanterman testified that his role at the Adjustment Committee hearings was to "witness" the proceedings. (Doc. 181-7, Haag Dep. at 26:9-11; Doc. 181-10, Lanterman Dep. at 100:13-15, 103:2-3).

Wexford employees' role in the disciplinary process is limited and performed in conjunction with security staff. (Doc. 181-23). The process is defined by the IDOC's Administrative Directives, including the directive related to special considerations for imposing discipline upon SMI inmates. *Id.* Administrative Directive 05.12.103 requires MHPs to consider (1) if the offender's mental illness contributed to the underlying behavior; (2) the overall appropriateness of placement in segregation based on the offender's mental health symptoms and needs, including the potential for deterioration or any reason why placement in segregation would be inadvisable; and (3) recommendations, if any, for a specific term of segregation, including no segregation time, or specific treatment during the term of segregation. *Id.* at 3. The fact that Wexford did not have a separate policy does not create liability under *Monell*. The Court also finds that Defendant Haag's and Lanterman's testimony regarding their role in the disciplinary process does not create a genuine dispute of material fact regarding whether Wexford is liable under *Monell.* Therefore, summary judgment is granted in favor of Wexford.

**IT IS THEREFORE ORDERED:**

(1)    The Wexford Defendants' Motion for Summary Judgment [181] is GRANTED. Defendants Andrea Moss, Kelly Haag, Todd Nelson, Linda Duckworth, Stephan Lanterman, and Wexford Health Sources, Inc. are DISMISSED with prejudice.

ENTERED:    1/24/2023

s/ Jonathan E. Hawley
Jonathan E. Hawley
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| CORDELL SANDERS, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| v. | ) | **Case No. 16-cv-1366-JEH** |
| | ) | |
| ANDREA MOSS, *et al.,* | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER ON IDOC DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is now before the Court on a Motion for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7.1(D) by Defendants Rob Jeffreys, Michael Melvin, Teri Kennedy, and Dr. Daidra Marano (the "IDOC Defendants") (Doc. 183); Plaintiff's Response (Doc. 241); and Defendants' Reply (Doc. 237). For the reasons stated below, the IDOC Defendants' Motion is GRANTED.

## BACKGROUND

Plaintiff Cordell Sanders, an inmate in the custody of the Illinois Department of Corrections ("IDOC"), is proceeding on an Amended Complaint under 42 U.S.C. § 1983. (Doc. 69). Plaintiff, who was diagnosed with mental illnesses and designated as seriously mentally ill ("SMI"), was held in segregation[1] at Pontiac Correctional Center ("Pontiac") for approximately eight years for various disciplinary violations. *Id.*

Plaintiff asserts five claims against the IDOC Defendants. In Count I, he alleges that Defendants Melvin and Kennedy violated his rights under the Eighth Amendment

---

[1] Defendants use the term "disciplinary segregation" to describe the restricted housing area at Pontiac. Plaintiff uses the term "solitary confinement." There is no housing area called "solitary confinement" at Pontiac. For purposes of this Order, the distinction is immaterial.

to be free from cruel and unusual punishment by keeping him in segregation for an extended period and depriving him of basic human needs. *Id.* at ¶¶ 89-95. In Count II, Plaintiff alleges that Defendants Melvin and Kennedy violated his rights under the procedural due process clause of the Fourteenth Amendment. *Id.* at ¶¶ 96-98. In Count III, Plaintiff alleges that Defendants Melvin, Kennedy, and Marano were deliberately indifferent to his objectively serious medical needs in violation of the Eighth Amendment. *Id.* at ¶¶ 99-108. Plaintiff brings Counts V and VI against Defendant Jeffreys, the IDOC Director, and alleges that the IDOC violated the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA") because Defendants discriminated against him based on his disability. *Id.* at ¶¶ 117-143.

Plaintiff also alleges that Defendants Wexford Health Sources, Inc. and mental health professionals ("MHPs") Andrea Moss, Kelly Haag, Todd Nelson, Linda Duckworth, and Stephan Lanterman (the "Wexford Defendants") were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. *Id.* at ¶¶ 99-116. The Wexford Defendants filed a Motion for Summary Judgment (Doc. 181), which this Court addressed in a separate Order.

## MATERIAL FACTS

As an initial matter, Defendants argue that some of Plaintiff's additional material facts do not comply with Local Rule 7.1(D)(2)(b)(5) and should be stricken because these facts (1) combine multiple facts, making it impossible to categorize and respond to them; (2) contain argumentative and conclusory statements rather than facts; or (3) are vague due to words like "rarely, oftentimes, defendants, and mental health providers," without

2

reference to specific individuals or dates. (Doc. 237 at 72). Defendants object to the following additional material facts:  1, 8-9, 12, 14, 18, 20, 25-26, 34, 46, 48-49, 51-52, 63, 72-74, 76-78, 81, 84, 86, 91-92, 95, 97-98, 100, 103, 105, 107, 109, 118, 121-126, 129, 135, 137, 141, 150, 153, 155-163, and 166. *Id.* at 1-72.

The Court agrees that many of Plaintiff's additional material facts violate the Local Rules and are not statements of undisputed fact. Consequently, those statements are not included in the overview of the facts below. However, in the argument section of Plaintiff's Response, he cites to specific stated facts. (Doc. 241 at 61-85). In each instance, the Court has reviewed the cited materials.

### *Parties*

Plaintiff Cordell Sanders is an inmate in the custody of the IDOC and was incarcerated at Pontiac during the relevant time period. (Doc. 183 at UMF[2] 1). He was diagnosed with intermittent explosive disorder, impulse control disorder, and a depressive disorder when he was fifteen years old. (Doc. 241 at AUMF[3] 2). Since then, various MHPs have assessed his mental health needs and diagnosed him with other serious mental illnesses, including bipolar mood disorder, schizoaffective disorder, and posttraumatic stress disorder ("PTSD"). *Id.* at AUMF 4, 113. Although Plaintiff's mental health diagnoses have varied, MHPs at Pontiac treated his symptoms by prescribing medication. *Id.* at AUMF 5. At times, Plaintiff was designated as SMI. *Id.* at AUMF 121.

---

[2] An "Undisputed Material Fact" from Defendants' Motion (Doc. 183) is abbreviated as "UMF."
[3] An "Additional Undisputed Material Fact" from Plaintiff's Response (Doc. 241) is abbreviated as "AUMF."

3

Defendant Jeffreys is the current IDOC Director and was automatically substituted for the former IDOC Director John Baldwin pursuant to Federal Rule of Civil Procedure 25(d). (Doc. 183 at UMF 2). Defendant Melvin was the Warden of Pontiac from August 2016 to December 2017. *Id.* at UMF 3. Defendant Kennedy was the Assistant Warden of Pontiac from May 2016 to May 2018. *Id.* at UMF 4. Defendant Marano is a licensed psychologist and was employed at Pontiac during the relevant time period. *Id.* at UMF 5.

### *Plaintiff's Disciplinary History*

Before entering Pontiac in 2008, Plaintiff was found guilty of several violations, including possession of dangerous contraband (sharpened eyeglasses) and assault. (Doc. 184-6 at 1-2). Between 2008 and when he filed this lawsuit in September 2016, Plaintiff was disciplined fifty times for various offenses, including masturbating in front of staff, insolence, intimidation or threats, and assaulting staff members and other inmates multiple times. (Doc. 184-6). His assaults against staff members included throwing liquids and bodily fluids in their faces and physically harming them. *Id.* For instance, Plaintiff headbutted an officer in the face and pulled an officer into the bars, causing him to strike his head. *Id.* at 4, 6; Doc. 184-10 at 2. Between 2014 and 2016, Plaintiff engaged in indecent exposure and masturbated in front of staff six times. (Doc. 184-6).

Plaintiff denies the disciplinary charges he incurred because he never pled guilty and claims his behavior was characteristic of the psychiatric effects of segregation. (Doc. 184-7, Sanders Dep. at 192:18-20; Doc. 206-1, Grassian Report at 33-35). Plaintiff's requests for segregation time reduction, restoration of grade, and restoration of commissary and yard privileges were denied until January 26, 2017, when Plaintiff's segregation end date

4

and C Grade status was cut by nearly ten years from an end date of June 16, 2027 to July 1, 2017. (Doc. 241 at AUMF 87-88). He also received cuts to his commissary and yard restrictions. *Id.*

### *Segregation at Pontiac*

It is undisputed that Plaintiff incurred several disciplinary infractions and was held in segregation at Pontiac for over eight years. (Doc. 241 at AUMF 6). Segregation is a disciplinary measure intended to keep inmates who engage in behavior that jeopardizes the safety, security, and operations of the facility separate from the general population. (Doc. 184-2, Kennedy Dep. at 143:2-144:24; Doc. 184-3, Forbes Dep. at 57:12-19, 64:3-19, 65:8-13).

Plaintiff spent most of his time in Pontiac's North Cellhouse, a max-segregation unit designed to house inmates with high security levels and disciplined with long-term segregation. (Doc. 183 at UMF 7). Each cell Plaintiff occupied was a small, concrete room with no furniture except a toilet and a bed (which often consisted of a concrete slab), a single light in the ceiling (which was on twenty-four hours a day depending on the gallery he was assigned to), and a solid steel door with a small window looking into the gallery. (Doc. 184-7, Sanders Dep. at 185:19-186:8).

Inmates in segregation have less privileges and freedoms and are allowed out of their cells for showers, yard, visits, and to use the segregation law library. (Doc. 184-3, Forbes Dep. at 73:13-21, 128:25-129:8, 198:7-12). An inmate's total time in his cell depends upon the activities scheduled for that day. *Id.* at 118:18-119:10. While in segregation, Plaintiff was permitted to receive only non-contact visitors twice per month for no more

5

than one hour. (Doc. 241 at AUMF 40). Prior to the *Rasho* settlement[4], Plaintiff was allowed to shower once a week; beginning in April 2017, he was allowed to shower three times a week. *Id.* at AUMF 23.

Plaintiff's yard time was restricted. *Id.* at AUMF 30, 37. He testified that he was typically allowed yard time once a month but only if his cell was considered "in compliance." (Doc. 184-7, Sanders Dep. at 233:11-18). Inmates *with* yard restrictions are permitted one hour of yard time every thirty days while inmates *without* yard restrictions receive eight hours of yard time per week. (Doc. 184-3, Forbes Dep. at 127:2-14). Yard time can be revoked without warning if the unit is on lockdown. *Id.* at 124:17-125:10.

Inmates are still subject to discipline while in segregation, and disciplinary violations will result in a loss of privileges. *Id.* at 110:24-111:8. Plaintiff was also disciplined with privilege grade reductions and classified as C Grade, which further restricted his already limited institutional privileges. (Doc. 241 at AUMF 39). During this time, he was not permitted to have video visitation or make collect calls to family. *Id.* at AUMF 41. He could purchase clothes, hygiene products, and paper from commissary every thirty days, but he was not allowed to purchase food, drinks, or electronics. *Id.* at AUMF 44-45.

### *Disciplinary Process at Pontiac*

Department Rule 504 ("DR 504") defines what type of conduct constitutes a punishable offense. (Docs. 204-85 and 204-86). DR 504 was revised on April 1, 2017, in

---

[4] *Rasho, et al. v. Walker, et al.*, 07-cv-1298-MMM (C.D. Ill. 2007).

App. 0049

response to the *Rasho* litigation, and the total maximum segregation time for certain offenses was reduced. (Doc. 241 at AUMF 54; Doc. 184-3, Forbes Dep. at 80-83; Doc. 204-85; Doc. 204-86).

When an inmate engages in behavior that violates IDOC and Pontiac policies and regulations, the reporting officer creates an incident report. (Doc. 183 at UMF 16). After notice of the hearing and the charges are provided to the inmate, the inmate appears before the Adjustment Committee, where he is permitted to present evidence to contest the charges brought against him. (Doc. 184-2, Kennedy Dep. at 63:2-10; Doc. 184-3, Forbes Dep. at 63:4-12). Plaintiff claims that he was frequently denied the right to present evidence. (Doc. 241 at 6, ¶ 17).

After making its findings and determining that the inmate committed a violation, the Adjustment Committee makes a recommendation for discipline based on the penalties listed in DR 504. (Doc. 183 at UMF 18; Doc. 241 at AUMF 80). The Adjustment Committee may recommend discipline amounting to merely a verbal reprimand up to the maximum penalties set forth in DR 504. (Doc. 183 at UMF 20; Doc. 241 at AUMF 53; Doc. 184-3, Forbes Dep. at 84:21-85:9).

The process for imposing discipline on inmates designated SMI is set forth in IDOC Administrative Directive 05.12.103. (Doc. 241 at AUMF 65; Doc. 181-23). Due to Plaintiff's status as SMI, mental health staff conducted reviews of his disciplinary sanctions to determine if his mental health contributed to his behavior by completing a Mental Health Disciplinary Review, also known as "DOC 0443." (Doc. 183 at UMF 27, 38). When completing DOC 0443, MHPs review the inmate's mental health record, assess

7

the inmate's mental status, and determine if the inmate's behavior was caused by his mental illness. (Doc. 184-5; Doc. 241 at AUMF 70). If the MHP determines that the inmate's behavior was attributed to his mental illness, mental health staff will make a recommendation to either not discipline the inmate or recommend a less severe disciplinary sanction. *Id.* at AUMF 71. Plaintiff admits that the MHPs completed DOC 0443, but he disputes whether they meaningfully assessed his mental status and claims they did not consider how segregation affected his mental health. (Doc. 241 at 9, ¶¶ 28-30; Doc. 184-7, Sanders Dep. at 113:15-18, 117:17-23). For a detailed description of Plaintiff's mental health treatment, the Court references and incorporates herein its Order on the Wexford Defendants' Motion for Summary Judgment.

If an inmate is classified as SMI, the Warden will review the disciplinary recommendations of both the Adjustment Committee and mental health staff and either approve or lower the recommended discipline. (Doc. 183 at UMF 26, 31). The final imposition of the discipline and a summary of the hearing is contained in a document entitled "Final Summary Report." *Id.* at UMF 32.

If an inmate is dissatisfied with the procedures of the disciplinary hearing or the discipline imposed, he may file a complaint through the prison grievance process. (Doc. 184-1, Melvin Dep. at 36:3-37:19). Plaintiff filed numerous grievances and complaints about the prison, including his imposed segregation. (Doc. 183 at UMF 41; Docs. 140-1–140-5). Plaintiff, however, claims that the grievance process was effectively meaningless, as Defendants did not grant him relief. (Doc. 241 at 9, ¶ 33).

*Plaintiff's Relevant Litigation History*

***Sanders v. Copeland*, No. 15-cv-1225 (C.D. Ill. filed June 2, 2015):** Plaintiff claimed that on December 20, 2013, Pontiac correctional officer Michael Copeland used excessive force against him and medical staff did not adequately treat his injuries. As a result of these actions, the Adjustment Committee imposed one year C Grade, one year segregation, a revocation of one year of good conduct credits, one year yard restriction, and six months contact visits restriction. Upon the court's merit review on January 5, 2016, the court dismissed Plaintiff's complaint for failure to pay his filing fees. As a result, the court ordered Plaintiff to pay his filing fees within fourteen days of the court's order, which Plaintiff failed to do. Thus, the court dismissed Plaintiff's case for want of prosecution.

***Sanders v. Hamilton*, No. 15-cv-1236 (C.D. Ill. filed June 9, 2015):** Plaintiff claimed that members of the Pontiac Adjustment Committee violated his right to procedural due process in a disciplinary hearing on May 29, 2013 because they refused to hear exculpatory evidence. The court dismissed this case on merit review because Plaintiff failed to state a claim. Plaintiff also received a strike for filing this lawsuit.

***Sanders v. Baldwin*, No. 15 MR 1126 (Sangamon Cnty. filed Dec. 21, 2015):** Plaintiff claimed that the Pontiac Adjustment Committee violated his rights in a disciplinary hearing on December 3, 2014 because it allegedly failed to follow certain portions of the Illinois Administrative Code in administering his hearing. Plaintiff appealed this decision in a grievance to IDOC Director Baldwin, who concurred with the Committee's actions. On this basis, Plaintiff sued Baldwin because he allegedly did not

9

review the Committee's actions and did not order them to follow the Administrative Code. On May 23, 2016, the circuit court granted Baldwin's motion to dismiss because Plaintiff failed to state a claim.

*Sanders v. Brown, et al.*, **No. 16 MR 77 (Livingston Cnty. filed April 18, 2016):** Plaintiff sued members of the Pontiac Adjustment Committee because his right to procedural due process was allegedly violated during Adjustment Committee hearings on December 3, 2014 and March 3, 2015. After conducting discovery, the defendants moved for summary judgment. On September 29, 2017, the court found that there was no genuine issue of material fact and that Plaintiff's claim failed as a matter of law.

*Sanders v. French, et al.*, **No. 16 MR 191 (Livingston Cnty. filed Dec. 8, 2016):** Plaintiff sued members of the Pontiac Adjustment Committee and the Grievance Office alleging that his right to procedural due process was allegedly violated during a disciplinary hearing on May 5, 2015. The parties filed motions to dismiss, and a hearing was held on October 5, 2017. After argument, the court dismissed Plaintiff's claims without prejudice. Plaintiff was given leave to refile his complaint within twenty-one days of the court's order, but he did not do so.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, "[t]he court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires

10

a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004). To successfully oppose a motion for summary judgment, a plaintiff must do more than raise a "'metaphysical doubt' as to the material facts, and instead must present definite, competent evidence to rebut the motion." *Michael v. St. Joseph Cnty.*, 259 F.3d 842, 845 (7th Cir. 2001) (internal citation omitted).

## ANALYSIS

I.   **Plaintiff's claims arising from incidents prior to September 29, 2014, are not barred by the statute of limitations.**

Plaintiff was held in segregation at Pontiac from approximately April 2009 until September 2017, a period of more than eight years. In § 1983 actions, federal courts apply the statute of limitations governing personal injury actions in the state where the injury occurred. *Kelly v. City of Chicago*, 4 F.3d 509, 511 (7th Cir. 2022) (citing *Wilson v. Garcia*, 471 U.S. 261, 280 (1985)). In Illinois, such claims must be brought within two years. *Kelly*, 4 F.3d at 511 (citing 735 ILCS 5/13-202). The statute of limitations for ADA claims is also two years. *Cheeney v. Highland Cmty. Coll.*, 15 F.3d 79, 81-82 (7th Cir. 1994).

Defendants argue that because the statute of limitations for Plaintiff's claims is two years, any claims based on alleged actions that occurred before September 29, 2014—two

years prior to filing the Complaint on September 29, 2016—are barred. (Doc. 183 at 10-15). Plaintiff's disciplinary card lists exactly fifty disciplinary sanctions between January 1, 2008 and September 29, 2016. (Doc. 184-6). Thirty-three of Plaintiff's disciplinary sanctions where segregation was imposed occurred before September 29, 2014. Defendants argue that claims arising from these violations are time-barred.

Plaintiff asserts that the continuing violation doctrine applies. (Doc. 241 at 61-63). As the Seventh Circuit recently explained,

> The continuing violation doctrine … is aimed at ensuring that illegal conduct is punished by preventing a defendant from invoking the earliest manifestation of its wrongdoing as a means of running out the limitations clock on a course of misconduct that persisted over time; the doctrine serves that end by treating the defendant's misconduct as a continuing wrong and deeming an action timely so long as the last act evidencing a defendant's violation falls within the limitations period. … Thus, where the violation at issue can be characterized as a continuing wrong, the limitations period begins to run *not* when an action on the violation could first be brought, but when the course of illegal conduct is complete.

*United States v. Spectrum Brands, Inc.*, 924 F.3d 337, 350 (7th Cir. 2019) (internal citations omitted). "A violation is continuing where 'it would be unreasonable to require or even permit [a prisoner] to sue separately over every incident of the defendant's unlawful conduct.'" *Turley v. Rednour*, 729 F.3d 645, 651 (7th Cir. 2013) (quoting *Heard v. Sheahan*, 253 F.3d 316, 319 (7th Cir. 2001)). For a continuing harm, the statute of limitations begins to run on the last occurrence of the harm. *Turley*, 729 F.3d at 651.

Plaintiff raises due process, Eighth Amendment, and ADA/RA claims. The statute of limitations for each claim will be addressed separately.

12

A. **Due Process Claim**

In Count II of his Amended Complaint, Plaintiff alleges that Defendants Melvin and Kennedy violated his procedural due process rights under the Fourteenth Amendment. (Doc. 69 at ¶¶ 96-98). Defendants argue that the continuing violation doctrine does not apply because Plaintiff sued the IDOC or its employees at least four times about alleged constitutional violations related to his disciplinary hearings. (Doc. 237 at 75). Defendants argue that "[t]his reflects Plaintiff's unmistakable judgment that the issues he had with disciplinary actions was not a continuing wrong but was instead a series of discrete wrongful acts that were separately actionable." *Id.*

Defendants rely upon *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). In *National Railroad,* the Supreme Court discussed the circumstances in which a plaintiff alleging employment discrimination under Title VII of the Civil Rights Act could file suit based on events that fall outside the relevant statutory time period. *Id.* at 105. The Court first held that a suit must be brought within the applicable limitation period for each "discrete discriminatory act." *Id.* at 114–15. It reasoned "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" *Id.* at 114. However, allegations related to a hostile work environment were different because "[t]heir very nature involves repeated conduct. ... The 'unlawful employment practice' therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be

13

App. 0056

actionable on its own." *Id.* at 115. "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* at 117.

Like *National Railroad* where a failure to promote or refusal to hire was a separate act, Defendants assert that the continuing violation doctrine does not apply to Plaintiff's due process claim because each disciplinary action was a discrete act which was separately actionable. This interpretation of Plaintiff's claims is too narrow, however. *See Wright v. Wynn*, 2020 WL 5423933, at *3 (S.D. Ind. Sept. 10, 2020) (finding that plaintiff's due process claim stemming from a seven-year period of segregation was not barred by the statute of limitations). Plaintiff asserts that Defendants Melvin and Kennedy failed to afford him due process over an extended period of time. His due process claim does not arise from a single incident, but from the alleged prolonged practice of allegedly overcharging him with disciplinary actions and imposing long periods of segregation and privilege restrictions, which ran consecutively and resulted in Plaintiff spending over eight years in segregation. Therefore, the Court finds that the continuing violation doctrine applies.

**B.  Eighth Amendment and ADA/RA Claims**

In Counts I, III, V, and VI of his Amended Complaint, Plaintiff alleges that Defendants violated his rights under the Eighth Amendment, ADA, and RA. (Doc. 69).

In *Heard v. Sheahan*, the Seventh Circuit reversed the district court's finding that the plaintiff's claim based on the defendants' failure to provide medical treatment was time-barred. 253 F.3d at 318-20. The Seventh Circuit explained the focus in an Eighth

14

Amendment claim should be on the defendants' refusal to treat the condition and the refusal "continued for as long as the defendants had the power to do something about his condition," and "[e]very day that they prolonged [the plaintiff's] agony by not treating his painful condition marked a fresh infliction of punishment that caused the statute of limitations to start running anew." *Id.* at 318. The Seventh Circuit determined that all the events and pain endured after the defendants learned of the plaintiff's condition and refused to provide treatment were "fair game for the plaintiff's suit, by virtue of the doctrine of 'continuing violation.'" *Id.*

Defendants rely upon *Love v. Cook Cnty.*, 82 F. Supp. 2d 911 (N.D. Ill. 2000), which predates *Heard* and the proliferation of cases that followed. *See Cesal v. Moats*, 851 F.3d 714, 722 (7th Cir. 2017) (applying continuing violation doctrine to deliberate indifference case); *Turley*, 729 F.3d at 651 (Eighth Amendment claims based on defendants' repeated use of lockdown procedures for improper purposes not time-barred under continuing violation doctrine where "with each continuing day and period of lockdown, [plaintiff's] injuries increased"); *Jervis v. Mitcheff*, 258 F. App'x 3, 5-6 (7th Cir. 2007) ("Deliberate indifference to a serious medical need is a continuing violation that accrues when the defendant has notice of the untreated condition and ends only when treatment is provided or the inmate is released."); *McClary v. Huston*, No. 11-1394, 2012 WL 5354709, at *3 (C.D. Ill. Oct. 29, 2012) (rejecting defendant's reliance on pre-*Heard* authority governing continuing violation).

Here, Plaintiff alleges that he was subject to multiple, consecutive periods of segregation and privilege restrictions over an extended period and the prolonged

App. 0058

segregation allegedly resulted in physical and psychological harm. (Doc. 69 at ¶¶ 92-94). He also claims that Defendants were deliberately indifferent to his serious medical needs by failing to provide adequate mental health services and continuing to condone additional segregation time rather than advocating for his removal from segregation. *Id.* at ¶ 101. The allegations in this case are analogous with *Heard* in that Plaintiff alleges a "continuous series of events giv[ing] rise to a cumulative injury." *See Heard*, 253 F.3d at 320. "[I]f the Court were to follow Defendants' logic as to why the continuing violations doctrine does not apply in this case, the Court would be disregarding that part of the *Heard* opinion which provided that, "'it would impose an unreasonable burden on the courts to entertain an indefinite number of suits and apportion damages among them.'" *McClary*, 2012 WL 5354709, at *3 (quoting *Heard*, 253 F.3d at 320).

Plaintiff's conditions of confinement claim is similar to the hostile work environment claim described in *National Railroad* in that a single occurrence of an unsuitable condition in his cell or the denial of yard time would not be actionable on its own. *See Wright*, 2020 WL 5423933, at *3. "Whether prolonged confinement constitutes an Eighth Amendment violation depends both 'on the duration and nature of the segregation.'" *Id.* (citing *Isby v. Brown*, 856 F.3d 508, 521 (7th Cir. 2017)). Therefore, the Court finds that the continuing violation doctrine also applies to his Eighth Amendment and ADA/RA claims.

## II. Plaintiff's claims are not barred by the doctrine of *res judicata*.

Defendants also argue that Plaintiff's claims are barred by the doctrine of *res judicata* based on his prior federal and state lawsuits. (Doc. 183 at 15-19). Defendants state

16

that Plaintiff filed five lawsuits in state and federal courts regarding claims arising from the same transaction or occurrence as the claims in this action. As a result, they assert that Plaintiff's current claims arising from disciplinary hearings from September 29, 2014 to May 19, 2015 are barred because he had the opportunity to raise these claims in his prior lawsuits. In response, Plaintiff argues that these claims are not barred by *res judicata* because (1) Defendants waived or forfeited this defense and (2) the elements of *res judicata* are not met. (Doc. 241 at 63-67).

"Under *res judicata*, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry*, 449 U.S. 90, 94 (1980). The purpose of this doctrine is to "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." *Id. Res judicata* is an affirmative defense that must be stated in a responsive pleading. *See* FED. R. CIV. P. 8(c)(1) (listing "*res judicata*" as an affirmative defense); *Arizona v. California*, 530 U.S. 392, 410 (2000) (explaining that *res judicata* is "an affirmative defense ordinarily lost if not timely raised").

Here, Defendants raised the *res judicata* defense for the first time at summary judgment. Defendants did not assert the *res judicata* defense in their Answer (Doc. 88) or Amended Answer (Doc. 105), nor did they attempt to raise it in their Motion for Judgment on the Pleadings (Doc. 120). By failing to assert this defense previously, the Court finds that Defendants have waived the right to argue that Plaintiff's claims are barred by *res judicata* at summary judgment. *See Tully v. Barada*, 599 F.3d 591, 594 (7th Cir. 2010); *Davis*

17

**App. 0060**

*v. Bd. of Educ. of Peoria Sch. Dist.*, 2016 WL 5660375, at *6 (C.D. Ill. Sept. 29, 2016) (finding that defendants "acquiesced" to case and plaintiff's claims were not barred where defendants failed to assert *res judicata* for two years after lawsuit was filed and raised it for the first time on summary judgment).

Waived claims are those that are "knowingly and intelligently relinquished." *Wood v. Milyard*, 566 U.S. 463, 470 n.4 (2012). Courts may not revive waived affirmative defenses under any circumstances. *Id.* at 471 n.5 ("[A] federal court has the authority to resurrect only forfeited defenses."). Forfeited defenses are those that are inadvertently abandoned and can only be reviewed under "extraordinary circumstances." *Id.* at 470 n.4, 471. When given the opportunity to address this issue in their Reply, Defendants failed to argue that extraordinary circumstances excused the forfeiture of this defense. The Court finds that Defendants' *res judicata* defense is waived and Plaintiff's claims are not barred. As a result, the Court need not address whether the elements of *res judicata* have been met.

### III. Defendants did not violate Plaintiff's procedural due process rights.

In Count II of his Amended Complaint, Plaintiff alleges that Defendants Melvin and Kennedy denied him procedural due process in violation of the Fourteenth Amendment. Specifically, Plaintiff alleges that the eight years he spent in segregation created a liberty interest entitling him to the protections of the due process clause, but Defendants denied him a meaningful opportunity to challenge or be heard before continuing to impose segregation; failed to provide information about the basis for any decision to continue that confinement; denied him the opportunity to provide information to the ultimate decisionmaker regarding his continuing segregation; and

18

failed to inform him of the requirements to be released from segregation. (Doc. 69 at ¶¶ 96-98).

Defendants argue that Plaintiff's segregation sentences do not give rise to a liberty interest because the segregation and privilege restrictions that he received for his behavior were not atypical and he was given the requisite due process. (Doc. 183 at 20, 26; Doc. 237 at 76-77). In response, Plaintiff argues that summary judgment is not warranted because there are genuine issues of material fact regarding whether he had a liberty interest in avoiding eight years of segregation and received due process. (Doc. 241 at 66-73). Plaintiff asserts that the duration and conditions of his segregation, coupled with yard restrictions and his mental illness, amounted to an atypical and significant hardship such that a reasonable jury could conclude that he asserted a cognizable liberty interest. *Id.* at 68.

"The Due Process Clause of the Fourteenth Amendment applies only to deprivations of life, liberty, and property." *Isby*, 856 F.3d at 524. Prisoners are entitled to certain due process protections when subject to disciplinary sanctions. *Wolff v. McDonald*, 418 U.S. 539, 564-71 (1974). The review of a procedural due process claim requires a two-part analysis: whether the plaintiff was deprived of a protected interest, and if so, what process was due under the circumstances. *Isby*, 856 F.3d at 524. In other words, if a constitutional right is identified, then procedural due process must be provided. *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1020 (7th Cir. 2000). "Prisoners do not have a constitutional right to remain in the general population." *Isby*, 856 F.3d at 524 (citing *Sandin v. Conner*, 515 U.S. 472, 480 (1995)). However, a due process violation may be implicated if "the

19

defendants deprived [plaintiff] of a liberty interest by imposing an 'atypical and significant hardship on [him] in relation to the ordinary incidents of prison life.'" *McCoy v. Atherton*, 818 F. App'x 538, 541 (7th Cir. 2020) (quoting *Sandin*, 515 U.S. at 484). The Court must examine not just the severity, but the duration of the complained-of conditions. *Marion v. Columbia Corr. Inst.*, 559 F.3d 693, 697 (7th Cir. 2009) ("both the duration *and* the conditions of the segregation must be considered in the due process analysis").

### A. Plaintiff had a liberty interest at stake based on the duration and conditions of segregation.

It is undisputed that Plaintiff spent eight years in segregation. Nearly every court – including the Seventh Circuit – to consider the issue held that similar durations of segregation are atypical. *See, e.g.*, *Isby*, 856 F.3d at 524 (plaintiff had a liberty interest at stake when plaintiff spent over ten years in solitary confinement); *see also, e.g.*, *Aref v. Lynch*, 833 F.3d 242, 248-49, 257 (D.C. Cir. 2016) (five years); *Brown v. Or. Dep't of Corr.*, 751 F.3d 983, 988 (9th Cir. 2014) (two years); *Wilkerson v. Goodwin*, 774 F.3d 845, 855, 857-58 (5th Cir. 2014) (two and a half years); *Harris v. Caruso*, 465 F. App'x 481, 484 (6th Cir. 2012) (eight years); *Harden-Bey v. Rutter*, 524 F.3d 789, 793 (6th Cir. 2008) (three years); *Iqbal v. Hasty*, 490 F.3d 143, 161 (2d Cir. 2007) (305 days); *Shoats v. Horn*, 213 F.3d 140, 144 (3d Cir. 2000) (eight years); *Magluta v. Samples*, 375 F.3d 1269, 1282 (11th Cir. 2004) (500 days); *Colon v. Howard*, 215 F.3d 227, 231-32 (2d Cir. 2000) (305 days); *Kelly v. Brewer*, 525 F.2d 394, 396-98 (8th Cir. 1975) (three years).

20

The Court must also consider whether Plaintiff had a cognizable liberty interest due to the conditions of segregation. *See Marion*, 559 F.3d at 699. According to Plaintiff's expert, Dr. Grassian, the conditions Plaintiff experienced from 2009-2017 "were generally of the conditions typically prevailing in solitary confinement" with some particularities. (Doc. 206-1 at 31-34).

Each cell Plaintiff occupied was a small, concrete room with no furniture except a toilet and a bed consisting of a concrete slab. (Doc. 184-7, Sanders Dep. at 185:19-186:8). There was a single light in the ceiling, which remained on twenty-four hours a day depending on the gallery he was assigned to. *Id.* Plaintiff testified the cell floors were "nasty," and he was not given any towels or pads to clean with. *Id.* at 129:9, 219:11-22.

Plaintiff received limited yard time while in segregation. He was generally allowed yard time once a month if his cell was deemed to be "in compliance." *Id.* at 233:11-18. During yard time, he was placed in an outdoor recreation area "shaped like dog runs enclosed with chain link fencing." (Doc. at 206-1 at 32; Doc. 206-4 at 1-11).

Plaintiff was also disciplined with privilege grade reductions and classified as C Grade during his time at Pontiac, and his already limited institutional privileges were further restricted. (Doc. 241 at AUMF 39). During this time, he was not permitted to have video visits, call his family, or purchase food, drinks, or electronics from commissary. *Id.* at AUMF 41, 44-45.

The Court finds that these conditions coupled with Plaintiff's mental illness and eight-year confinement in segregation imposed an atypical and significant hardship in the correctional context and implicated a liberty interest.

App. 0064

**B.  There is no evidence that Plaintiff was deprived of due process.**

"Where a liberty interest in shown, the due process claim 'is not complete unless and until the State fails to provide due process.'" *Harris*, 465 F. App'x at 484 (quoting *Zinermon v. Burch*, 494 U.S. 113, 126 (1990)). As such, the next inquiry is whether Plaintiff's due process rights were violated at Pontiac. The due process requirements for prison disciplinary hearings set forth in *Wolff* include: (1) written notice of the charge, given at least twenty-four hours prior to the hearing; (2) the right to appear in person before an impartial hearing body; (3) the right to call witnesses and present documentary evidence, if prison safety allows; and (4) a written statement of reasons for the disciplinary action. *Cain v. Lane*, 857 F.2d 1139, 1145 (7th Cir. 1988) (citing *Wolff*, 418 U.S. at 563-67)). Moreover, the decision to continue confinement must be supported by "some evidence." *Black v. Lane*, 22 F.3d 1395, 1402 (7th Cir. 1994).

Defendants argue that Plaintiff's Adjustment Committee decisions clearly show that he was given the requisite due process. (Doc. 237 at 76) (citing Doc. 204-59 at 2; Doc. 204-60 at 2; Doc. 204-62 at 2; Doc. 204-80 at 3)). Defendants also assert that Plaintiff's due process rights were not violated because he had the opportunity to challenge his disciplinary charges and grieve the discipline imposed through the prison grievance process. He did so by filing numerous grievances and lawsuits about the prison and segregation. (Doc. 183 at UMF 41; Docs. 140-1–140-5).

In his Response, Plaintiff argues that there is a genuine issue of material fact regarding whether he received procedural due process. (Doc. 241 at 72-74). He claims that Defendants "rubber-stamped" his continued confinement in segregation without

22

considering the cumulative nature of the punishment on his mental health. He also argues that segregation served a punitive purpose unrelated to any reasonable safety rationale. (Doc. 184-11, Marano Dep. at 85:12-16) (testifying the intention of segregation was a form of punishment)). Plaintiff's expert, Dan Pacholke, opined that the disciplinary segregation Plaintiff received was not appropriate or proportional to his conduct. (Doc. 206-2, Pacholke Report at 5-13). Plaintiff also argues that DR 504 was updated during his incarceration, which reduced the total maximum segregation times for certain offenses, but no retroactive adjustments were made to segregation terms that exceeded the new DR 504's maximums.

All inferences must be viewed in the light most favorable to the non-moving party, but as the Seventh Circuit has noted, summary judgment is the "put up or shut up" phase of litigation. *Anderson*, 477 U.S. at 255; *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). Plaintiff cannot rely on general conclusory allegations, but instead "must present affirmative evidence to defeat a properly supported motion for summary judgment." *Valentine v. Joliet Twp. High Sch. Dist. No. 204*, 802 F.2d 981, 986 (7th Cir. 1986). Plaintiff has failed to do so here. Instead of pointing to specific facts that would contradict his Adjustment Committee records, Plaintiff addressed Defendants' argument with a blanket statement that "to the extent they have proffered any facts suggesting they complied with the requirements of the due process clause (which they did not), those facts are disputed." (Doc. 241 at 72). Then, instead of providing evidence of how due process was not given during his disciplinary hearings, he critiques the grievance process and claims that segregation serves a punitive rather than a security purpose. This is not

23

enough to defeat summary judgment. Plaintiff was not denied due process simply because the grievance procedure did not produce a favorable outcome. *See Crayton v. Duncan*, No. 15-CV-399, 2015 WL 2207191, at *6 (S.D. Ill. May 8, 2015) ("[T]he fact that this procedure has not had a favorable outcome does not mean that [Plaintiff was] denied due process."). "To successfully oppose the defendants' motion for summary judgment, [plaintiff] must do more than raise a 'metaphysical doubt' as to the material facts, and instead must present definite, competent evidence to rebut the motion." *Michael*, 259 F.3d at 845 (internal citation omitted). Plaintiff has not done so here. Therefore, the Court finds that granting summary judgment in favor of Defendants on Plaintiff's due process claim is appropriate.

### IV. Defendants Marano, Melvin, and Kennedy were not deliberately indifferent to Plaintiff's serious medical needs in violation of the Eighth Amendment.

In Count III of his Amended Complaint, Plaintiff alleges that Defendants Marano, Melvin, and Kennedy were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment because they knew he suffered from severe mental illness and were aware of the risk of harm if he did not receive appropriate mental health care. (Doc. 69 at ¶¶ 99-108). Despite that knowledge, they allegedly failed to advocate for his removal from segregation. *Id.*

Deliberate indifference to a prisoner's serious medical need violates the Eighth Amendment. *Snipes v. DeTella*, 95 F.3d 586, 590 (7th Cir. 1996) (citing *Estelle v. Gamble*, 429 U.S. 104 (1976)). A claim of deliberate indifference contains both an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To satisfy the objective

component, Plaintiff must demonstrate that his medical condition is "objectively, sufficiently serious." *Id*. As this Court has already found, Plaintiff suffered from an objectively serious medical condition. (Doc. 243).

To satisfy the subjective component of a deliberate indifference claim, Plaintiff must demonstrate that Defendants acted with a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. at 837. Plaintiff must show that Defendants engaged in more than negligence and that their conduct approached intentional wrongdoing or criminal recklessness. *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012) (citing *Farmer*, 511 U.S. at 837).

Furthermore, "to be liable under [Section] 1983, an individual defendant must have caused or participated in a constitutional deprivation." *Pepper v. Vill. of Oak Park*, 430 F.3d 809, 810 (7th Cir. 2005) (citations omitted). An individual is only responsible for the harm that he or she personally inflicted on the prisoner. *Munson v. Gaetz*, 673 F.3d 630, 637 (7th Cir. 2012). In other words, "[t]here must be a causal connection or affirmative link between the action complained about and the official sued." *Arnett v. Webster*, 658 F.3d 742, 759 (7th Cir. 2011).

## A. Defendant Marano

Defendants argue that summary judgment is warranted in favor of Defendant Marano because no reasonable jury could find that she had sufficient personal involvement in the alleged constitutional violations. (Doc. 183 at 26-27). Defendants also

25

claim that even if Defendant Marano was involved in the disciplinary process, she "could only make recommendations to reduce punishment if she determined mitigating circumstances existed based on Plaintiff's mental health status." *Id.* at 27.

Defendant Marano testified that she was not Plaintiff's primary provider and did not recall reviewing his disciplinary or medical records. (Doc. 184-11, Marano Dep. at 95:9-18, 193:2-6). She admitted that she might have encountered Plaintiff during rounds in the North Cellhouse, but she did not recall interacting with him specifically because she "encountered thousands of inmates." *Id.* at 95:23-25, 96:1-10.

Plaintiff argues that the evidence shows Defendant Marano ignored his pleas for help to reduce or eliminate his segregation time, obtain yard access, or receive mental health treatment. (Doc. 241 at 80; Doc. 184-7, Sanders Dep. at 207:2-9). Plaintiff claims that he interacted with Defendant Marano on several occasions while she was passing through his cellhouse, and during those conversations, he told her that he was not getting yard time and was suffering from mental health issues. (Doc. 241 at 80). When Plaintiff told Defendant Marano that it seemed like the only way he could get mental health treatment was in response to episodes of self-harm or suicidal ideation, she allegedly stated, "that's what it seems like" and walked away. (Doc. 184-7, Sanders Dep. at 207:2-11). Plaintiff also claims that Defendant Marano had personal knowledge of his severe mental illness and need for treatment, as she participated in responding to his episodes of self-harm because she testified that "[i]t was typical for us to have a treatment team discussion about all those things on a daily basis." (Doc. 241 at ¶ 120; Doc. 184-11, Marano Dep. at 213:21-214:5).

26

Plaintiff also argues that a reasonable jury could infer that Defendant Marano was involved in his disciplinary proceedings because she testified that she served on the Adjustment Committee "maybe a handful of times." *Id.* at 39:13-16. Plaintiff argues that Defendant Marano played a large role in determining the nature of prisoners' punishment as a member of the SMI Segregation Review Committee, in which she "had to review every SMI person or every person designated as SMI from their start of correction to the current moment." *Id.* at 66:18-81:13.

Here, the Court finds that no reasonable jury could find that Defendant Marano had sufficient personal involvement in Plaintiff's mental health treatment, his disciplinary hearings, or the discipline imposed. Plaintiff claims that Defendant Marano served on the Adjustment Committee a "handful of times," but he presented no evidence showing that she was a member of the Adjustment Committee during *his* disciplinary hearings.

Even if the Court were to find that she had sufficient personal involvement, no reasonable jury could find that she was deliberately indifferent to Plaintiff's serious medical needs. Plaintiff claims that he talked to Defendant Marano several times when she passed through his cellhouse and informed her that he was not getting yard time and was suffering from mental health issues. This is insufficient to establish deliberate indifference and does not approach the level of intentional wrongdoing or criminal recklessness. *See Holloway*, 700 F.3d at 1073; *see also Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022) (citing *Rosario v. Brawn*, 670 F.3d 816, 822 (7th Cir. 2012) (affirming a grant of summary judgment to officers where their acts were "not perfect" but demonstrated an

27

"overall picture" of "protection and compassion")). Therefore, the Court finds that Defendant Marano was not deliberately indifferent to Plaintiff's serious medical needs.

### B. Defendants Melvin and Kennedy

In Count I of his Amended Complaint, Plaintiff alleges that Defendants Melvin and Kennedy violated his rights under the Eighth Amendment based on his long-term segregation where he was allegedly deprived of basic human needs. (Doc. 69 at ¶¶ 89-95). In Count III, Plaintiff alleges that Defendants Melvin and Kennedy were deliberately indifferent to his serious medical needs. *Id.* at ¶¶ 99-108.

Plaintiff asserts that Defendants waived or forfeited any argument that they are entitled to summary judgment on his Eighth Amendment claims because they did not address these claims in their Motion. (Doc. 241 at 74-75). This is not accurate, however. On pages 29-31 of their Motion, Defendants argue that Melvin and Kennedy's involvement in this matter through the disciplinary and grievance process does not establish liability. (Doc. 183 at 29-31). They argue further that simply because Defendant Melvin agreed with the actions and recommendations of the Adjustment Committee does not rise to the level of animus constituting deliberate indifference, as liability under § 1983 requires a defendant's direct, personal involvement. *See Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995).

The Court finds that there is insufficient evidence to establish that Defendants Melvin and Kennedy had knowledge of the allegedly extreme conditions Plaintiff experienced in segregation. Plaintiff alleges that in August 2015 and again in February 2017, he wrote letters to Dr. Melvin Hinton, the IDOC's Chief of Mental Health Services,

28

relaying his concerns about his mental health treatment and asking for relief from segregation. (Doc. 69 at ¶ 68). Plaintiff alleges further that Dr. Hinton dismissed his concerns in "perfunctory response letters," which copied Defendants Melvin, Marano, and other prison personnel. *Id.* This is insufficient to establish liability against Defendants, however. *See Diaz v. McBride*, 1994 WL 750707, at *4 (N.D. Ind. Nov. 30, 1994) (holding that plaintiff could not establish defendant's personal involvement and subject the prison official to liability under § 1983 merely by sending the official various letters or grievances).

Defendants' involvement in this matter through the grievance process is also insufficient to establish a violation of the Eighth Amendment. *See Thomas v. Knight*, 196 F. App'x 424, 429 (7th Cir. 2006) (explaining that a warden does not incur § 1983 liability just by participating in the grievance process); *Neely v. Randle*, 2013 WL 3321451, at *3 (N.D. Ill. June 13, 2013) (quoting *Gevas v. Mitchell*, 492 F. App'x 654, 660 (7th Cir. 2012) ("If there is 'no personal involvement by the warden outside the grievance process,' that is insufficient to state a claim against the warden.").

The evidence shows that Defendants Melvin and Kennedy adhered to the recommendations of mental health staff when imposing disciplinary segregation upon Plaintiff. In the two years prior to Plaintiff filing suit, Defendant Melvin reviewed Plaintiff's discipline in five separate instances. In each instance, MHPs completed a Mental Health Disciplinary Review ("DOC 0443") to evaluate Plaintiff's mental status and determine if his behavior was caused by his mental illness and made a recommendation to either not discipline Plaintiff for a specific charge or to recommend a

App. 0072

less severe disciplinary sanction. (Doc. 184-8). In each of the Final Summary Reports, the final imposition of discipline does not go above the amount of discipline recommended by the MHPs. *Id.*

Plaintiff argues that he spoke with Defendants Kennedy and Melvin during their tours of gallery cellhouses about the conditions of his confinement, the adverse effects of his long-term placement, lack of yard time, and limited out-of-cell activities. *Id.* at 204:3-20, 205:19-206:16. Plaintiff was under the care of MHPs during the relevant time period. As non-medical prison officials, Defendants Melvin and Kennedy were entitled to rely on the opinions of medical staff. *See Hayes*, 546 F.3d at 527; *see also Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004) ("If a prisoner is under the care of medical experts … a non-medical prison official will generally be justified in believing that the prisoner is in capable hands."). As this Court has already found, the Wexford Defendants provided adequate mental health treatment and were not deliberately indifferent to Plaintiff's serious mental health needs during the disciplinary process. (Doc. 243). Consequently, Defendants Melvin and Kennedy were not deliberately indifferent by approving the Adjustment Committee's disciplinary recommendations rather than advocating for Plaintiff's removal from segregation. Defendants are entitled to summary judgment on Plaintiff's Eighth Amendment claims.

### V. Defendants did not discriminate against Plaintiff or deny him access to programs, services, or activities based on a disability.

In his Amended Complaint, Plaintiff claims that Defendants' alleged failure to adequately consider his mental illness or mental health when imposing segregation as a

30

disciplinary sanction caused him to be deprived of access to meaningful human contact, prison programs, mental health services, and other activities. (Doc. 69).

Under the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." § 12132. "To establish a violation, a plaintiff must show 'he is a qualified individual with a disability, that he was denied the benefits of the services, programs, or activities of a public entity or otherwise subjected to discrimination by such an entity, and that the denial or discrimination was by reason of his disability.'" *Hildreth v. Butler*, 960 F.3d 420, 430 (7th Cir. 2020) (quoting *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015)). "To receive compensatory damages, [Plaintiff] must show deliberate indifference, which occurs when defendants '*knew* that harm to a federally protected right was substantially likely and … *failed* to act on that likelihood.'" *Hildreth*, 960 F.3d at 431 (quoting *Lacy v. Cook Cnty., Illinois*, 897 F.3d 847, 862 (7th Cir. 2018) (emphasis in original)). The ADA applies to both federal and state prisons. *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 208 (1998).

Similarly, the Rehabilitation Act, 29 U.S.C. §§ 794-94e, protects qualified persons with disabilities who are denied access to programs or activities because of a disability. *Jaros v. Illinois Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012). To establish a *prima facie* case under the RA, Plaintiff must satisfy four elements: (1) Plaintiff is a handicapped individual under the Act; (2) Plaintiff is "otherwise qualified" for the benefit sought; (3) Plaintiff was discriminated against solely because of his handicap; and (4) the program

31

in question received federal financial assistance. *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 484 (7th Cir. 2019). There is no dispute that the IDOC receives federal financial assistance. (Doc. 183 at 27-28) (citing *Jaros*, 684 F.3d at 671).

Defendants state that the standards for assessing liability for Defendants Melvin, Kennedy, and Jeffreys under Plaintiff's Eighth Amendment and ADA/RA claims is the same. (Doc. 183 at 27). Defendants assert that (1) Plaintiff is not an "otherwise qualified individual" and (2) Defendants did not discriminate against him because of a disability. (Doc. 183 at 27-31; Doc. 237 at 77-79). In response, Plaintiff claims that there is a genuine dispute as to both elements. (Doc. 241 at 81-84).

## A. Plaintiff was not an "otherwise qualified individual."

Plaintiff claims that Defendants' alleged failure to adequately consider his mental illness or mental health when imposing segregation as a disciplinary sanction deprived him of access to meaningful human contact, prison programs, mental health services, and other activities. Defendants argue that although Plaintiff has a diagnosed mental illness, he does not meet the required "otherwise qualified" standard. (Doc. 183 at 28-29). Section 12131(2) of the ADA defines "qualified individual with a disability" as:

> an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by the public entity.

§ 12131(2). "An otherwise qualified person is one who is able to meet all of a program's requirements *in spite of* his handicap." *See Cmty. Coll. v. Davis*, 442 U.S. 397, 406 (1976)

32

(emphasis added). Defendants argue that Plaintiff is not a "qualified individual with a disability" because, absent his mental illnesses, he would still have had segregation imposed against him for engaging in disruptive and violent behavior. (Doc. 183 at 28-29).

In response, Plaintiff argues that there is no dispute that he has a qualifying disability because he was diagnosed with schizoaffective disorder. (Doc. 241 at 82) (citing *Toledo v. Sanchez*, 454 F.3d 24, 32 (1st Cir. 2006)). He also argues that the evidence shows Defendants denied him access to programs, services, or activities at Pontiac because of his mental illness or for conduct attributable to his mental illness. Specifically, Plaintiff states that his mental health records reveal a myriad of diagnoses and MHPs testified his mental illnesses were associated with poor impulse control. (Doc. 241 at 83). According to Plaintiff's expert, "Mr. Sanders' extended placement in segregation was not penologically appropriate nor proportional to his misconducts. There were feasible less restrictive alternatives to manage Mr. Sanders' disciplinary issues." (Doc. 206-2, Pacholke Report at 6).

It is undisputed that Plaintiff was diagnosed with serious mental illnesses. However, the evidence shows that his limited access to programs, services, and activities was due to his segregation status, which resulted from numerous disciplinary violations, not his disability. *See Norfleet v. Walker*, 3:09-CV-00347-JPG, 2011 WL 5572834, at *3 (S.D. Ill. Nov. 16, 2011) (inmate was denied access to exercise equipment because he was in segregation); *see also Kogut v. Ashe*, 602 F.Supp.2d 251, 253-54 (D. Mass. 2009) (State prisoner's alleged disabilities were not the reason for his exclusion from work programs, as would violate the ADA; rather, prisoner was excluded from work programs because

of disciplinary infractions, which required prisoner's segregation from general prison population). According to Plaintiff's disciplinary card, he was found guilty of committing fifty violations between 2008 and 2016, including assaulting other inmates and staff, possession of dangerous contraband, sexual misconduct, and other disciplinary infractions. (Doc. 184-6). Plaintiff fails to provide evidence, beyond his own conclusory allegations, that he was denied access to any programs, services, or activities for discriminatory reasons. He documents his medical condition and his expert's report that other lesser sanctions may have been available for his disciplinary violations, but he does not show that Defendants discriminated against him because of his mental illnesses. Therefore, the Court finds that Plaintiff has failed to establish that he was an "otherwise qualified individual."

**B. Plaintiff was not subjected to discrimination because of his disability.**

Even if Plaintiff established that he was an "otherwise qualified individual," Defendants argue that they did not discriminate against him based on his disability. (Doc. 183 at 29-31). Plaintiff asserts that there is a genuine dispute of material fact regarding whether Defendants discriminated against him. (Doc. 241 at 81-84).

The ADA defines a disability as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [a qualified] individual; (B) a record of such an impairment; or (C) being regarded as having such impairment. § 12102(1)(A)-(C). To establish intentional discrimination under the ADA and RA, Plaintiff must show that Defendants were deliberately indifferent to the accommodations needed for his disability. *Lacy*, 897 F.3d 847 at 863 (adopting deliberate indifference as the

34

standard for determining intentional discrimination under the ADA). Specifically, Plaintiff must show that Defendants: (1) knew that a harm to a federally protected right is substantially likely; and (2) "a failure to act upon that likelihood." *Id.* (citing *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 263 (3d Cir. 2013) (quoting *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001)) (internal quotation omitted). However, in making this analysis, it should be noted that "deliberate indifference must be a deliberate choice, rather than negligence or bureaucratic inaction." *S.H.*, 739 F.3d at 263 (quoting *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 276 (2d Cir. 2009) (internal quotation omitted)).

Here, the Court finds that Plaintiff has not presented sufficient evidence to show that Defendants intentionally acted on the basis of his disability by denying him access to programs, services, or activities. Plaintiff has not established that Defendants were deliberately indifferent to the accommodations needed for his disability. *See Lacy*, 897 F.3d at 863 (adopting deliberate indifference as the standard for determining intentional discrimination under the ADA).

**IT IS THEREFORE ORDERED:**

(1)     The IDOC Defendants' Motion for Summary Judgment [183] is GRANTED. Defendants Michael Melvin, Daidra Marano, Teri Kennedy, and Rob Jeffreys are DISMISSED with prejudice.

(2)     The Clerk is directed to enter judgment and close this case.

(3)     If Plaintiff wishes to appeal this judgment, he must file a notice of appeal with this Court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4).

35

(4)     To proceed *in forma pauperis* on appeal, Plaintiff must file a motion to proceed on appeal *in forma pauperis* and identify the issues he will present on appeal to assist the Court in determining whether the appeal is taken in good faith. Fed. R. App. P. 24(a)(1)(c); *Celske v. Edwards*, 164 F.3d 396, 398 (7th Cir. 1999) (An appellant should be given an opportunity to submit a statement of his grounds for appealing so that the district judge "can make a responsible assessment of the issue of good faith."); *Walker v. O'Brien*, 216 F.3d 626, 632 (7th Cir. 2000) (providing that a good faith appeal is an appeal that "a reasonable person could suppose . . . has some merit" from a legal perspective). If Plaintiff chooses to appeal, he will be liable for the $505.00 appellate filing fee regardless of the outcome of the appeal.

ENTERED:   1/24/2023

                                        s/ Jonathan E. Hawley
                                        Jonathan E. Hawley
                                        United States Magistrate Judge

36

1:16-cv-01366-JEH   # 245   Page 1 of 1

Case: 23-1335   Document: 64   Filed: 07/01/2024   Pages: 149

E-FILED

Tuesday, 24 January, 2023 03:51:22 PM

Clerk, U.S. District Court, ILCD

AO 450 (Rev. 11/11)  Judgment in a Civil Action

# United States District Court

### for the

### Central District of Illinois

| | |
|---|---|
| CORDELL SANDERS, | ) |
| *Plaintiff* | ) |
| v. | ) |
| MICHAEL MELVIN, et al., | ) |
| *Defendants* | ) |

Civil Action No.   16-1366

## JUDGMENT IN A CIVIL ACTION

The court has ordered that *(check one)*:

☐ the plaintiff *(name)* _____ recover from the defendant *(name)* _____ the amount of _____ dollars ($ _____ ), which includes prejudgment interest at the rate of _____ %, plus post judgment interest at the rate of _____ % per annum, along with costs.

☐ the plaintiff recover nothing, the action be dismissed on the merits, and the defendant *(name)* _____ recover costs from the plaintiff *(name)* _____ _____ .

☑ other: that Plaintiff, Cordell Sanders', action against Defendants Michael Melvin, Andrea Moss, Daidra Marano,Kelly Haag, Todd Nelson, Linda Duckworth, Stephan Lanterman, Teri Kennedy, Wexford Health Sources Inc, Rob Jeffreys, and Frank Lawrence, is dismissed with prejudice; Plaintiff shall recover nothing on his claims against each of the named Defendants.

This action was *(check one)*:

☐ tried by a jury with Judge _____ presiding, and the jury has rendered a verdict.

☐ tried by Judge _____ without a jury and the above decision was reached.

☑ decided by Judge   Jonathan E. Hawley   on motions for summary judgment as to Defendants Michael Melvin, Andrea Moss, Daidra Marano,Kelly Haag, Todd Nelson, Linda Duckworth, Stephan Lanterman, Teri Kennedy, Wexford Health Sources Inc, and Rob Jeffreys and by Judge Joe B. McDade on motion for summary judgment as to Defendant Frank Lawrence.

Date:   1/24/2023

CLERK OF COURT

_____
s/ Shig Yasunaga
*Signature of Clerk or Deputy Clerk*

1/24/2023

**App. 0080**